MAR 21 2008

**FILED**

MAR 21 2008 EA

MICHAEL W. DOBBINS
**CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PATERNO IMPORTS, LTD., d/b/a Terlato Wines International,<br><br>        Plaintiff,<br><br>v.<br><br>LION NATHAN ENTERPRISES PTY LIMITED,<br><br>        Defendant. | No. 08 C 1674<br><br>The Honorable John W. Darrah |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
### FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Paterno Imports, Ltd. ("Paterno") has moved this Court for a temporary restraining order and preliminary injunction in an effort to prevent the irreparable harm it will suffer if Defendant Lion Nathan Enterprises Pty Limited ("Lion Nathan") is permitted to implement a large price increase on two days notice in clear breach of the parties' contract.

Paterno is a premier importer and marketer of premium and super-premium foreign and domestic wines in the United States. Lion Nathan owns the critically acclaimed Argyle winery in Oregon's Willamette Valley. Pursuant to an Agreement dated June 23, 2003, as amended, Paterno retains the exclusive right to sell, market and distribute Argyle wines in the United States and other territories until 2023. Paterno resells the wine it purchases from Lion Nathan to licensed wholesale distributors throughout the United States.

In December 2007, Lion Nathan advised Paterno without prior consultation of its intention to implement a price hike on Argyle wines averaging roughly 40% effective March 1, 2008. These large price increases to Paterno, which are then passed on to Paterno's customers and ultimately consumers, are unprecedented and would negatively affect the Argyle brand in the

market, particularly in light of the current downturn in the United States' economy. After Lion

Nathan confirmed these prices on January 24, 2008 at the parties "Annual Meeting," Paterno

commenced an arbitration with the American Arbitration Association on February 5, 2008. In

that arbitration, Paterno is seeking, among other things, a declaration that Lion Nathan breached

the Agreement by setting the new prices in bad faith in violation of the parties' Agreement.[1]

Although Paterno is hopeful that an appointment will occur quickly, no arbitrator has yet been

appointed in that proceeding.

On February 28, 2008, Lion Nathan advised Paterno of a new price change to be effective

March 1, 2008. The new pricing reflects modest declines in the prices Lion Nathan established

(in bad faith) at the Annual Meeting, and Paterno continues to pursue its arbitration claims

relative to the February 28, 2008 pricing. Lion Nathan's February 28, 2008 actions, however,

also gave rise to another breach that is the subject of the instant matter before this Court. Section

5(B)(1) of the parties' Agreement requires that Lion Nathan notify Paterno ninety days in

advance of a price change. In breach of Section 5(B)(1), Lion Nathan only gave Paterno two

days notice of the new March 1, 2008 pricing in its February 28, 2008 letter.

---

[1]   The Agreement contains an arbitration clause and this matter falls within the scope of the arbitration clause. The parties did not adopt in the Agreement American Arbitration Association's ("AAA") "Optional Rules for Emergency Measures of Protection." *See* AAA Rules, O-1-O-8 (2003), at http://www.adr.org. The law is clear that district courts are permitted to enter temporary restraining orders and preliminary injunctions on the behalf of aggrieved parties under the circumstances currently before the Court. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993) (upholding district court's grant of a temporary restraining order despite the existence of an arbitration agreement and noting that "'pro-arbitration policies . . . are furthered, not weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration by granting injunctive relief'") (citation omitted); *Gateway Eastern Railway Co. v. Terminal Railroad Assoc.*, 35 F.3d 1134, 1141 (7th Cir. 1994) (affirming the district court's grant of a preliminary injunction in the face of arbitration clause); *IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537 (7th Cir. 1998) (aff'g in part district court's grant of a preliminary injunction); *see also Wine Not Int'l v. 2atec, LLC*, No. 06-CV-117-T-23TGW, 2006 U.S. Dist. LEXIS 46218, at *32 (M.D. Fla. May 18, 2006) ("The decisions of the First, Second, Third, Fourth, Sixth and Seventh Circuits reason that . . . the entry of a preliminary injunction actually fosters the FAA's liberal policy toward arbitration by ensuring that the status quo is maintained so that the arbitration proceedings remain meaningful.") (citations omitted).

The wine industry is heavily regulated and built upon a complex web of interdependent relationships in the supply chain. Lion Nathan's breach leaves Paterno with no adequate remedy at law. With regulatory filings relating to price increases due Tuesday, March 25, 2008 and April 1, 2008 in many States, immediate relief is necessary in order to permit Paterno to navigate the challenging regulatory and business environment associated with large price increases. For these reasons and the reasons noted below, the factors to be considered by this Court when presented with a request for a temporary restraining order or preliminary injunction all weigh heavily in favor of this Court granting Paterno's Motion for Temporary Restraining Order and Preliminary Injunction ("Motion").

## I.   FACTUAL BACKGROUND[2]

Paterno sets forth below facts relating to its request for injunctive relief. Given the current arbitration proceeding between the parties, Paterno is not asking the Court to make any determinations relating to the question of whether Lion Nathan acted in bad faith in setting the prices referenced in its February 28, 2008 letter. Rather, to the extent that the background giving rise to that proceeding is referenced below, it is relevant to the relief Paterno is seeking in its Motion based on Lion Nathan's clear breach of Section 5(B)(1)'s ninety day notice provision.

### A.   The Parties' Long-Term Agreement, Pricing and Total Case Sales

On June 23, 2003, Paterno entered a "Marketing Agreement" ("the Agreement") with Lion Nathan, the owner of Oregon-based Argyle Winery. An executed copy of the Agreement, as amended in November 2005, is attached as Exhibit A. The Agreement does not expire until June 23, 2023 at the earliest.

---

[2]   Attached as Exhibit 1 is the affidavit of William Terlato, Paterno's President and Chief Executive Officer. The affidavit sets forth the facts set forth above and is incorporated by reference herein.

Although the parties' entered a twenty year agreement in 2003, the Agreement contains provisions relating to annual pricing and sales goals. Section 5(A) of the Agreement requires the parties to hold an "Annual Meeting" to address, among other things, prices for the upcoming "Subject Year," which by definition is a calendar year, as well as the goal for total shipments ("Target Case Sales") in the Subject Year. Exhibit A § 5(B). Under the Agreement, Lion Nathan has the "sole discretion to establish the price for each Product to become effective March 1st of the Subject Year," but it is required to consult with Paterno before doing so. *Id.* at § 5(B)(1)).

Section 5(B)(1) provides that once prices have been established at the Annual Meeting, Lion Nathan must give Paterno ninety days notice before modifying the price again:

> During the Annual Meeting, the parties will consult about:
>
> 1.     The price for the Subject Year, and following such consultation, LN shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year. ***After the prices for the year have been established, LN will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by Paterno of notice of such change.*** The parties shall re-enter negotiations on Target Case Sales for the Subject Year under Section 5(b)(2) on account of any such price increases.

*Id.* (emphasis added).

## B.    Lion Nathan's Pricing for 2008

Despite the fact that sixteen years remained on the term of the Agreement, Lion Nathan began putting pressure on Paterno in the summer and fall of 2007 to permit Lion Nathan to buy-out Paterno's interests in the Agreement. Lion Nathan, which now had new management, wanted out of the Agreement its prior management had only recently executed and amended in 2003 and 2005, respectively. These efforts did not succeed.

Later in 2007, in a letter dated December 19, 2007 (attached as Exhibit B), Lion Nathan unilaterally announced new pricing effective March 1, 2008 which contemplated a 40% average price increases for Argyle wines. Lion Nathan did not consult with Paterno before announcing this pricing. Paterno did not understand the reasons for such price increases as Lion Nathan had been adamantly opposed to price increases the prior year and only agreed to modest price increases in 2007 in response to Paterno's recommendations. On December 20, 2007, Paterno expressed its surprise at the "extraordinary price increases" and asked for confirmation that the pricing was accurate. *See* Dec. 20, 2007 Email from W. Terlato to A. Roberts (attached as Exhibit C). When Paterno received no response, on January 7, 2008 it once again requested confirmation regarding its pricing plans. *See* Jan. 7, 2008 Email from W. Terlato to A. Roberts (attached as Exhibit D). Ten days later, in a letter dated January 17, 2008 (attached as Exhibit E), Lion Nathan confirmed its intention to follow through with what it now labeled "proposed" prices.

At the Annual Meeting, which was held on January 24, 2008, Lion Nathan again confirmed its plans to increase the price of Argyle brand wines by an average of more than 40%. *See* Lion Nathan's Argyle Terlato Annual Sales and Marketing Recap—January 2008, dated February 7, 2008 (attached as Exhibit F); *see also* Letter from T. Steffanci to R. Soles, dated February 27, 2008 (attached as Exhibit G). Paterno expressed a variety of concerns, including its concern that a 40+% price hike posed serious risks to the Argyle brand in the market. Lion Nathan took the position that it "is entitled under the Agreement to set prices in its sole discretion" and has "no obligation to provide justification to [Paterno]." *See* Exhibit F, at 2.

After Lion Nathan established pricing at the Annual Meeting, Paterno filed a demand with the American Arbitration Association on February 5, 2008, seeking a declaration that Lion

Nathan had breached the Agreement by failing to act in good faith when setting the price of Argyle wines and requesting that the arbitrator establish a reasonable price, as contemplated by 810 ILCS § 5/2-305(2). *See* Paterno's Arbitration Demand (attached as Exhibit H). Lion Nathan again took the position on February 7, 2008 that its pricing was final. *See* Exhibit F.

### C.   Lion Nathan's Breach of Section 5(B)(1)

After having established March 1, 2008 pricing (albeit in bad faith) at the January 24, 2008 Annual Meeting, Lion Nathan unilaterally announced new pricing on February 28, 2008. In breach of its obligation to give Paterno ninety-days notice of any additional price changes, Lion Nathan declared that these prices would be effective on March 1, 2008. *See* February 28, 2008 Letter from Anthony Roberts to Bill Terlato (attached as Exhibit I). Paterno gave Lion Nathan notice of this breach on March 13, 2008. *See* March 13, 2008 Letter from Bill Terlato to Anthony Roberts (attached as Exhibit J).

On March 18, 2008, Lion Nathan's counsel responded to this notice of breach, claiming that the ninety-day notice requirement did not apply because the prices announced in Lion Nathan's February 28, 2008 letter were not "mid-year change in prices." *See* March 18, 2008 Letter from Maura Monaghan to Derek Meyer (attached as Exhibit K). Counsel did not address the issue of whether pricing had been "established" at the Annual Meeting.

### D.   Paterno's Irreparable Harm

When Paterno filed its arbitration demand on February 5, 2008, it anticipated that matter would proceed in a timely manner such that an arbitrator would be appointed and able to consider interim relief prior to March 1, 2008. As that date approached, Lion Nathan announced new pricing on February 28, 2008, effective March 1, 2008, on two days notice in breach of Section 5(B)(1).

In the face of this situation, Paterno could begin the processes to implement new pricing further down the supply chain resulting from Lion Nathan's new pricing to Paterno. This presents a combination of regulatory and business considerations. A number of States require that new pricing first be posted with their regulatory authorities prior to the effective date of those prices and this process takes time. New York, for example, is one of the most significant states in terms of wine sales and it requires notice of new pricing on the 25th day in order for that pricing to become effective the 1st day of the month after the next month. As a result, Paterno would need to post any new pricing with New York on Tuesday, March 25, 2008 in order to increase new pricing on May 1, 2008. Likewise, States such Massachusetts and Maine require new pricing to be posted by the 1st day of the month in order to become effective the 1st of the following month, with Connecticut requiring new pricing to be posted by the 5th of the month in order to be effective the 1st day of the following month.

The States' varying regulatory requirements, which are challenging in their own right, must also be part of a national pricing strategy. Many of the distributors to whom Paterno sells Argyle wines are large national and regional companies with large numbers of customers further down the supply chain with their own demands and expectations. The broad geographic scope and size of such operations result in certain significant distributors demanding as much as ninety days notice of price increases.

To address these issues, Paterno requested that Lion Nathan forego implementing its February 28, 2008 pricing until the arbitration concludes and offered to conclude that arbitration by April 15, 2008. In the event that the arbitrator set new pricing and/or Paterno lost the

arbitration, Paterno proposed that the new pricing would go into effect June 15, 2008 to allow Paterno at least some time to begin the process of implementing the price increases.[3]

Lion Nathan rejected this proposal. Lion Nathan offered to invoice Paterno at the new February 28, 2008 pricing while allowing Paterno to pay 2007 prices until the arbitration is concluded. In the meantime, Lion Nathan identified two suggested alternatives for Paterno. First, Lion Nathan suggested that Paterno raise the prices it charges to its customers during the arbitration. Suggesting that the prior pricing could be reinstated if Paterno prevails in the arbitration, Lion Nathan suggested that under this approach "there would appear to be a prospect of a windfall to Paterno!" (See Exhibit K).

This is a troubling suggestion. Paterno represents dozens of wineries other than Argyle. Each of these wineries presents its own strengths, and Paterno's expansive portfolio opens doors to buyers interested in access to the many premium brands offered by Paterno in one stop. Numerous brands, including Argyle, depend on Paterno's long-term and extensive relationships with distributors and others in the supply chain. The suggestion that Paterno seek to reap a "windfall" in these circumstances is simply wrong and would jeopardize the very relationships upon which Paterno depends for its success.

In the alternative, Lion Nathan suggested that Paterno could not seek to implement any price increase until the arbitration is concluded. If Paterno loses the arbitration and the February 28, 2008 prices are allowed to remain in place, Paterno would be required to then pay the new pricing (but not permitted to go back to its customers to recover the difference). If Paterno wins the arbitration, Lion Nathan reasons, Paterno will have suffered no harm. (*Id.*).

---

[3] In the event Lion Nathan did not desire to conclude the arbitration before April 15, 2008, Paterno also offered the option of retaining 2007 pricing until the date of the arbitration decision and no new pricing, if any, would go into effect until sixty days after the arbitration decision. Lion Nathan rejected this proposal.

Absent from this offer is any consideration of the requirement of Section 5(B)(1) that Paterno receive ninety days notice of a price change. This time, as noted above, is necessary to allow Paterno to address the regulatory and business considerations associated with a price increase, another consideration Lion Nathan's proposal ignores.

Lion Nathan is selling a regulated product, not widgets. Now that Lion Nathan has confirmed in recent communications that it will not honor the ninety day notice provision in Section 5(B)(1), the corresponding regulatory and business considerations noted above weigh in favor of Paterno immediately beginning the process to implement the price increases it seeks to avoid to minimize the harm to its relationships with its customers associated with a large price increase on short notice. That is the result Lion Nathan is banking on in connection with its clear breach of Section 5(B)(1).

Lion Nathan, a large Australian beer and wine conglomerate, is also sophisticated enough to understand that once Paterno begins implementing price increases in the market, any subsequent reduction in the price would be not be construed as an arbitration victory. The pricing of wines is a complex exercise dependent on many factors. The market reacts to decreases in wine prices shortly after price increases as the result of poor price management and/or confirmation that the brand was not worthy of the temporary price increases. This would be especially true if this occurred within a single calendar year. As a result, if Paterno raised prices and then lowered prices after an arbitration victory, it would nevertheless be construed as poor price management by Paterno and Argyle and harm Paterno's reputation as the marketer responsible for the Argyle brand. It could be further be construed as a statement by the market that the Argyle wines were not worthy of the increase pricing and undermine Paterno's

performance under the Agreement. Both of these scenarios illustrate the irreparable harm to Paterno and the absence of an adequate remedy at law.

By breaching Section 5(B)(1) and presenting Paterno with no choice but to immediately beginning the process to raise prices, Lion Nathan also seeks to deprive Paterno of any meaningful opportunity to seek interim injunctive relief and to pursue its arbitration claim during the ninety day notice period. Like the circumstance described above, this is another example of Paterno having no adequate remedy at law and Paterno's irreparable harm.

## II.    ARGUMENT

The purpose of a temporary restraining order ("TRO") or a preliminary injunction "'is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999) (*quoting Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir. 1990)). A temporary restraining order or preliminary injunction should issue when, as here, a plaintiff shows: "(1) they have some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the harm the non-movant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *SMC Corp., Ltd. v. Lockjaw, LLC,* 481 F. Supp. 2d 918, 924 (N.D. Ill. 2007) (citations omitted).

### A.    Paterno is Likely to Succeed on the Merits

As the Seventh Circuit has explained, "[t]he threshold for . . . showing [a likelihood of success of the merits] is low." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). "Plaintiffs need only demonstrate a 'better than negligible chance of succeeding.'" *Id.* (quoting *Boucher v. School Bd. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998)). Paterno easily clears this hurdle. As shown above in Section I(C), Lion Nathan's breach of Section 5(B)(1) is clear.

The fact the issue is so clear has other implications in this case. As a general rule, the "degree of likelihood that the plaintiff will succeed on the merits varies inversely with the degree of harm plaintiff will suffer if an injunction is not issued." *CUNA Mut. Life Ins. Co., v. Kuperman,* No. 97 C 6228, 1998 U.S. Dist. LEXIS 622, *18-19 (Jan. 20, 1998, N.D. Ill.) (granting a preliminary injunction). Therefore, the stronger the case on the merits, the less irreparable harm must be shown. *Id.* at *19 (citations omitted); *Cleveland Hair Clinic, Inc. v. Puig,* 968 F. Supp. 1227 (N.D. Ill. 1996) (finding that the burden of demonstrating irreparable injury is not substantial where the likelihood of success is clearly demonstrated). In light of this inverse relationship between the merits of Paterno's breach of contract claim and its irreparable harm, the amount of irreparable harm that Paterno must establish is low.

## B. Paterno Has No Adequate Legal Remedy and Faces Irreparable Harm

As Judge Posner has remarked, "[t]he premise of the preliminary injunction is that the remedy at the end of the trial will not make the plaintiff whole." *Amer. Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 594 (7th Cir. 1986). Likewise, there are several ways that a plaintiff can prove irreparable harm. For example, irreparable harm exists if "an award of damages would come too late to remedy the harm" or "the nature of the plaintiff's loss renders damages too difficult to calculate." *LCOR Inc., v. Murray,* 1997 U.S. Dist. LEXIS 3373, at *31 (citations omitted

While Lion Nathan will likely focus on the price differential between 2007 and 2008 pricing and argue that is what is at issue, this ignores the broader implications of its conduct. As noted, the wine industry is heavily regulated and built upon a complex web of interdependent relationships in the supply chain. While it is not possible to craft contract terms relating to all the disputes that might arise in this context, Lion Nathan and Paterno did agree on how price

changes are to be handled between the parties to allow Paterno time to address the many related considerations. In breaching Section 5(B)(1), Lion Nathan is seeking to deprive Paterno of that opportunity. This intangible harms associated with this cannot be measured by the finite difference between 2007 and 2008 pricing.

Paterno's reputation is also at risk as noted above. Courts in Illinois have recognized that "[l]oss of goodwill or business reputation are . . . injuries for which money damages are inadequate." *Consumer Sales & Marketing, Inc. v. Digital Equip. Corp.*, No. 95 C 5049, 1995 U.S. Dist. LEXIS 13374, at *10 (N.D. Ill. Sept. 11, 1995); *see also Sears Roebuck & Co. v. Int'l Serv. rrop.*, 92 C 7679, 1992 U.S. Dist. LEXIS 22506, at *3 (N.D. Ill. Nov. 24, 1992) (noting that "[h]arm to one's reputation is impossible to quantify in dollar amounts and may result in loss of consumer confidence" which will not only cause present harm, but also harm "in the future for an indeterminable period of time.").

## C.    The Balance of the Equities Favors Granting Paterno's Request for Injunctive Relief

The balance of harms also heavily favors granting Paterno the injunctive relief it seeks. Lion Nathan faces no harm in being compelled to honor its obligations under the Agreement. Even Lion Nathan is able to allege harms associated with complying with the Agreement, when evaluating whether to grant injunctive relief, courts in this Circuit apply a "sliding scale" analysis, "whereby the greater the likelihood of success on the merits, the less of a showing that is required relative to risk of harm, and vice versa." *Id.* (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Whether under this standard or not, the harms to Paterno if relief is not granted greatly exceed the potential harms to Lion Nathan.

**D.    Entry of an Injunction Will Not Harm the Public**

Finally, an injunction in this case will not disserve the public interest.  As courts in this District have acknowledged, "the public has an interest in valid contracts being enforced." *Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 U.S. Dist. LEXIS 705, at *13 (N.D. Ill. Jan 16, 1997).

**III.    CONCLUSION**

The factors to be considered by this Court when presented with a request for a temporary restraining order or preliminary injunction all weigh heavily in favor of this Court granting Paterno's Motion.  Paterno respectfully requests that the Court grant its Motion.

Dated: March 21, 2008

PATERNO IMPORTS, LTD., d/b/a Terlato
Wines International

_____
One of Plaintiff's Attorneys

Derek J. Meyer
Holland M. Tahvonen
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606-5096
Telephone: 312.372.2000
Facsimile: 312.984.7700

## CERTIFICATE OF SERVICE

I, Derek J. Meyer, an attorney, hereby certify that I caused a true and correct copy of Paterno Imports, Ltd.'s Memorandum in Support of Its Emergency Motion for Temporary Restraining Order and Preliminary Injunction on the following individuals via Federal Express and Email on this 21st day of March 2008:

> Maura K. Monaghan, Esq.
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, New York 10022

By: _____

> Derek J. Meyer
> McDermott Will & Emery LLP
> 227 West Monroe Street
> Chicago, Illinois  60606-5096
> Telephone:  312.372.2000
> Facsimile:  312.984.7700

CHI99 4958287-2.063476 0024

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATERNO IMPORTS, LTD., d/b/a Terlato Wines International, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| LION NATHAN ENTERPRISES PTY LIMITED, | ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF WILLIAM A. TERLATO

William A. Terlato, under penalty of perjury, declares and states as follows:

1.     I am the President and Chief Operating Officer of Paterno Imports, Ltd. d/b/a Terlato Wines International ("Paterno"). I joined Paterno in 1981 after graduating from Loyola University in Chicago. In 1985, I became Paterno's National Sales Manager. In 1988, I was promoted to Vice President and, in 1994, I became President of the company. I make this affidavit based on my own personal knowledge.

2.     Paterno is a premier importer and marketer of premium and super-premium foreign and domestic wines in the United States. Lion Nathan owns the critically acclaimed Argyle winery in Oregon's Willamette Valley. Pursuant to an Agreement dated June 23, 2003, as amended, Paterno retains the exclusive right to sell, market and distribute Argyle wines in the United States and other territories until 2023. Paterno resells the wine it purchases from Lion Nathan to licensed wholesale distributors throughout the United States.

3.      On June 23, 2003, Paterno entered a "Marketing Agreement" ("the Agreement") with Lion Nathan.  An executed copy of the Agreement, as amended in November 2005, is attached as Exhibit A.  The Agreement does not expire until June 23, 2023 at the earliest.

4.      Although the parties' entered a twenty year agreement in 2003, the Agreement contains provisions relating to annual pricing and sales goals.  Section 5(A) of the Agreement requires the parties to hold an "Annual Meeting" to address, among other things, prices for the upcoming "Subject Year," which by definition is a calendar year, as well as the goal for total shipments ("Target Case Sales") in the Subject Year.  Exhibit A § 5(B).  Under the Agreement, Lion Nathan has the "sole discretion to establish the price for each Product to become effective March 1st of the Subject Year," but it is required to consult with Paterno before doing so.  *Id.* at § 5(B)(1)).

5.      Section 5(B)(1) provides that once prices have been established at the Annual Meeting, Lion Nathan must give Paterno ninety days notice before modifying the price again:

> During the Annual Meeting, the parties will consult about:
>
> 1.      The price for the Subject Year, and following such consultation, LN shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year.  *After the prices for the year have been established, LN will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by Paterno of notice of such change.*  The parties shall re-enter negotiations on Target Case Sales for the Subject Year under Section 5(b)(2) on account of any such price increases.

*Id.* (emphasis added).

6.      Despite the fact that sixteen years remained on the term of the Agreement, Lion Nathan began putting pressure on Paterno in the summer and fall of 2007 to permit Lion Nathan to buy-out Paterno's interests in the Agreement.  Lion Nathan, which now had new management,

2

wanted out of the Agreement its prior management had only recently executed and amended in 2003 and 2005, respectively. These efforts did not succeed.

7.      Later in 2007, in a letter dated December 19, 2007 (attached as Exhibit B), Lion Nathan unilaterally announced new pricing effective March 1, 2008 which contemplated a 40% average price increases for Argyle wines.  Lion Nathan did not consult with Paterno before announcing this pricing.  Paterno did not understand the reasons for such price increases as Lion Nathan had been adamantly opposed to price increases the prior year and only agreed to modest price increases in 2007 in response to Paterno's recommendations.

8.      On December 20, 2007, Paterno expressed its surprise at the "extraordinary price increases" and asked for confirmation that the pricing was accurate.  *See* Dec. 20, 2007 Email from W. Terlato to A. Roberts (attached as Exhibit C).  When Paterno received no response, on January 7, 2008 it once again requested confirmation regarding its pricing plans.  *See* Jan. 7, 2008 Email from W. Terlato to A. Roberts (attached as Exhibit D).

9.      At the Annual Meeting, which was held on January 24, 2008, Lion Nathan again confirmed its plans to increase the price of Argyle brand wines by an average of more than 40%. *See* Lion Nathan's Argyle Terlato Annual Sales and Marketing Recap—January 2008, dated February 7, 2008 (attached as Exhibit F); *see also* Letter from T. Steffanci to R. Soles, dated February 27, 2008 (attached as Exhibit G).  Paterno expressed a variety of concerns, including its concern that a 40+% price hike posed serious risks to the Argyle brand in the market.   Lion Nathan took the position that it "is entitled under the Agreement to set prices in its sole discretion" and has "no obligation to provide justification to [Paterno]."  *See* Exhibit F, at 2.

10.     After Lion Nathan established pricing at the Annual Meeting, Paterno filed a demand with the American Arbitration Association on February 5, 2008, seeking a declaration

3

that Lion Nathan had breached the Agreement by failing to act in good faith when setting the price of Argyle wines and requesting that the arbitrator establish a reasonable price, as contemplated by 810 ILCS § 5/2-305(2). *See* Paterno's Arbitration Demand (attached as Exhibit H). Lion Nathan again took the position on February 7, 2008 that its pricing was final. *See* Exhibit F.

11.     After having established March 1, 2008 pricing at the January 24, 2008 Annual Meeting, Lion Nathan unilaterally announced new pricing on February 28, 2008. In breach of its obligation to give Paterno ninety-days notice of any additional price changes, Lion Nathan declared that these prices would be effective on March 1, 2008. *See* February 28, 2008 Letter from Anthony Roberts to Bill Terlato (attached as Exhibit I). Paterno gave Lion Nathan notice of this breach on March 13, 2008. *See* March 13, 2008 Letter from Bill Terlato to Anthony Roberts (attached as Exhibit J).

12.     On March 18, 2008, Lion Nathan's counsel responded to this notice of breach, claiming that the ninety-day notice requirement did not apply because the prices announced in Lion Nathan's February 28, 2008 letter were not "mid-year change in prices." *See* March 18, 2008 Letter from Maura Monaghan to Derek Meyer (attached as Exhibit K).

13.     When Paterno filed its arbitration demand on February 5, 2008, it anticipated that matter would proceed in a timely manner such that an arbitrator would be appointed and able to consider interim relief prior to March 1, 2008. As that date approached, Lion Nathan announced new pricing on February 28, 2008, effective March 1, 2008, on two days notice in breach of Section 5(B)(1).

14.     In the face of this situation, Paterno could begin the processes to implement new pricing further down the supply chain resulting from Lion Nathan's new pricing to Paterno. This

presents a combination of regulatory and business considerations. A number of States require that new pricing first be posted with their regulatory authorities prior to the effective date of those prices and this process takes time. New York, for example, is one of the most significant states in terms of wine sales and it requires notice of new pricing on the 25th day in order for that pricing to become effective the 1st day of the month after the next month. As a result, Paterno would need to post any new pricing with New York on Tuesday, March 25, 2008 in order to increase new pricing on May 1, 2008. Likewise, States such Massachusetts and Maine require new pricing to be posted by the 1st day of the month in order to become effective the 1st of the following month, with Connecticut requiring new pricing to be posted by the 5th of the month in order to be effective the 1st day of the following month.

15.    The States' varying regulatory requirements, which are challenging in their own right, must also be part of a national pricing strategy. Many of the distributors to whom Paterno sells Argyle wines are large national and regional companies with large numbers of customers further down the supply chain with their own demands and expectations. The broad geographic scope and size of such operations result in certain significant distributors demanding as much as ninety days notice of price increases.

16.    To address these issues, Paterno requested that Lion Nathan forego implementing its February 28, 2008 pricing until the arbitration concludes and offered to conclude that arbitration by April 15, 2008. In the event that the arbitrator set new pricing and/or Paterno lost the arbitration, Paterno proposed that the new pricing would go into effect June 15, 2008 to allow Paterno at least some time to begin the process of implementing the price increases.

17.    Lion Nathan rejected this proposal. Lion Nathan offered to invoice Paterno at the new February 28, 2008 pricing while allowing Paterno to pay 2007 prices until the arbitration is

5

concluded. In the meantime, Lion Nathan identified two suggested alternatives for Paterno. First, Lion Nathan suggested that Paterno raise the prices it charges to its customers during the arbitration. Suggesting that the prior pricing could be reinstated if Paterno prevails in the arbitration, Lion Nathan suggested that under this approach "there would appear to be a prospect of a windfall to Paterno!" (See Exhibit K).

18.    This is a troubling suggestion. Paterno represents dozens of wineries other than Argyle. Each of these wineries presents its own strengths, and Paterno's expansive portfolio opens doors to buyers interested in access to the many premium brands offered by Paterno in one stop. Numerous brands, including Argyle, depend on Paterno's long-term and extensive relationships with distributors and others in the supply chain. The suggestion that Paterno seek to reap a "windfall" in these circumstances is simply wrong and would jeopardize the very relationships upon which Paterno depends for its success.

19.    In the alternative, Lion Nathan suggested that Paterno could not seek to implement any price increase until the arbitration is concluded. If Paterno loses the arbitration and the February 28, 2008 prices are allowed to remain in place, Paterno would be required to then pay the new pricing (but not permitted to go back to its customers to recover the difference). If Paterno wins the arbitration, Lion Nathan reasons, Paterno will have suffered no harm.

20.    Absent from this offer is any consideration of the requirement of Section 5(B)(1) that Paterno receive ninety days notice of a price change. This time, as noted above, is necessary to allow Paterno to address the regulatory and business considerations associated with a price increase, another consideration Lion Nathan's proposal ignores.

21.    Now that Lion Nathan has confirmed in recent communications that it will not honor the ninety day notice provision in Section 5(B)(1), the corresponding regulatory and

6

business considerations noted above weigh in favor of Paterno immediately beginning the process to implement the price increases it seeks to avoid to minimize the harm to its relationships with its customers associated with a large price increase on short notice. That is the result Lion Nathan is banking on in connection with its breach of Section 5(B)(1).

22.    Lion Nathan, a large Australian beer and wine conglomerate, is also sophisticated enough to understand that once Paterno begins implementing price increases in the market, any subsequent reduction in the price would be not be construed as an arbitration victory. The pricing of wines is a complex exercise dependent on many factors. The market reacts to decreases in wine prices shortly after price increases as the result of poor price management and/or confirmation that the brand was not worthy of the temporary price increases. This would be especially true if this occurred within a single calendar year. As a result, if Paterno raised prices and then lowered prices after an arbitration victory, it would nevertheless be construed as poor price management by Paterno and Argyle and harm Paterno's reputation as the marketer responsible for the Argyle brand. It could be further be construed as a statement by the market that the Argyle wines were not worthy of the increase pricing and undermine Paterno's performance under the Agreement.

23.    By breaching Section 5(B)(1) and presenting Paterno with no choice but to immediately beginning the process to raise prices, Lion Nathan also seeks to deprive Paterno of any meaningful opportunity to seek interim injunctive relief and to pursue its arbitration claim during the ninety day notice period.

7

24.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_William A. Terlato_
William A. Terlato

# EXHIBIT A

## AMENDMENT TO LION NATHAN AND PATERNO

### MARKETING AGREEMENT

This Amendment to the June 23, 2003 Lion Nathan and Paterno Marketing Agreement ("Amendment" and "2003 Agreement," respectively) is entered into between Lion Nathan Enterprises Pty Limited, on the one hand, and Paterno Imports, Ltd., d/b/a Paterno Wines International ("Paterno"), on the other hand, both of which are sometimes collectively referred to below as the "Parties" and individually as "Party."

WHEREAS, the Parties wish to amend their 2003 Agreement;

IT IS AGREED by the Parties, in consideration of the mutual undertakings and releases contained herein and for other valuable consideration, the sufficiency of which is hereby acknowledged, that:

1. All capitalized terms in this Amendment shall have the same meaning as in the Agreement.

2. Paterno claims that it fully achieved 2005 Target Case Sales and Lion Nathan claims that it never reached agreement on a 2005 Target Case Sales goal with Paterno. Each Party releases the other Party and its representatives of any and all claims relating to whether Paterno fully achieved its 2005 Target Case Sales goal and/or whether the Parties reached Agreement on a 2005 Target Case Sales goal under Section 5(B) of the 2003 Agreement. All issues regarding 2005 Target Case Sales have been resolved and the terms of Section 6(B) of the 2003 Agreement shall not apply for purposes of 2005 Target Case Sales.

3. Effective April 1, 2006 or such earlier date as may be agreed in good faith by the parties, all current and future SKU's or variants of the Petaluma, St. Hallet, Mitchelton, and Wither Hills brands (collectively, "the Lion Nathan Australasian Brands") will be excluded from the definition of Products in the 2003 Agreement. The Lion Nathan Australasian Brands will also not be included in the forthcoming discussions for 2006 Target

Case Sales and there will be no target for those brands through April 1, 2006. Prior to that date, Paterno shall continue to carry the Lion Nathan Australasian Brands in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement.

4. Other than paragraph 2 above, nothing in this Amendment shall be construed to affect each Party's rights and obligations relative to the Argyle Brand, which shall remain within the definition of Products in the 2003 Agreement.

5. On or after December 1, 2005, representatives of Lion Nathan and Paterno will meet to discuss a new agreement relative to the Lion Nathan Australasian Brands. In the event they do not come to Agreement by December 31, 2005 or such later date as the parties may mutually agree upon, Lion Nathan will be free to enter an agreement with another entity relative to those brands to become effective April 1, 2006. At the request of Lion Nathan, Paterno shall continue to carry the Lion Nathan Australasian Brands for up to 90 days after April 1, 2006, in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement. With effect from the date on which the Lion Nathan Australasian Brands are released from distribution by Paterno pursuant to this clause, the parties will release each other from all claims relating to the Lion Nathan Australasian Brands, excluding any claims related to the parties' rights and obligations under Section 7 below, including the payment obligations of Paterno for stock purchases in excess of amounts due for returned inventory, if any, and Section 9 of the 2003 Agreement.

6. Section 4(B)(4) of the 2003 Agreement is amended to exclude from New Products which Lion Nathan or a LN Related Entity decides to market in the Territory those additional wine brands which are produced in Australia or New Zealand.

7. In the event that Lion Nathan and Paterno do not enter a new agreement relative to the Lion Nathan Australasian Brands, the terms of Section 7 of the 2003 Agreement shall govern the procedures regarding those brands.

8. The term "Agreement" in the 2003 Agreement shall be deemed to include this Amendment and this Amendment is incorporated into the 2003 Agreement by reference.

9. Unless explicitly modified by the terms of this Amendment, all other terms and conditions of the 2003 Agreement shall remain in full force and effect as set forth in the 2003 Agreement.

10. The Parties mutually warrant and acknowledge that no promise or inducement has been offered to any of them, other than as hereinabove set out, and that this Amendment is executed without reliance upon any statements or representations by any of the Parties or their representatives.

11. No Party shall be deemed to have drafted this Amendment or any terms herein, and it shall be deemed a joint effort of the Parties.

12. This Amendment shall be construed in accordance with and governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

IN WITNESS WHEREOF, the parties have agreed, accepted and signed this Amendment this 27th day of November, 2005.

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____

William A. Terlato, President & C.E.O.

Executed by
LION NATHAN ENTERPRISES PTY LIMITED
in accordance with Section 127(1) of the Corporations Act (2001)

Attest: _____

By: Robert Murray, DIRECTOR          Duncan Makeig, SECRETARY
[Name, title]

# LION NATHAN AND PATERNO

# MARKETING AGREEMENT

Agreement made this _____ day of April 2003, by and between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) having its principal place of business at Level 30, 363 George Street, Sydney NSW 2000, Australia (hereinafter "*LN*") and Paterno Wines International, (an Illinois Corporation), having its principal place of business and offices at 900 Armour Drive, Lake Bluff, Illinois 60044, USA (hereinafter "*Paterno*").

## RECITALS

A  *LN* through its various subsidiaries carries on business as a premium winemaker and manufactures markets and sells premium wine in Australia and other areas throughout the world.

B  Paterno carries on business as a marketer and importer of wines and other related products.  Paterno has the expertise to import and market LN's products and to maintain and enhance the image and profile of *LN's* products.

C  Paterno has agreed to accept the appointment as the importer and marketer of the Products in the Territory on and subject to the terms and conditions of this Agreement.

## WITNESSETH

In consideration of the mutual promises and covenants herein contained, *LN* and *Paterno* agree as follows:

1.    APPOINTMENT

*LN* hereby grants to *Paterno* the exclusive rights to import, sell, distribute and market the wines specified in Exhibit C (hereinafter the "Products") effective from the date specified in the Product Migration Schedule for the relevant Product set out in that Exhibit C and as specified under the terms of this Agreement in the United States of America, the District of Colombia, and all possessions of the United States including Puerto Rico, and those in the Caribbean Islands as well as sales to cruise lines and airlines, originating in the Territory (hereinafter collectively the "Territory").  The Products shall not include wine sold directly to consumers

(not for resale) at the tasting rooms or through the Wine Clubs of *LN's* licensed United States wineries or those of any LN Related Entity (as defined in Section (4)(B)(4))(hereinafter collectively "Winery Direct Sales").

The parties will co-operate in good faith in relation to the migration of the Products to the exclusive distribution of Paterno in the Territory in accordance with the Product Migration Schedule.

## 2.    COMMENCEMENT AND TERM OF AGREEMENT

This Agreement will come into effect from the date on which the following Exhibits to this Agreement are finalized and executed between the parties (such date referred to as the "Effective Date" of this Agreement.):

| | |
|---|---|
| Exhibit A | Initial Prices |
| Exhibit B | List of Trademarks, Trade Names and Domain Names |
| Exhibit C | Products and Product Migration Schedule |
| Exhibit D | Reporting Format |
| Exhibit F | Initial Target Case Sales |

The parties will exercise their respective best endeavors in good faith to complete such Exhibits on or before 30 April 2003 or such later date as may be agreed.

This Agreement shall be for an initial term of twenty (20) years, commencing on the Effective Date. This Agreement will automatically continue after the initial term for successive terms of twenty (20) years each unless written notice is given by registered mail by either party to the other of the intent not to renew, no later than two (2) years prior to the expiration of the original period or any subsequent period as applicable.

## 3.    TERMS OF SALE

A.    The agreed prices for the Products shall be stated F.O.B Port in US Dollars and are set forth in Exhibit A which Exhibit is incorporated and made part of this Agreement. Such prices shall be altered only in accordance with Section 5(b)(1) of this Agreement.

B.    The terms of payment shall be sixty (60) days from date of shipping and payment shall be in US dollars by wire transfer to an account specified by *LN*. *Paterno* is not entitled to withhold payment or to make any deduction from the price at which the Products are supplied to it or at its direction by *LN*.

C.    *Paterno* may, in its discretion from time to time, purchase the Products from *LN* and request that *LN* ship such Products to specific customers of *Paterno* in the

Territory for *Paterno*'s account and at *Paterno*'s expense. *Paterno*, in such cases, shall assume full liability for payment thereof upon the same terms and conditions as if *Paterno* were purchasing such products for direct delivery to *Paterno*

D.    Title and ownership of the Product which is shipped by *LN* to a *Paterno* warehouse, as opposed to a direct shipment to a specific customer of *Paterno's* as provided for in Section 3(b) above, will not pass to *Paterno* and is retained by *LN* until *LN* receives payment in full for the relevant Products.

4.    PERFORMANCE STANDARDS

A.    *Paterno* agrees:
1.    To use its best efforts to promote, distribute, market and sell the Products within the Territory;

2.    To use the channels of distribution, which in their reasonable discretion are best for the Products and their integrity or reputation as premium quality wines;

3.    That it will not distribute or sell the Products outside of the Territory or within the Territory for resale outside of the Territory;

4.    That it will hold *LN* harmless from any and all fines, levies, damages, and costs of judgments that *LN* may be required to pay as a result of *Paterno's* failure to comply with applicable laws in the Territory including, but not limited to, the payment of any taxes and the maintenance of appropriate licenses;

5.    To inform *LN* promptly (within thirty (30) days) of learning of any material quality problems or complaints about the Products;

6.    In the event that *Paterno* becomes aware of sales of the Products in *Paterno's* territory in violation of this exclusive agreement, *Paterno* shall immediately notify *LN* thereof in writing;

7.    That it will not alter or permit any alterations to the Products and that it will hold *LN* harmless from any accident, damage, loss or injury to any person or property or any other liability caused by any Products altered by *Paterno* or which *Paterno* knowingly permitted to be altered;

8.    That *Paterno* shall bear all costs and expenses of selling, promoting, advertising, and distributing the Products in the Territory except for those costs which *LN* shall incur in its sole discretion;

9.    That it will not do anything that might reasonably be expected to prejudice the integrity or reputation of the Products as premium quality wines;

10.   To at its own expense, comply with all laws and hold all licences and authorities necessary to enable it to lawfully promote, sell and distribute the Products in the Territory;

11.    To purchase the Products only from *LN*;

12.    To provide *LN* with Reports in the format, containing the information and at the frequency as set forth in Exhibit D.

**B.**    *LN* agrees:

1.    That it will not ship or sell the Products to the Territory, except upon the order or by the direction of *Paterno*;

2.    That it will refer to *Paterno* any and all orders and inquiries for such Products that it may receive for shipment to customers located within the Territory;

3.    That *LN* agrees to cease doing business with a customer who is found violating this exclusive agreement by selling the Products to customers in *Paterno's* territory and who fails to cease doing so within 30 days of receipt of a notice requiring it to do so ;

4.    Should either (i) *LN*, (ii) any entity in the Lion Nathan Group of Companies or under its control, or (iii) any entity under the control of any person or entity in the Lion Nathan Group of Companies which controls *LN* ('*LN Related Entity*') decide to market in the Territory additional wine brands, which wine brands are not marketed in the Territory by *LN* as of the effective date of this Agreement ("New Product"), then *LN* shall, if this Agreement is in full force and effect, present to *Paterno* samples of the wines and their packaging, as well as proposed pricing and sales and marketing expectations. *Paterno* shall thereupon have thirty (30) days from the receipt of *LN's* notice within which to decide if it desires to market such New Product in the Territory. In the event that *Paterno* desires to market such New Product, the parties will be required to negotiate a separate agreement for the marketing of this product, which shall be substantially identical in form, remaining term and substance to this Agreement. If *Paterno* does not notify *LN* within the thirty (30) day period or should *Paterno* decline to distribute the New Product, then *LN* shall be free to sell the New Product in the Territory through another company. "Control" or "control" shall mean in relation to any entity either holding, directly or indirectly, the right to elect more than fifty percent (50%) of the directors or cast more than fifty percent (50%) of the votes of the shareholders, partners, or members on matters to be decided by the equity holders, or otherwise having the right to direct the affairs, transactions or management of the entity.

PWI Lion Nathan Agreement

LN will not be obliged to offer *Paterno* the distribution rights for any New Product in the Territory:

a.    where the New Product is acquired by *LN* or any *LN* Related Entity after the effective date of this Agreement and is subject to existing importation, distribution or marketing agreements in the Territory; provided that *LN* will work in good faith to migrate the New Products to *Paterno* as appropriate , but will not be obliged to break existing, binding importation, distribution or marketing agreements; or

b.    unless, at the time of granting of the distribution rights, *Paterno* has achieved the Target Case Sales in the immediately preceding Subject Year provided the Agreement has been in place for more than 12 months.

5.    **ANNUAL MEETING**

A.    The parties shall meet once each calendar year for the purpose of planning sales and marketing activities in the Territory ("Annual Meeting") for the coming year (Subject Year). The Annual Meeting shall normally take place in December of the preceding year and no later than February of the Subject Year or at such other time as the parties may mutually agree. The parties will meet in April 2003 for the purposes of planning sales and marketing activities for the period between the Effective Date and the commencement of the first Subject Year ("Initial Period") as well as the first Subject Year.

B.    During the Annual Meeting, the parties will consult about:

1.    The price for the Subject Year, and following such consultation, *LN* shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year. After the prices for the year have been established, *LN* will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by *Paterno* of notice of such change. The parties shall re-enter negotiations on Target Case Sales for the Subject Year under Section 5(b)(2) on account of any such price increases.

2.    The goal for total shipments of the Products to *Paterno* ("Target Case Sales") for the Subject Year. In establishing the Target Case Sales, the parties will take into account, among other factors, the price set under Section 5(b)(1), the quality of the vintage and the overall consumer

demand in the Territory for wines in the price category of the Products. If after mutual discussion and consultation the parties cannot agree upon the Target Case Sales, then such disagreement shall be resolved by binding arbitration under the provisions of Section 14. The Target Case Sales for the first Subject Year and Initial Period will be set out in Exhibit F. Once agreed and signed by both parties, the Target Case Sales for subsequent Subject Years will be deemed to replace that Exhibit F and to form part of this Agreement.

3. The overall price positioning of the Products in the Territory, but Paterno's resale price of the Products will be set in its sole discretion.

## 6.   TERMINATION

A.   Either party may terminate this Agreement, by written notice to the other party, effective sixty (60) days after delivery for any of the following reasons:

1. Insolvency of the other party; the filing of a voluntary petition in bankruptcy, reorganization or a similar proceeding by the other party; the filing of an involuntary petition in bankruptcy provided such petition is not vacated within thirty (30) days from the date of filing; the appointment of a receiver or trustee for all or a substantial part of the other party's property, provided such appointment is not vacated within thirty (30) days from the date of such appointment; or execution by the other party of an assignment for the benefit of creditors; or

2. The suspension of business, liquidation, dissolution, or termination of the existence of the other party; the condemnation, attachment, or appropriation of all or a material portion of the property of the other party; or

3. The failure of the other party to maintain, at all times, all federal licenses, permits, approvals, and consents necessary for the performance of its obligations hereunder, irrespective of the cause or reason for such failure, except that suspension of federal licenses or permits for a period of less than sixty (60) days shall not be construed as a failure for the purpose of this paragraph; or

4. The failure of the other party to cure a breach of this Agreement within ninety (90) days after notice of such breach is given by the non-breaching party.

5.    The failure of the other party to cure a monetary breach of this Agreement within ten (10) days after notice of such breach is given by the non-breaching party.

B.    Provided *LN* has complied with its material commitments which directly impact on *Paterno's* ability to meet the Target Case Sales, including those of Product quality and availability, as well as those made and acknowledged by *LN* in the written marketing plan(s), then *LN* shall have the option to terminate this Agreement if:

1.    *Paterno* fails to achieve 90% of Target Case Sales (as set out in Section 5(b)(2) in any two (2) consecutive years of the term of this Agreement or for each of two years out of any three-year period. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the second failure. The effective date of the termination shall be not less than ninety (90) days and not more than one hundred eighty (180) days following the date of notice; or

2.    *Paterno* fails to achieve 85% of Target Case Sales (as set out in Section 5(b)(2)) for any year. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the failure. The effective date of the termination shall be not less than ninety (90) days and no more than one hundred eighty (180) days following the date of notice.

C.    *LN* shall have the option to terminate this Agreement in the event of a change in Control of *Paterno* (with Control having the meaning set out above in Section 4(b)(4)), provided that immediately following the change in Control, the persons or entity in Control of *Paterno* shall be an Australian or New Zealand based competitor of *LN*.

7.    OBLIGATIONS FOLLOWING EXPIRATION OR TERMINATION

Upon the termination of this Agreement for any reason:

A.    *Paterno* shall discontinue the use of the Trademarks, except for reasonable use in connection with the liquidation and sale, in accordance with this Agreement, of any of the Products *Paterno* has in its inventory.

B.    *LN* agrees that in the event of a termination under Section 6(b) above, neither party shall have liability for damages, including but not limited to indirect, incidental, consequential or special damages or loss of profits or revenue due to the failure to achieve the Target Case Sales and *LN's* sole remedy will be

termination of this Agreement. The foregoing shall not, however, prevent either party from pursuing any or all remedies available to it at law or in equity for any other breaches of this Agreement.

C.    LN shall repurchase the Products in saleable condition then in the possession of *Paterno* at *Paterno's* laid-in cost, excluding warehousing and storage charges, and with deduction for monies due or to become due to LN under this Agreement. Payment for such repurchase shall be made by certified check or wire transfer in US dollars at the time of transfer.

D.    The parties will follow the further termination and migration procedures set out in Exhibit F.

8.    TRADEMARKS

A.    LN hereby grants to *Paterno* for the term of this Agreement a right to use the trademarks, trade names, and domain names ("Trademarks") as set forth in Exhibit B solely in the Territory and solely in connection with and for the purpose of promoting, advertising, and selling the Products pursuant to the terms of this Agreement.    Nothing contained herein shall constitute an assignment of the Trademarks, or grant to *Paterno* any right, title, or interest therein, except the right to use the Trademarks as set forth herein.

B.    *Paterno* further agrees (i) not to remove the Trademarks from the Products; (ii) not to alter the Trademarks in any way; (iii) not to use any trademark, trade name, or designation of origin other than the Trademarks and *Paterno's* trade name in connection with the promotion, advertising, or sale of the Products; and (iv) not to use the Trademarks in connection with any products, goods, business or services other than the Products.

C.    LN represents and warrants that, to the best of its knowledge, it is the owner or licensee of the Trademarks listed on Exhibit B and has not assigned or licensed in the Territory any right or interest therein; there are no claims or demands in the Territory pertaining to such Trademarks and no proceeding has been instituted or is pending or threatened against it which would challenge the right of LN in respect thereof; and LN has not been charged with infringement or violation of any adversely-held trademark in connection with the sale of the Products and is not aware of any claim of or liability for any such infringement or violation.

D.    In the event that *Paterno* becomes aware of any infringement of the Trademarks, or any claim that the Trademarks infringe the proprietary rights of a third party, *Paterno* shall immediately notify LN thereof in writing.    Should LN in its sole

discretion, decide to take legal action in respect of the same, such action shall be at the sole cost and for the sole benefit (including any recovery of damages) of *LN*. Upon the request of *LN*, *Paterno* shall cooperate with *LN* in connection with any such action but at no additional expense to *Paterno*. *Paterno* shall not undertake any action against any purported infringement of the Trademarks or defend against any claim that the Trademarks infringe the rights of another, without the prior written consent of *LN*.

E.  *LN* will cooperate with *Paterno* to the fullest extent possible by supplying all information and/or documentation necessary to *Paterno* for purposes of recording *LN's* U.S. Registered Trademarks with the U.S. Customs Office for purposes of protecting both parties to this Agreement against the importation of counterfeit or confusingly similar trademarks.

F.  *Paterno* may only use, publish and display the Trademarks  and logos, and reproduce the copyright in labels, packaging, logos, get-up, sales brochures and other marketing material relating to the Products during the term of this Agreement and only to the extent that is reasonably necessary to give effect to this Agreement and will not damage the goodwill, reputation or integrity of the Trademarks or *LN* or its business. *Paterno* will not, without *LN's* prior written consent, make any change to the design or specification of the labels, packaging, logos.

G.  *Paterno* will provide *LN* with copies of sales aids, brochures, or any manuals or other like materials relating to the Products if requested to do so by *LN*.

9.  **WARRANTIES AND PRODUCT LIABILITY**

*LN* warrants that all Products sold or shipped under this Agreement will be of good quality, suitable for beverage consumption, properly packaged by *LN*, in conformity with the applicable laws, regulations, and requirements in force in the Territory.  *LN* will hold *Paterno* harmless from any and all fines, levies, damages, and costs of judgments that *Paterno* may be required to pay as a result of *LN's* failure to comply with the provisions of this paragraph, subject to the provisions relating to defective products set out below.  *LN* makes no further claims or warranties, either express or implied, concerning the Pro ducts.

*Paterno* will be responsible for advising *LN* of any amendments required to the packaging and labeling from time to time, required to ensure it complies with all applicable laws and regulations in all relevant parts of the Territory.

**Notifications of defects**

Paterno may, following receipt of the Products, reject any Products which it reasonably considers to be materially defective or not substantially compliant with any purchase order provided that the following procedure is complied with:

A. Paterno must give *LN* notice of any Product which is defective or not compliant within 30 days of discovery specifying the Product name, the nature of the defect and confirming that a sample of the defective Product will be available for inspection at a particular time and place;

B. Paterno and *LN* must confer and negotiate in good faith within 14 days of *LN* receiving the defect notice to determine whether the parties agree the product is defective. If the parties:

    i. Agree the Product is defective, *LN* will:

        A. At Paterno's option, either replace the Product which is defective or reimburse Paterno for the defective Product at Paterno's laid in cost; and

        B. Will be responsible for the costs incurred in shipping the defective Product to *LN*.

    ii. Cannot agree that the Product is defective within 14 days, the issue will be treated as a dispute under this Agreement.

## Costs of recall

C. *LN* will indemnify *Paterno* against *Paterno*'s reasonable direct costs and expenses (including but not limited to; freight, warehousing, advertising, reasonable legal costs, fines, customer reimbursements, and product testing) of any legitimate recall of any Product provided that:

    iii. *LN* will not be responsible and will not indemnify Paterno for costs or expenses which are attributable to a recall which is caused by an act of Paterno;

    iv. *LN* is previously advised of the recall; and

    v. the recall is required under the laws of the Territory or the parties have agreed to the recall.

## Complaints

D. If *LN* or *Paterno* receives any complaint (including any notice or threat of recall) in relation to a Product from any customers or any third party in the Territory, the party who receives the complaint will in a reasonably prompt manner and in any event within 14 days inform the other party of the complaint. *Paterno* will be responsible for dealing with the complaint in consultation with *LN* and will in a reasonably prompt

manner investigate that complaint and take appropriate measures to rectify it. Neither party shall admit liability or settle the matter without the written consent of the other party.

10.    FORCE MAJEURE

Neither of the parties shall be responsible or liable in any way for any default in the performance of this Agreement arising directly or indirectly from events or causes beyond their control including, but not limited to, fire, flood, action of the elements, riots, wars, civil and common, strikes, lockouts, anomalous and unfavorable climate course, or any other unavoidable events or contingencies.

11.    NOTICES

All notices or other written communications required or referred to in this Agreement shall be in writing and sent to the address of the recipient as it appears in the introductory paragraph to this Agreement (or such other address as such party shall have notified to the sender) by registered air mail, return receipt requested, by DHL, Federal Express or other reputable commercial carrier, or by electronic or facsimile transmission, with all costs of delivery or transmission prepaid, and shall be deemed given when actually received.

12.    SEVERABILITY

This Agreement is intended for general use in the United States and in the event any term or provision hereof is in violation of, or prohibited by, any applicable law or regulation, including laws or regulations promulgated by particular states, such term or provision shall be deemed to be amended or deleted to conform to such law or regulation without invalidating or amending or deleting any other term of this Agreement.

13.    WAIVER

The failure or omission by either party to insist upon or enforce any of the terms of this Agreement shall not be deemed a waiver of such term unless the waiver is in writing and signed by the party against whom such waiver is sought to be enforced. Waiver of any one term shall not be deemed a waiver of any other term. Waiver of any one term on any one occasion shall not be deemed a waiver of the same term on any other occasion.

14.    DISPUTE RESOLUTION

In the event of any dispute under this Agreement, other than one under Section 5.b.2, which the parties have not been able to resolve through negotiation, shall be resolved upon the petition of either party by binding arbitration before the American Arbitration Association (AAA) pursuant to its Commercial Arbitration Rules. Such arbitration shall otherwise be conducted, pursuant to the AAA's Commercial Arbitration Rules. The site of any arbitration

will be Chicago, Illinois. The award of the arbitrator may be enforced by any court of competent jurisdiction upon the petition of either party.

Disputes under Section 5(b)(2) (that is disputes in relation to setting the Target Case Sales for a Subject Year), shall be resolved in accordance with the following process:

A. A party claiming that a dispute under section 5(b)(2) has arisen must give written notice to the other party specifying the nature of the dispute

B. On receipt of the notice specified in Section 14(A) the parties to the dispute must immediately escalate the dispute to the Chief Executive Officer of *Paterno* and the *LN* Chief Executive Officer and *LN* Group Managing Director, Wines and Spirits;

C. If within 7 days after receipt of the notice, the parties are still unable to resolve the dispute, the parties must refer the dispute to an independent wine industry expert (i) agreed to by the parties and (ii) with no less than 10 years experience in the US market for super premium wine;

D. If *LN* and *Paterno* fail to agree to an expert within the same seven day period in which the referral to the expert was to be made pursuant to Section 14(C), then within five days, *LN* shall obtain the services of JAMS, or a similar alternative dispute resolution organization, which such organization, in its sole discretion, shall appoint one arbitrator, notice of whose appointment must be furnished to *Paterno* by *LN* within two days following *LN*'s receipt of notice of the appointment;

E. Within seven days following *Paterno's* receipt of notice of the arbitrator's appointment, *LN* and *Paterno* shall submit to the arbitrator each party's best case for its suggested expert;

F. Within five days following the parties' submissions, and based solely on such submissions, the arbitrator shall (i) select the expert suggested either by *LN* or *Paterno*, such decision to be binding on the parties and (ii) provide notice to each party of the decision;

G. Each party shall, within 30 days of the appointment of the expert, submit to the expert and exchange with each other in advance of the hearing their respective last, best proposals as to the correct Target Case Sales for the Products; and

H. The expert will act as an arbitrator pursuant to the AAA's Commercial Arbitration Rules and his opinion will be binding on the parties. The expert shall be limited to awarding only one of the two competing proposals for the

Target Case Sales of the Product submitted, such award to be made within seven days following the hearing.

15.   **RESTRICTIVE COVENANTS**

A.   <u>Acknowledgement</u>.  Each party acknowledges that as a result of entering into this Agreement it will be provided with access to the other's Confidential Information (as defined below), business relationships and methods of doing business, and that such Confidential Information, business relationships and methods of doing business constitute valuable assets of the other party and a significant part of its goodwill, the preservation of which is essential to the success of its business, and that a party has a legitimate interest in restricting the other's ability to take advantage of such Confidential Information, business relationships and methods of doing business.

B.   <u>Non-solicitation</u>.  In light of the foregoing and in order to protect the value of the each party's business, each party covenants and agrees that during the term of this Agreement and during the three (3) year period (the "Restricted Period") following the date that this Agreement expires or is terminated (whether with or without cause) it shall not directly or indirectly (whether as a principal, agent, independent contractor, partner, officer, director, owner, lender or otherwise):

   (i)   solicit, encourage or induce any customer of the other party to cease doing business with that party or otherwise interfere with that party's relationships with any of its customers,

   (ii)  solicit, encourage or induce any employee of the other party to leave the employment of that party or employ or engage as a consultant or otherwise any employee of the other party or otherwise interfere with that party's relationship with any of its employees,

   (iii) make, whether orally or in writing, disparaging statements or inferences regarding *Paterno*, its business, officers or directors, and

   (iv)  solicit, encourage or induce any of the other party's vendors or suppliers to terminate, curtail or restrict their relationship with that party or in any way interfere with the relationship between any such vendor or supplier and that party.

C.   <u>Nondisclosure</u>.  Each agrees that during the term of this Agreement and during the Restricted Period it will not, directly or indirectly, disclose to any third party, or use for the benefit of itself or any other person or entity, any Confidential Information of the other party.  As used in this Agreement, the term "Confidential Information" shall mean any information of a party or any information used by a party in the course of conducting its business, in either case which is not generally known to the

public or the disclosure of which could result in a competitive or other disadvantage to that party. Confidential Information includes information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including, by way of example and without limitation, trade secrets, ideas, concepts, designs, configurations, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, processes, techniques, formulas, software, improvements, inventions, domain names, data, know-how, discoveries, copyrightable materials, marketing plans and strategies, sales and financial reports and forecasts, customer lists, studies, reports, records, books, contracts, instruments, surveys, computer disks, diskettes, tapes, computer programs and business plans, methods of doing business, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management of the relevant party  Confidential Information also includes the confidential information of others with which a party has a business relationship. Each party further agrees that even if such information is developed or contributed to, in whole or in part, by *it* pursuant to this Agreement, such information is and shall remain the sole and exclusive property of the party which originated the information. Notwithstanding the foregoing, Confidential Information does not include information in the public domain, unless due to breach of a party's duties under this Agreement.

D. <u>Breach</u>. The parties agree that any breach of Section 15(b) or Section 15(c) above will result in irreparable damage to *the other party* for which *that party* will have no adequate remedy at law. Each party acknowledges that the restrictions contained in this Section 15 are reasonable, and reasonably related to the legitimate business interests of the other  In the event that any portion of this Section 15 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a period of time or too large a geographic area or over too great a range of activities, it shall be interpreted to extend only over the maximum lesser period of time, geographic area, or range of activities as to which it may be enforceable. Each of the covenants herein shall be deemed a separate and severable covenant. In the event that *a party* or any of its officers, directors or employees breaches any provision of this Section 15, *the other party* shall be entitled to recover from the breaching party all costs of enforcement, including reasonable attorneys' fees.

E. <u>Severability</u>. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

F. <u>Termination</u>. The terms and provisions of this Section 15 shall apply as of the date hereof, as shall continue in effect whether or not this Agreement shall be subsequently terminated or expire.

16.     GOVERNING LAW

Any disputes arising under this Agreement are to be governed and construed in accordance with the laws of the state of Illinois; provided, however, that it is subject to the U.S. Federal Alcohol Administration Act and all regulations promulgated pursuant to such Act.

17.     NATURE OF AGREEMENT

The parties hereto acknowledge that they are dealing with one another hereunder as independent contractors and not as partners, joint venturers or principal and agent. Neither party is granted any right or authority to act or hold itself out as the legal agent of the other, or to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of the other or any person or entity affiliated with the other or to bind the other in any manner whatsoever except as may otherwise be expressly agreed upon by the parties in writing for purposes of compliance with applicable state or federal laws or requirements.

18.     ENTIRE AGREEMENT

This Agreement shall constitute the entire understanding by and between the parties as to the subject matter hereof, replacing and superseding all previous agreements and understandings between the parties hereto or their predecessors concerning such subject matter.     No modification of this Agreement shall be of any effect unless set forth in writing and signed by both parties. All notices required by this Agreement shall be in writing and shall be deemed given on the date of delivery.

19.     BINDING AGREEMENT

This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

20.    ASSIGNMENT

Neither party may assign or transfer its rights or obligations under this Agreement which would materially change the duties owed by the parties, materially increase the burden or risk imposed on either party by this Agreement, materially impair either party's chance of obtaining return performance, or materially reduce the Agreement's value to either party, without the prior consent of the other, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of this Agreement without such consent will constitute a breach of this Agreement.    Notwithstanding this, *LN* may assign this agreement to any company which is controlled by or under common control with *LN*.

21.    *LN* PERFORMANCE

*LN* is a holding entity for Lion Nathan Wine Group interests.    Accordingly, any obligation of *LN* under this Agreement shall be deemed to be duly performed if it is performed by any *LN* Related Entity (as defined in Section 4(b)(4)).    Any act or omission of any such *LN* Related Entity in furtherance of this Agreement shall be deemed to be the act or omission of *LN* and in relation to that act or omission this Agreement shall be read as if a reference to *LN* includes a reference to that *LN* Related Entity.

**(SIGNATURE PAGE FOLLOWS)**

IN WITNESS WHEREOF, the parties have signed the Agreement as of the dates first above written.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____

Gordon Cairns, Chief Executive Officer


PATERNO WINES INTERNATIONAL

Attest: _____

By: _____

William A. Terlato, President & COO

**EXHIBIT A**

**Initial Prices**

Per Case
(12/750ml)
FOB "_____" Port

## EXHIBIT B

**List of Trademarks, Trade Names, and Domain Names**

## EXHIBIT C

## PRODUCTS AND PRODUCT MIGRATION SCHEDULE

**EXHIBIT D**

**REPORTING FORMAT**

## EXHIBIT E

## TERMINATION AND MIGRATION PROCEDURES

On termination of this Agreement:

a) all orders of the Product placed by Paterno with LN which are undelivered at the termination date, will be deemed to have been cancelled;

b) *Paterno* must return to *LN* or a person nominated by *LN* or destroy, as required by *LN* (at *LN's* sole discretion) all current and usable samples of Product, supply records, point of sale materials, brochures, specifications, designs, instruction materials, brochures, manuals, advertising or display materials featuring or referring to the Product or other information or material supplied by *LN* or acquired by *Paterno* in any way relating to the Product and any other items that relate to the distribution of the Products within 30 days of the termination date at *LN's* cost ;

c) *Paterno* will, immediately upon request by *LN*, provide *LN* with full particulars of all unfulfilled orders and enquiries received by Paterno in respect of the Product;

d) *Paterno* will remove any signs from its premises using or incorporating the Trade Mark and all other trade marks of *LN* and discontinue the use of any material bearing such trade marks;

e) *Paterno* will cease to hold itself out as being associated in any way with *LN* or the Product;

f) *LN* and *Paterno* must not do anything to prejudice each other's business or goodwill;

g) each party must advise the other party of all monies which are owing under the terms of this Agreement;

h) to the extent legally possible, *Paterno* will assign to *LN* or its nominee free of charge all permissions, consents and licences (if any) relating to the marketing, distribution and sale of the Products and execute all documents and do all things necessary to ensure *LN* or its nominee will enjoy the benefit of the permissions, consents and licences from the termination date;

i) *Paterno* and *LN* will continue to perform their obligations under this Agreement diligently until the termination of this Agreement becomes effective;

j) *LN* and *Paterno*, in good faith, will take whatever actions are reasonably necessary to effect as orderly a transition as possible;

k) at least 30 days prior to the termination of this agreement, Paterno will advise LN of its then outstanding:

- orders and the approximate volume and location of its inventory of the Products; and

- contractual commitments in relation to the supply of Products after the termination of this Agreement.

**EXHIBIT F**

**INITIAL TARGET CASE SALES**

**EXHIBIT A**
**INITIAL PRICES**

This is Exhibit A referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

| LION NATHAN ENTERPRISES PTY LIMITED | PATERNO WINES INTERNATIONAL |
|---|---|
| Attest: | Attest: |
| By: | By: |
| Peter Cowan, Director | William A. Terlato, President & COO |
| Date: 25/06/03 (Effective) | Date: 6/26/03 |

**Product, Vintage, Case Pack & Price Information**
(All pricing to be in US dollars.)

| | Vintage | 750 ml Case Pk | | Pricing to Paterno |
|---|---|---|---|---|
| **Petaluma** | | | | |
| Riesling (Clare Valley) | 2003 | 12 | $ | 52.00 |
| Chardonnay (Picadilly, Adelaide Hills) | 2001 | 12 | $ | 82.00 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 | $ | 120.00 |
| Shiraz (Adelaide Hills) | 2001 | 12 | $ | 99.00 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 | $ | 100.00 |
| | | | | |
| **St Hallett** | | | | |
| Faith Shiraz | 2001/2002 | 12 | $ | 54.00 |
| Blackwell Shiraz | 1999 | 12 | $ | 99.00 |
| Old Block Shiraz | 1999 | 6 | $ | 85.00 |
| | | | | |
| **Mitchelton** | Assumes 1 January 2004 start | | | |
| Airstrip | 2001 | 12 | $ | 54.00 |
| Crescent | 2000 | 12 | $ | 54.00 |
| Print Shiraz | 1998 | 6 | $ | 66.00 |
| | | | | |
| **Wither Hills** | | | | |
| Sauvignon Blanc | 2003 | 12 | $ | 54.00 |
| Chardonnay | 2002 | 12 | $ | 54.00 |
| Pinot Noir | 2002 | 6 | $ | 56.00 |
| | | | | |
| **Argyle (including Oregon)** | Assumes 1 August 2003 start | | | |
| Willamette Valley Pinot Noir | 2001 | 12 | $ | 71.00 |
| Reserve Pinot Noir | 2000 | 6 | $ | 59.00 |
| Nuthouse Pinot Noir | 2001 | 6 | $ | 78.00 |
| Spirithouse Pinot Noir | 2000 | 6 | $ | 99.00 |
| | | | | |
| Willamette Valley Chardonnay | 2001 | 12 | $ | 48.00 |
| Nuthouse Chardonnay | 2000 | 6 | $ | 60.00 |
| Reserve Chardonnay | | | | |
| | | | | |
| Brut NV | 1998 | 12 | $ | 87.00 |
| Extended Tirage Brut | 1991 | 6 | $ | 61.00 |

**EXHIBIT B**
**LIST OF TRADEMARKS, TRADE NAMES AND DOMAIN NAMES**

This is Exhibit B referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 32 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: _____
Peter Cowan, Director
Date: 25 / 06 / 03 (Effective )

PATERNO WINES INTERNATIONAL

Attest:

By: _____
William A. Terlato, President & COO
Date: 6/26/03

| Product Family | Relevant US Registered Mark | Registration Number |
|---|---|---|
| **Petaluma** | Petaluma Australia | 2038678 |
| Riesling (Clare Valley) | | |
| Chardonnay (Picadilly, Adelaide Hills) | | |
| Cabernet Merlot (Coonawarra) | | |
| Shiraz (Adelaide Hills) | | |
| Tiers Chardonnay (Adelaide Hills) | | |
| **St Hallett** | St Hallett | 2739740 |
| Faith Shiraz | Faith Shiraz | 2513993 |
| Blackwell Shiraz | | No |
| Old Block Shiraz | Old Block | 2379734 |
| **Mitchelton** | Mitchelton | 1589249 |
| Airstrip | | |
| Crescent | | |
| Print Shiraz | | |
| **Wither Hills** | Wither Hills | 2384094 |
| Sauvignon Blanc | | |
| Chardonnay | | |
| Pinot Noir | | |
| **Argyle (including Oregon)** | Argyle | 2425250 |
| Willamette Valley Pinot Noir | Willamette | Pending |
| Reserve Pinot Noir | | |
| Nuthouse Pinot Noir | | |
| Spirithouse Pinot Noir | | |
| Willamette Valley Chardonnay | Willamette Valley Vineyards | Pending |
| Nuthouse Chardonnay | | |
| Reserve Chardonnay | | |
| Brut NV | | |
| Extended Tirage Brut | | |

**EXHIBIT C**
**PRODUCTS AND PRODUCT MIGRATION SCHEDULE**

This is Exhibit C referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____
Peter Cowan, Director

Date: 25 / 06 / 03 (Effective)

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____
William A. Terlato, President & COO

Date: 6/26/03

**Migration Date to Paterno (subject to execution of releases with any current distributors for the relevant Product)**

**Petaluma**
| | |
|---|---|
| Riesling (Clare Valley) | 23-Jun-03 |
| Chardonnay (Picadilly, Adelaide Hills) | 23-Jun-03 |
| Cabernet Merlot (Coonawarra) | 23-Jun-03 |
| Shiraz (Adelaide Hills) | 23-Jun-03 |
| Tiers Chardonnay (Adelaide Hills) | 23-Jun-03 |

**St Hallett**
| | |
|---|---|
| Faith Shiraz | 23-Jun-03 |
| Blackwell Shiraz | 23-Jun-03 |
| Old Block Shiraz | 23-Jun-03 |

**Mitchelton**
| | |
|---|---|
| Airstrip | 01-Jan-04 |
| Crescent | 01-Jan-04 |
| Print Shiraz | 01-Jan-04 |

**Wither Hills**
| | |
|---|---|
| Sauvignon Blanc | 23-Jun-03 |
| Chardonnay | 23-Jun-03 |
| Pinot Noir | 23-Jun-03 |

**Argyle (including Oregon)**
| | |
|---|---|
| Willamette Valley Pinot Noir | 01-Aug-03 |
| Reserve Pinot Noir | 01-Aug-03 |
| Nuthouse Pinot Noir | 01-Aug-03 |
| Spirithouse Pinot Noir | 01-Aug-03 |
| Willamette Valley Chardonnay | 01-Aug-03 |
| Nuthouse Chardonnay | 01-Aug-03 |
| Reserve Chardonnay | 01-Aug-03 |
| Brut NV | 01-Aug-03 |
| Extended Tirage Brut | 01-Aug-03 |

## EXHIBIT D
## REPORTING FORMAT

This is **Exhibit D** referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____
Peter Cowan, Director

Date: 25 / 06 / 03 (Effective)

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____
William A. Terlato, President & COO

Date: 6/26/03

### Paterno Wines International
### Monthly Sales and Marketing Activity Report

**KPI's**

| 1. Volume | Month | | | YTD (Subject Year to date) | | | Balance To Go | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Target Case Sales | % + (-) | Actual | Target Case Sales | % + (-) | Vol | % to go |
| Brand: | · · | | | | | | | |
| Product x, y, z | · · | | | | | | | |
| Total Volume | · · | | | | | | | |

Actual      Plan

2. Revenue ~ per case $

3. Advertising and Promotional Expenditure (A+P $)

4. Commentary with Exhibits (where applicable)

- Volume – causes of deviation, key actions as required
- Pricing – Ability to achieve targets and key actions
- A+P $ – Expenditure type to date and key support activities
- Marketing Highlights – PR/Accolades/Customer + key influencer response/relevant market and competitor activity (Australian)
- Distribution
  - Progress/Issues/Channel Update/Significant account update
  - Wine List achievements
- Red flags – pre-emptive exposure/risks to any issues

## EXHIBIT F
## INITIAL TARGET CASE SALES

This is Exhibit F referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: Peter Cowan, Director

Date: 25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest:

By: William A. Terlato, President & COO

Date: 6/26/03

| Petaluma | Vintage | Case Pk | 750 ml<br>Pricing<br>to Paterno | Minimum<br>Commitment<br>(Initial Target<br>Case Sales) |
|---|---|---|---|---|
| Riesling (Clare Valley) | 2003 | 12 | $ 52.00 | 400 |
| Chardonnay (Picadilly, Adelaide Hills) | 2001 | 12 | $ 82.00 | 500 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 | $ 120.00 | 1,200 |
| Shiraz (Adelaide Hills) | 2001 | 12 | $ 99.00 | 1,200 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 | $ 100.00 | 300 |
| **Total Petaluma** | | | | **3,600** |
| | | | | |
| **St Hallett** | | | | |
| Faith Shiraz | 2001/2002 | 12 | $ 54.00 | 5,000 |
| Blackwell Shiraz | 1999 | 12 | $ 99.00 | 500 |
| Old Block Shiraz | 1999 | 6 | $ 86.00 | 300 |
| **Total St Hallett** | | | | **5,800** |
| | | | | |
| **Mitchelton** | | | | |
| Airstrip | 2001 | 12 | $ 54.00 | 500 |
| Crescent | 2000 | 12 | $ 54.00 | 500 |
| Print Shiraz | 1998 | 6 | $ 68.00 | - |
| **Total Mitchelton** | | | | **1,000** |
| | | | | |
| **Wither Hills** | | | | |
| Sauvignon Blanc | 2003 | 12 | $ 54.00 | 5,000 |
| Chardonnay | 2002 | 12 | $ 54.00 | 750 |
| Pinot Noir | 2002 | 6 | $ 56.00 | 750 |
| **Total Wither Hills** | | | | **6,500** |
| | | | | |
| **Argyle (including Oregon)** | Assumes 8/1/03 start | | | |
| Willamette Valley Pinot Noir | 2001 | 12 | $ 71.00 | 9,200 |
| Reserve Pinot Noir | 2000 | 6 | $ 59.00 | 3,000 |
| Nuthouse Pinot Noir | 2001 | 6 | $ 78.00 | 2,000 |
| Spirthouse Pinot Noir | 2000 | 6 | $ 99.00 | 800 |
| Willamette Valley Chardonnay | 2001 | 12 | $ 48.00 | 8,000 |
| Nuthouse Chardonnay | 2000 | 6 | $ 60.00 | 800 |
| Reserve Chardonnay | | | | |
| Brut NV | 1998 | 12 | $ 87.00 | 7,500 |
| Extended Tirage Brut | 1991 | 6 | $ 81.00 | 700 |
| **Total Argyle** | | | | **32,000** |
| | | | | |
| **Total Lion Nathan** | | | | **48,900** |

# EXHIBIT B



# LION NATHAN

Lion Nathan Limited, ABN 34 093 160 448
Level 30, 363 George Street, Sydney NSW 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225 Australia
Telephone 61 2 9290 6600  Facsimile 61 2 9290 6699  Web Site www.lion-nathan.com.au

19 December 2007

Mr. William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL  60044

**VIA E-MAIL**

Re:    2008 Annual Lion Nathan/Paterno Meeting

Dear Bill,

Section 5 of the Lion Nathan and Paterno Marketing Agreement requires an annual meeting between our two companies for the purpose of planning marketing and sales activities for 2008. The annual meeting this year is to occur between December 2007 and February of 2008.

The agreement does not specify a location for the annual meeting.  This year we propose that the meeting be held in Dundee, Oregon, in January 2008 in order to allow Mr. Rollin Soles, the General Manager and Chief Winemaker of Argyle, to participate.  While we prefer a face-to-face meeting, we are prepared to arrange for a discussion via teleconference if you or your representatives are not able to travel to Oregon.

We look forward initially to consulting with and reaching agreement on the Target Case Sales (total number of cases to be shipped to Paterno) in 2008.  In light of the continuing popularity of and high demand for wines from Oregon and Argyle Winery in particular, the 2008 case totals by product and associated pricing are set out on Exhibit A to this letter.

Lion Nathan will need to work closely with Paterno to develop and to implement the 2008 marketing and sales plans, particularly with the increased volumes and new product lines envisaged.  It therefore wishes to ensure that the appropriate processes and information flows are in place to achieve this.  Accordingly, in keeping with Paterno's obligations under the agreement "[t]o use its best efforts to promote, distribute, market and sell [Argyle's wines]" as well as its obligation to "[n]ot do anything that might reasonably be expected to prejudice the integrity or reputation of [Argyle's wines]...as premium quality wines..." we specifically request that Paterno agree to the following:

1.  Paterno to provide Lion Nathan a proposed annual marketing and sales plan prior to each Annual Meeting.  This should include any strategy for placing still and sparkling wine with wine retailers, chain restaurants or chain grocery stores.

2.  2008 Target Case Sales by individual product line for the quantities shown on Exhibit A hereto.

3.  Paterno/Wholesalers submit all purchase orders to Lion Nathan within 30 days of release for the quantities shown on Exhibit A.




Mr. William Terlato
19 December 2007
Page 2

4. Paterno to require wholesalers to fully deplete their inventory of Lion Nathan wines within the time periods shown on Exhibit A.

5. Set and notify Lion Nathan of a minimum resale price for each product to avoid "dumping" and maintain brand value/reputation.

6. Provide Lion Nathan with a copy of Paterno's 2008 budget for marketing and sales and a quarterly report showing actual expenditures on a quarterly/annual basis for these categories.

7. Paterno to notify Lion Nathan of sales calls to all national accounts, the 25 largest retail accounts, and any chain restaurants or chain grocery stores and allow one or more LN representatives to accompany Paterno's sales person(s).

8. The provision to Lion Nathan on a quarterly basis of details of Paterno sales personnel coverage for each State and distributor in the Territory (including an organizational chart showing distributors and Paterno personnel responsible for liaising with those distributors).

9. The provision to Lion Nathan of the reports set out in Exhibit D of the current Marketing Agreement at the frequency and in the format set out in that Exhibit D, including the commentary referenced in Exhibit D4.

Lion Nathan looks forward to meeting with you and/or your representatives in the near future to finalize agreement on these critical sales and marketing issues.

Please feel free to contact me if you have any questions in the meantime .

Yours sincerely,

Anthony Roberts
General Manager
Lion Nathan Wine Group

EXHIBIT A

Terlato International - Argyle Winery
Targeted Case Sales 2008/2009



## Target Case Sales April 2008 to March 2009

| Wine | Cases | Vintage | Release | April-June | July-Sept | Oct-Dec | Jan-Mar | bottle/case | Price/case |
|---|---|---|---|---|---|---|---|---|---|
| Brut | 6900 | 2003/5 | April | 3450 | 3450 | | | 12 | $124.00 |
| Ext. Tirage | 750 | 1998 | September | | 263 | 487 | | 6 | $162.00 |
| WVPN | 20500 | 2007 | August | | 7175 | 10250 | 3075 | 12 | $120.00 |
| ResPN | 9600 | 2006 | May | 4800 | 4800 | | | 6 | $90.00 |
| ResPN | 1000-375ml | 2006 | May | 500 | 500 | | | 12 | $70.00 |
| NHPN | 4000 | 2005 | April | 4000 | | | | 6 | $140.00 |
| SHPN | 1200 | 2006 | Oct | | | 1200 | | 6 | $200.00 |
| NHCH | 3000 | 2007 | August | 3000 | | | | 6 | $84.00 |
| WVCH | 2400 | 2007 | August | | 1200 | 1200 | | 12 | $100.00 |
| Rose | 400 | 2005 | April | 400 | | | | 6 | $100.00 |
| Blanc Blancs | 300 | 2000 | April | 300 | | | | 6 | $110.00 |
| Riesling | 500 | 2007 | July | | 250 | 250 | | 12 | $120.00 |

# EXHIBIT C

**From:**    Bill Terlato [bt@twg.com]
**Sent:**    Thursday, December 20, 2007 2:06 PM
**To:**    Jennifer Thomason
**Subject:** FW: Argyle 2008 Target Case Sales

**From:** Bill Terlato
**Sent:** Thursday, December 20, 2007 2:05 PM
**To:** 'Anthony Roberts - LNWG'
**Cc:** Rollin Soles; IAN MORDEN - LNCORP; Tom Steffanci; David Lane; John Scribner
**Subject:** RE: Argyle 2008 Target Case Sales

Dear Anthony:

Thank you for your letter. We have sent several requests to Rollin over the past few weeks requesting dates when he could participate in the Annual Meeting in Chicago. Last year we were able to accommodate Rollin's request to meet in Oregon, but unfortunately early in 2008 we have a very tight schedule are unable to do that. Given that we have more people on our side participating in the meeting, and all our data and resources are located here, we believe Chicago is the best location to hold these annual meetings. While we feel it would be more productive to meet in person in Chicago as anticipated, a video-conference is an acceptable alternative if Rollin Soles is not available to meet with us at our office.

Thank you for forwarding the potential availability by item. Obviously, we need to study your proposal in greater detail, but it seems like the winery is proposing rather extraordinary price increases. That is inconsistent with all our previous conversations and communications (in fact last year the winery was adamantly opposed to any price increases). Can you please review the pricing information you sent us for accuracy and confirm the prices that the winery is proposing to sell each item to Paterno.

We look forward to reviewing all of the relevant factors and to agreeing upon a final Target Case Sales number for the upcoming year. While we understand your letter provides us with availability by product, we would like to reiterate that Target Case Sales for purposes of the minimum shipments obligation is a total brand and not an individual item number. For example, the Target Case Sales figure for 2007 is 30,844, and we are happy to report that we will once again exceed our annual commitment.

In terms of the numbered requests in your letter, we will provide a marketing plan consistent with the format of prior years at our 2008 meeting and, of course, provide you the information specified in our agreement. However, we disagree with the suggestion that the two contractual provisions you quoted create obligations on Paterno to provide the other information you requested or to take any of the additional undertakings you have requested, which are not contemplated in our agreement. While we are happy to discuss your preferences with you at our meeting, our agreement is clear on the rights, responsibilities and risks allocated to each party, and Lion Nathan cannot unilaterally impose new obligations for Paterno as set forth in your letter.

In terms of a meeting date, my team and I are available on Tuesday January 15th to meet either in Chicago or by video-conference. We look forward to the meeting.

Sincerely,

Bill

# EXHIBIT D

**From:**    Bill Terlato [bt@twg.com]
**Sent:**    Monday, January 07, 2008 3:31 PM
**To:**    anthony.roberts@lion-nathan.com.au; rollin@argylewinery.com
**Cc:**    John Scribner; Tom Steffanci; David Lane; Jennifer Thomason
**Subject:** Argyle Annual Meeting


Dear Anthony,

   While I have not received a response to my letter of December 20th, this morning Rollin did send
some proposed dates for our annual meeting to our Argyle Brand Manager. We can confirm our
availability for the morning of January 24th. Unfortunately, Rollin is unable to come to Chicago for the
face-to-face meeting which was our preference, so we will agree to the alternative of a videoconference.
I understand that Argyle does not have videoconferencing capabilities and have asked that they find a
videoconferencing facility near their offices. While videoconferencing is not an ideal substitute for a
face-to-face meeting, a teleconference is probably ineffectual for such an important meeting. It should
be relatively easy for Rollin to find a videoconferencing facility.

   I would like to remind you that in my email of December 20th, I requested that you review and
confirm to us the accuracy of the pricing information that appears to have been proposed for 2008 in
your letter of December 19th. Given the nearness of the proposed annual meeting date, I ask for your
timely response so we can have sufficient time to prepare for the meeting.

Sincerely,
Bill

# EXHIBIT E



# LION NATHAN

Lion Nathan Limited, ABN 34 093 160 448

Level 30, 363 George Street, Sydney NSW 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225 Australia
Telephone 61 2 9290 6600  Facsimile 61 2 9290 6699  Web Site www.lion-nathan.com.au

17 January 2008

Mr. William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL 60044

**VIA E-MAIL**

Dear Bill,

Thank you for your email responding to my letter regarding the 2008 Marketing meeting and for Jennifer Thomason's email confirming that January 24th works at your end for holding the annual marketing meeting.

I must, however, in the spirit of open communication which is necessary to the success of our commercial relationship express my disappointment that the key members of your sales and marketing team, Tom Steffanci, Dave Lane and our brand manager Jennifer Thomason, cannot find time to travel to Oregon for the annual meeting. While it is true that they came out to Oregon for the annual meeting last year, the meeting was much shorter than planned eliminating the opportunity to visit the facility, taste the new wines, or tour the vineyards telling the story of Argyle. The abbreviated nature of the meeting and visit resulted in no discussion of long term strategy or specific actions required to implement that strategy. This was truly a missed opportunity for your people. Unlike our previous experience with Dreyfus Ashby, neither your brand manager nor your top sales and marketing people have visited the winery on a regular basis to become familiar with our wines and the Oregon terroir from which they emerge.

Given Rollin's schedule and your team's inability to schedule a West Coast meeting at any time over the next six weeks it appears that a video or telephone conference will have to do this year. While it may be difficult for your team to find time to travel out to Oregon for the annual meeting this year we believe it is very important to the success of the 2008 marketing effort for Tom, Dave and Jennifer to make time for the trip. By being in Oregon they and Rollin could not only plan at length for 2008, but also discuss the recent vintages, taste the array of Argyle's splendid wines and visit the wine growing area. A follow up visit by Terlato's top sales managers would benefit any programming decided upon for the 2008/9 period. This would no doubt make a great difference in the ability of your team to understand and successfully promote Argyle's wines in 2008 and beyond.

Given the long term nature of the marketing agreement between our companies, having Tom, Dave and Jennifer make the trip this year with enough time budgeted and spent for a meaningful meeting, as well as having members of your Sales and Marketing team visit on at least a semi-annual basis to taste the wines, is not only a wise investment of your company's time, but is essential to Terlato's ability to adequately represent the Argyle brand.



With regard to the proposed price increases let me provide further explanation. We acknowledge that you were requesting price increases last year which we were uncomfortable agreeing to. The fact that prices have indeed been held back in recent years, the apparently insatiable domestic demand for Oregon wine, in particular pinot noir, increases in pricing of other comparable Oregon brands, the continuing accolades in the wine press for Argyle wines, increased production costs, a need for greater return on investment, as well as the need for us to accumulate capital to sustain and potentially expand our business in Oregon, have caused us to reconsider our decision and to adopt a more realistic and profitable pricing structure. While we realize this may cause upward adjustments in the wholesale and retail price structure for our wines we are confident, given the assurances you have given us that your sales people are the best in the business, that the proposed price increases will not have an adverse impact on total sales. Furthermore, we do not anticipate in the current wine sales climate that you will have difficulty selling through the wines allocated under our Agreement to you in a manner that is reasonably profitable for you as well as for us.

We are pleased that you did not object to the total proposed Target Case Sales number. We provided target case sales numbers on a product by product basis to provide you with a clear understanding of our expectations for sales on a product by product basis. We believe that providing this expectation and reaching agreement on it beforehand is the best way for the parties to work together to achieve the maximum possible Target Case Sales.

As far as the numbered requests are concerned we are puzzled by your reaction. We developed the numbered requests in order to provide a clear framework for the parties to work together to increase sales, which as we all know is the fundamental goal shared by the parties under our marketing agreement. It is also our understanding that the information we have requested is or could be readily available to you. We are prepared to discuss at the annual meeting how best to address any concerns you have to the extent that any of our requests for information are not readily available or which in your view impose unreasonable burdens on your team. Otherwise, we again request that pursuant to your duty to use best efforts to promote, distribute, market and sell Argyle wines that you agree to the numbered requests.

Given the ever increasing popularity of and demand for Oregon wine in the U.S. market we look forward to discussing and implementing a marketing strategy which will be most likely to enable you to achieve the Target Case Sales figures contained in my December letter to you.

Finally, we request that you reconsider your decision not to send Tom, Dave and Jennifer to participate in the annual meeting in Oregon. We feel strongly that their participation in a productive meeting in Oregon this year is critical to the future of the Argyle brand and our successful collaboration in 2008. I look forward to hearing from you.

Sincerely,

Anthony Roberts
General Manager
Lion Nathan Wine Group

# EXHIBIT F

Argyle-Terlato Annual Sales and Marketing Meeting ReCap
January 2008

Terlato's agenda did not include an assessment of Argyle's Brand health or enhancement, instead it focused on Argyle's proposed 2008 Target Case Sales and pricing. Terlato followed its agenda. Terlato provided no information regarding past or proposed future marketing efforts. There was, for example, no recap of Terlato performance to its Marketing Plan of last year which would have been valuable.

The following is a summary of Argyle's comments. The wines listed in Argyle's version of a Targeted Sales spreadsheet provided to Terlato before the meeting are the best Argyle has seen since its inception in 1987. The volume is great and back to normal for Oregon viticulture. The wine press recognition for Argyle wines is at an all time high even with the difficult and short vintages of 2004 and 2005. Argyle has worked aggressively to increase its wine quality over all, build wine press, and invest in moving Argyle's mix of wines into higher amounts of our most sought after Prestige level wines.

In 2006, Argyle's vineyard and winemaking execution was brilliant. Through attention to detail and investment into improving already high quality, Argyle's wine will display a discernibly higher concentration of flavor than many competitors inside and outside the USA. Argyle is very excited about the opportunity this vintage presents to Terlato.

The Argyle proposed Target Case Sales presents an **opportunity** for Terlato to step up their attention for our Argyle Brand, build broad distribution, and position Argyle into the Top Tier of the World's greatest wines. Argyle has consistently asked Terlato to take a close look at Argyle's current distribution and identify markets that are underperforming and report these findings back to Argyle. In addition, a professional pricing survey was to have been completed 12 months ago and presented to Argyle, so that we both could have "worked together" to develop a sales strategy. Terlato stated Argyle was "working in a vacuum" when Argyle developed its proposed Target Case Sales document. This is false. In any case, it is Terlato's responsibility to maintain Argyle's understanding of the USA market vis a vis Argyle's potential (see Reports).

Argyle again asked Terlato to take a serious look at the current distribution, allocation, and positioning pre-conceptions within its own ranks before it proposes its version of Targeted Case Sales. Argyle believes its proposed Targeted Case Sales is achievable if Terlato places Argyle as "Top of Mind" within their organization.

Argyle emphasized during the entire meeting its contention that Argyle's proposed Targeted Sales document presents a very positive opportunity for Terlato and reflects the hard work and investment Argyle has made into its valuable brand image and quality.

**Argyle's response on a point by point basis to Steffanci "Argyle Meeting Recap"**

See Tom's Ten Key Points dated January 24, 2008:

1.  Bill Terlato promised to deliver his Targeted Case Sales number for F2009 within one week of the meeting. We have not received it as of February 6. When will marketing information supporting Terlato's Sales Goal be presented?

2.  Argyle in the end agreed to Terlato's price rises of 2007. Inventories at the wholesale level have grown by 30% since then. This is due to Terlato's inattention to the Brand and poor execution, made worse by not having a marketing plan, rather than the price increases. Argyle hopes that its proposed Targeted Case Sales will encourage Terlato to focus on our valuable brand and execute on Terlato's promised marketing actions and wine sales programs. Argyle's current "strategy" is to convince Terlato to "reposition" Argyle within Terlato's own perception of our brand, use Terlato's "expertise and closeness to the market", thus challenge Terlato to do what they claim to do best, i.e. sell the highest quality wines at the highest possible prices using its "unique" marketing expertise.

3.  Argyle is entitled under the Agreement to set prices in its sole discretion. Argyle has no obligation to justify price increases to Terlato. Argyle's proposed price increases are in any case reasonable when worked toward Suggested Retail Pricing. Argyle realizes that it cannot "control" pricing set by Terlato to Wholesalers. Argyle has found that other National Distributors extract gross profit margin of 15% - 25% from Domestic wine suppliers. Today, Terlato enjoys an average of 35% gpm on Argyle products. Argyle agrees that the winery should receive the "lion's share" of any price increase as it is the winery who takes the most risk. In this relationship, it appears that Terlato enjoys the "lion's share" of profit compared to a competitive set of national distributors. Argyle had hoped that with Terlato's higher profit, the brand would receive more attention from Terlato.

    i.   Please report what changes in Pinot noir supply and consumer demand that Terlato is aware of. Production of high quality California Pinot Noir is significantly down for the 2007 harvest, while pricing for Burgundy, New Zealand Pinot noirs are sharply up for 2005 and 2006 wines.

    ii.  The Argyle "brand" allocation to Terlato was up 23% in FY2008, and proposed target case sales are up 27% for FY2009. This displays a consistent, moderate rise in volume in a market Terlato contends is in "short supply".

    iii. Please send us the reports Terlato claims indicate historically sharp drops in consumption of high quality, Argyle-like wines as a result of economic factors.

    iv.  Please supply Argyle with report of "competitive price moves"

    b. Show results of consumer consumption of Pinot noir, Chardonnay, and Sparkling wines as Argyle is not a Pinot Noir only producer.

        i. 2007 calendar allocation was 39,868 cases to Terlato and characterized as "short supply" by Terlato. 2008 calendar allocation is a potential 50,557 cases for a moderate increase of 27%.

        ii. Report economy's effect on fine wine consumption.

        iii. The "extraordinary" portion is that Terlato has not positioned Argyle higher within Terlato's own perception of the quality and potential of this brand. Argyle sees its brand positioned amongst the Best of "grower sparkling wines" and competitive with the best of California, France, and New Zealand for its Chardonnay and Pinot Noir. Argyle's own investment in quality improvement and wine press recognition must be equally reflected by its Distribution partner.

4. Argyle is entitled under the Agreement to set prices in its sole discretion. It is not required to provide justification to Terlato. Nonetheless, Argyle has, in an attempt to maintain a good working relationship with Terlato, provided numerous bases for the price increases. As to overall strategy, the price increases are in line with Best in the World brands. Argyle has consistently placed its wines and reputation amongst the "Best in the World" as indicative of its possession of 9 Top 100 Wines of the World selections, inclusion into the Best of World Pinot Noir seminars, leadership in Sparkling wine quality as evidenced by it consistent high scoring and inclusion on important Sparkling wine panels. For 2007, Argyle had the top scoring Sparkling wine and chardonnay within the Wine Spectator (its Chardonnay was recognized in Food and Wine's top wines of 2007 wrap-up). All of Argyle's prestige Pinot noirs scored above 90 points. Argyle looks forward to hearing just where its own Marketing partner believes Argyle fits in the World of Wine. It's clear that wine experts believe Argyle is positioned in the Best in the World category.

5. Argyle's tasting room sales are in line with suggested retail pricing.

6. A long ago promised Competitive Set Survey from Terlato was promised again, this time by March 15, 2008. Argyle looks forward to seeing where Terlato places the Argyle brand within the world of fine wines.

7. Rollin is available to present Argyle wines to Terlato National Sales Meeting on either the 15th or 16th April 2008. Please indicate date, time of your preference.

8. Four travel periods for Rollin were presented in the spring of 2007 to Terlato. Terlato did not organize any travel for Rollin in 2007. In this same period, Rollin played a major role in Oregon Pinot Camp, organized with Terlato wine supplier, Bollinger, a major panel for Sparkling wine for the International Pinot Noir

Celebration, hosted Harvest Lunches for wine trade during vintage, participated in the unique B.O.B. event in Phoenix for Arizona wine trade, attended the Wine Spectator New York Wine Experience, and in January 2008 Rollin and Chris Cullina participated in the unique B.O.B. series of wine trade and consumer events across Florida. In addition, Rollin hosted wine press from Wine Spectator, Wine Advocate, Decanter Magazine as well as financed continuing Oregon Chardonnay Alliance efforts with the wine trade and wine press for Argyle's important chardonnay program. Argyle cannot afford to allow Terlato to continue to impede its access to the wine marketplace. Rollin's available dates through September 2008 are limited due to his responsibilities at the winery and existing commitments. He will be in Philadelphia on March 5 and 6 and New York the week of March 10, 2008. He is available to work with you while in New York. He has already agreed to attend your April 2008 national meeting. He has availability the week of May 19, 2008, in Texas. June and July are already booked due primarily to Oregon Pinot Camp and IPNC commitments. August is not open due to pre-crush activities. Please contact Rollin directly to discuss scheduling. We employ Chris Cullina as our national sales manager. If you have additional sales call dates in mind, please contact Chris to schedule meetings. He is, as you know, available for 20 weeks of travel each year.

9.  In Terlato's Marketing Plan F2008 one of the "Success Factors" was that Argyle "tightly managed allocations/releases to ensure year round presence of products". Argyle tries to work with its Brand manager who we assume works in concert with Terlato sales to plan the allocation of Argyle wines. Argyle believes any characterization of Terlato's allocation process as "cumbersome" and "difficult to steer" is solely derived by Terlato's lack of attention and ability to work the allocation plan. Unfortunately, Argyle does not receive enough sales information for it to evaluate Terlato's prodigious allocation changes in the last 12 months. Please explain to Argyle how Terlato plans to bring its allocation process back into manageable shape.

10. Suggested metrics will be sent in a separate document. Please provide Argyle with samples of the reporting Terlato does for its other domestic wine suppliers. In calendar 2007, the only report Argyle received was a difficult to read depletions report, deleting wholesaler inventory, wholesaler totals, and regional totals. This is the only monthly report Argyle receives. No monthly commentary accompanies this depletions report.

# EXHIBIT G

Rollin,

Thank you for your note. I understand you have been out of the office lately, and I have as well. In an effort to continue our dialogue, I want to respond to a few of the topics you addressed and also think it would be helpful for us to speak in the near future.

<u>Pricing Strategy</u>

After receiving confirmation of the extraordinary price increases that Lion Nathan announced prior to the Annual Meeting, our first priority in the conference call was to attempt to understand Argyle's new strategy and what led to the dramatic change in your pricing strategy. From our perspective, as we have repeatedly advised this type of unprecedented price adjustment is very detrimental to the brand's success. Therefore, before revising our marketing plan, we still need to understand your rationale for repositioning the brand. Even after our lengthy conference call in January, we are unclear as to what motivated such a dramatic change in pricing and corresponding brand positioning because you were not able to offer any insight on these issues.

In fact, in your letter, you note that you do not think you are "required to provide justification" to Terlato for your price strategy change. Putting aside the legal issues that might be associated with such a comment and recognizing that the issue of price was already the subject of an arbitration when you sent your recap of our January meeting, I am disappointed to hear that from you. First, I would think that you would want for us to understand the thinking behind your pricing strategy. Last year when we wanted to take a modest increase, you were opposed and I had several calls with you to explain why we felt that that was appropriate for the brand. While there was no requirement to do so, I did that because it was the right thing to do not because of the contents of the contract. It is just good business and basic professional courtesy. Second, the contract requires Lion Nathan to "consult" with Terlato before setting a new price. We believe that determining a price (particularly a price that is so inconsistent with your prior strategy), in the absence of that consultation, violates both the letter and the spirit of the contract. Third, even assuming that the price increase was to occur --a decision which TWI is challenging in the price arbitration noted above--we would nevertheless need to understand the rationale for the price adjustment in order to explain it to our distributors and their customers in the event the price increase is allowed. We even asked you several times during the meeting how you plan to explain the price change to your tasting room visitors and club members and never received an answer. We would once again ask you to provide us information regarding your planned strategy.

It is still very hard for us to believe that you personally agree with and support the price increases that Lion Nathan apparently intends to pursue in the event we do not prevail in the price arbitration. Although you criticize TWI for "not positioning Argyle higher," you were on the exact opposite side of that debate less than 12 months ago. We have had no discussion whatsoever during the past year about any, let alone this dramatic, repositioning of the brand and your criticisms of us this year are at odds with your views last year. You acknowledged during our meeting that last year you were adamantly

opposed to even the modest price increases that we had proposed. In the end, we agreed to move forward with those price adjustments and, as you acknowledged, our judgment proved to be right last year. What has changed that warrants dramatic price increases this year?

We are concerned about the effect that these extraordinary increases will have on the brand and we ask once again that you reconsider. In fact, while you are quick to tout Argyle's Wine Spectator reviews, you are taking a risk relative to future reviews if the proposed price increases become a reality, as price is one of the factors considered by the Wine Spectator in determining their ratings. Given our experience in the business and the success we have achieved with Argyle, we hope that you recognize that our judgment may again be right.

Although we would support a well thought out and long-term strategy to raise prices gradually over time, we think a sudden increase of this magnitude will be perceived in the market as unreasonable. Many great brands have taken steady price increases over the years but few, if any, US brands of Argyle's scale have increased prices on its entire range of items from 22-97% in one year. We agree that the quality of your wines is excellent, but that has been true for many years. Argyle's reputation will undoubtedly support a gradual move to a higher price point. However, our experience and understanding of the market make it clear that the dramatic price increase Lion Nathan is demanding will significantly damage the brand. If you are aware of any brands with Argyle's scale that have effected such dramatic price increases in the midst of the economic conditions currently in effect in the United States, we invite you to identify such brands for us. We are not aware of any such instances.

It is also important to consider that Argyle has been unable to provide TWI with ample supply and as such the market was often out of stock and as a result distribution points were lost. When Argyle wines were re-released the distribution was rebuilt by TWI and its distributors and we are very proud of the job that our team has done building and rebuilding Argyle distribution each year. If the pricing strategy was not changing so dramatically, we would agree with you that your increase in availability would create an opportunity for distribution growth. The price increase, however, will undermine this opportunity.

## Your Requests for Information

In your recap, you asked us to provide market price survey information, information relating to the pinot noir market, a report on the impact that the slowing economy has on fine wine consumption, and information regarding other producers' Oregon Pinot Noir supply.

As promised, you will receive our competitive set survey on March 15, 2008.

The general demand for pinot noir remains strong, although the increases we had been seeing in demand for the varietal has slowed as the market for the varietal matures.

Under these circumstances and other market conditions, we do believe there is room for a modest price increase relative your pinot noir wines as opposed to the larger increase you are pushing.

On the question of the relationship between the economy and fine wine consumption, we each must recognize that it is difficult to precisely isolate variables and pinpoint the economy's impact on consumption for particular brands and varietals. We are also confused by your request for reports indicating "historically sharp drops in consumption of high quality, Argyle-like wines as a result of economic factors." As noted below, Bill provided a proposed Target Case Sales figure earlier this month using 2007 prices of 41,600 cases, which is a 20% increase over 2007 depletions. We are not, as your request suggests, proposing a decrease in the TCS figure if 2007 pricing remains constant, nor would we be opposed to more modest prices increases provided that such price increases were factored into a revised TCS proposal. Our concerns relate more to the large price increases Argyle desires, which even if the economy were strong would be without precedent.

With respect to the final request, we do not have a data source to access the availability of other producers' Oregon Pinot Noir supply. Given your relationships with your neighbors, I would think that you would be able glean some information regarding their supply and, if so, would ask you to share that with us.

We will provide monthly reporting as provided for in our agreement. Live commentary can be provided live, as well, if you are available for monthly calls.

Other Issues

There are several other points that you raised in your letter, which I would like to address and/or correct:

- Contrary to your statement, distributor inventories on Argyle are currently very healthy and we are not in an over-stock situation.

- Bill has already sent you our proposed Total Case Sales figure for 2008. he sent that information on February 8, 2008. You have not responded, and he sent you a note again yesterday requesting a response. As he indicated in his note, this year's process is a little unusual because pricing is the subject of an arbitration and we remain hopeful that we can agree on how to proceed pending a resolution of that arbitration to protect the brand. We also remain willing to discuss this if it will help achieve a resolution.

- Your increase in available cases combined with an average 43% price increase is absolutely not moderate (as you assert) and, as noted above, we believe it is unprecedented among similar sized US brands.

- Your claim regarding travel is simply inaccurate. As you are well aware, we requested on many occasions via email and phone calls to get available dates from you. In each case, you either failed to reply or stated that you were not available. During the New York Wine Experience Bill Terlato, David Lane and Pete Danko addressed the issue with you in person and you stated that you did not intend to schedule market visits with TWI. Traveling on behalf of the brand, visiting our distributors and seeing key customers with the TWI team and the distributor is important. I do not understand how organizing a Bollinger visit to Argyle is relevant. You are giving us very narrow windows to organize travel for 2008 but we will attempt to set up some market visits.

- We will manage the all future allocations and related decisions. Please do not impede or amend orders that you receive from us. Our orders will serve as your confirmation of which markets received the goods.

On your end, we would ask that you plan to present at our National Sales meeting on April 16th in the morning in Santa Barbara California.

I am also a bit perplexed that you opened your letter with comments on the agendas we exchanged prior to our meeting and accusations that we did not address the topics on your agenda. As you know, you did not even forward your proposed agenda until 7:30 p.m. the night before our meeting. In addition, you did not complain about this topic in our call and, in fact, were provided the opportunity to raise any issues you wanted to raise during our meeting, regardless of whether the issue was on one, both or neither of our agendas. In any event, we are more than happy to schedule another session to cover any topics you wish to discuss.   Let us know if there are dates and times when you are available and send us a proposed agenda.

Finally, your recap made a vague reference to cataloguing our supposed "pre-conceptions" regarding the Argyle brand. There is no ambiguity in our mind. Argyle is a fantastic brand and we are very enthusiastic about the brand. We also believe that there is room for price increases. We disagree, however, with your apparent pricing strategy as noted above. As Bill mentioned in his last note, we are happy to discuss these issues with you.

As always, we look forward to continuing our work together..

Thank you,

Tom Steffanci

# EXHIBIT H

# AMERICAN ARBITRATION ASSOCIATION

PATERNO IMPORTS, LTD., d/b/a Terlato Wines
International,

                    Petitioner,

       v.

LION NATHAN ENTERPRISES PTY LIMITED,

                    Respondent.

        )
        )
        )
        )
        )
        )    AAA No. _____
        )
        )
        )
        )

## ARBITRATION DEMAND

Petitioner Paterno Imports, Ltd. d/b/a Terlato Wines International ("Paterno"), by and through its attorneys, states as follows for its Arbitration Demand against Respondent Lion Nathan Enterprises Pty Limited ("Lion Nathan").

## FACTUAL OVERVIEW[1]

Paterno is a premier importer and marketer of premium and super-premium wines in the United States. Lion Nathan is an Australian-based publicly traded corporation, primarily involved in the production and distribution of beer and wine. Lion Nathan owns the well-regarded Argyle winery in Oregon's Willamette Valley. Among other offerings, the Argyle winery is best known for its Pinot Noir and sparkling wines.

On June 23, 2003, Paterno entered a "Marketing Agreement" ("Agreement") with Lion Nathan, an executed copy of which, as amended in November 2005, is attached as Exhibit A.[2] Pursuant to the Agreement, Paterno retains the exclusive right to import, sell,

---

[1] The summary contained above is not a complete rendition of all relevant facts, and Paterno reserves the right to supplement or amend this overview, as well as offer additional evidence at the arbitration hearing.

[2] Paragraph 14 of the original Agreement contains the arbitration provision.

market and distribute Argyle wines in the United States and other territories. Paterno retains this right until at least June 23, 2023, the earliest date that the Agreement may expire.

Despite the fact that sixteen years remained on the term of the Agreement, at a meeting on June 28, 2007 and again in a letter dated August 24, 2007, Lion Nathan announced its intent to terminate the Agreement on or before the end of its fiscal year, September 30, 2007. Lion Nathan did not specify in the letter any basis for termination, nor did it identify any sort of breach of a contractual obligation by Paterno. Lion Nathan, which now had new management, simply wanted out of the Agreement its prior management had only recently executed and amended.

Paterno rightfully rejected Lion Nathan's efforts to unlawfully terminate the Agreement. Stymied in such efforts, Lion Nathan is now engaged in a thinly-veiled effort to undermine the Agreement under the guise of a price increase. Specifically, Lion Nathan announced its plans to increase the price of Argyle wines by an average of more than 40%, with price increase for individual wines ranging from 22% to 97%. Although the Agreement provides that Lion Nathan has the "sole discretion" to establish a price, Lion Nathan has not acted in good faith in setting the price and is therefore in breach of the Agreement. See 810 ILCS § 5/2-305(2).

Paragraph 5 of the Agreement requires the parties to hold an Annual Meeting to address the price of the wines for the upcoming year, as well as the goal for total shipments ("Target Case Sales"). Under the Agreement, Lion Nathan has the "sole discretion" to establish the price of its wine, but is required to consult with Paterno before doing so. Exhibit A ¶5.B.1. At the Annual Meeting, the parties must also agree on the

goal for total brand shipments ("Target Case Sales"), the goal against which Paterno's performance for the year is measured. However, in the event that the parties are unable to agree to a Target Case Sales figure for the year, the Agreement provides that they must submit a proposed Target Case Sales figure to an arbitrator in a baseball-style arbitration in which the arbitrator selects one of the two proposals.

This year, the Annual Meeting was held on January 24, 2008. More than a week before the Annual Meeting, however, without ever consulting Paterno, Lion Nathan unilaterally announced its plans to implement a price hike averaging more than 40%, effective March 1, 2008. The magnitude of this price increase is unprecedented and reflects a drastic departure from past price discussions. During the 2007 Annual Meeting, for example, Lion Nathan vehemently opposed even a modest price increase recommended by Paterno, despite the fact that supplies of Pinot Noir were limited and the market was more receptive to an increase based on the shortage of wine.

At the January 24, 2008 Annual Meeting, Lion Nathan confirmed its plans to increase the price of Argyle brand wines by more than 40% and simultaneously sought to increase Target Case Sales by approximately 20,000 cases. Paterno expressed concern that a 40+% price hike could pose serious risks to the Argyle brand in the market. It explained that if Lion Nathan wanted the brand positioned at a higher price point, the horizon for such a complete repositioning of the brand would normally be at least five years. Paterno also emphasized numerous other factors illustrating the ill-advised decision to implement such a large price increase, including the following factors:

(1)     The supply of Pinot Noir overall has increased as plantings have begun to catch up with demand for the varietal;

(2)     Argyle's available wine supply for 2008 is 46% greater than the amount of wine sold by distributors in calendar year 2007;

(3)     The United States economy is weaker than it has been in some time, and is likely to weaken further and possibly slip into recession;

(4)     The difficulties associated with proposing less drastic price increases under more favorable economic conditions, much less the current conditions;

(5)     The price increase is not only extraordinary, but is inconsistent with Argyle's past pricing strategies, the Argyle brand proposition, the approach to pricing of competitors in Oregon, and industry norms.

Despite Paterno's extensive experience in marketing wines in the U.S. market, Lion Nathan completely disregarded Paterno's expressed concerns. And, although Paterno has repeatedly inquired about the basis for the price increase, Lion Nathan refuses to offer any explanation or rationale for its abrupt change in strategy beyond a general desire to increase profits. As of the filing of this demand, Lion Nathan remains insistent on implementing its dramatic price increases effective March 1, 2008.

There is no legitimate basis for the price increases Lion Nathan seeks to impose on the brand and Paterno. Lion Nathan has breached the Agreement by insisting on a price increase that departs so drastically from the parties' course of dealing, all without advancing any plausible explanation for its drastic change in pricing strategy but only months after Lion Nathan's failed efforts to terminate the Agreement.

## REQUESTED RELIEF

Paterno seeks a declaration that Lion Nathan has breached the Agreement by proposing the dramatic price increases noted above in violation of its duties of good faith, fair dealing and honesty-in-fact. Paterno further requests that the Arbitrator establish a reasonable price, as contemplated by 810 ILCS § 5/2-305(2), and award Paterno all other relief deemed just and equitable, as well an award of all fees and costs.

DATED:  February 5, 2008

Respectfully submitted,

PATERNO IMPORTS, LTD.

One of Its Attorneys

Derek J. Meyer
Holland M. Tahvonen
McDermott, Will & Emery LLP
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Fax: (312) 984-7700

CHI99 4937415-3.063476.0024

# EXHIBIT A

# AMENDMENT TO LION NATHAN AND PATERNO

## MARKETING AGREEMENT

This Amendment to the June 23, 2003 Lion Nathan and Paterno Marketing Agreement ("Amendment" and "2003 Agreement," respectively) is entered into between Lion Nathan Enterprises Pty Limited, on the one hand, and Paterno Imports, Ltd., d/b/a Paterno Wines International ("Paterno"), on the other hand, both of which are sometimes collectively referred to below as the "Parties" and individually as "Party."

WHEREAS, the Parties wish to amend their 2003 Agreement;

IT IS AGREED by the Parties, in consideration of the mutual undertakings and releases contained herein and for other valuable consideration, the sufficiency of which is hereby acknowledged, that:

1. All capitalized terms in this Amendment shall have the same meaning as in the Agreement.

2. Paterno claims that it fully achieved 2005 Target Case Sales and Lion Nathan claims that it never reached agreement on a 2005 Target Case Sales goal with Paterno. Each Party releases the other Party and its representatives of any and all claims relating to whether Paterno fully achieved its 2005 Target Case Sales goal and/or whether the Parties reached Agreement on a 2005 Target Case Sales goal under Section 5(B) of the 2003 Agreement. All issues regarding 2005 Target Case Sales have been resolved and the terms of Section 6(B) of the 2003 Agreement shall not apply for purposes of 2005 Target Case Sales.

3. Effective April 1, 2006 or such earlier date as may be agreed in good faith by the parties, all current and future SKU's or variants of the Petaluma, St. Hallet, Mitchelton, and Wither Hills brands (collectively, "the Lion Nathan Australasian Brands") will be excluded from the definition of Products in the 2003 Agreement. The Lion Nathan Australasian Brands will also not be included in the forthcoming discussions for 2006 Target

Case Sales and there will be no target for those brands through April 1, 2006. Prior to that date, Paterno shall continue to carry the Lion Nathan Australasian Brands in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement.

4. Other than paragraph 2 above, nothing in this Amendment shall be construed to affect each Party's rights and obligations relative to the Argyle Brand, which shall remain within the definition of Products in the 2003 Agreement.

5. On or after December 1, 2005, representatives of Lion Nathan and Paterno will meet to discuss a new agreement relative to the Lion Nathan Australasian Brands. In the event they do not come to Agreement by December 31, 2005 or such later date as the parties may mutually agree upon, Lion Nathan will be free to enter an agreement with another entity relative to those brands to become effective April 1, 2006. At the request of Lion Nathan, Paterno shall continue to carry the Lion Nathan Australasian Brands for up to 90 days after April 1, 2006, in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement. With effect from the date on which the Lion Nathan Australasian Brands are released from distribution by Paterno pursuant to this clause, the parties will release each other from all claims relating to the Lion Nathan Australasian Brands, excluding any claims related to the parties' rights and obligations under Section 7 below, including the payment obligations of Paterno for stock purchases in excess of amounts due for returned inventory, if any, and Section 9 of the 2003 Agreement.

6. Section 4(B)(4) of the 2003 Agreement is amended to exclude from New Products which Lion Nathan or a LN Related Entity decides to market in the Territory those additional wine brands which are produced in Australia or New Zealand.

7. In the event that Lion Nathan and Paterno do not enter a new agreement relative to the Lion Nathan Australasian Brands, the terms of Section 7 of the 2003 Agreement shall govern the procedures regarding those brands.

8. The term "Agreement" in the 2003 Agreement shall be deemed to include this Amendment and this Amendment is incorporated into the 2003 Agreement by reference.

9. Unless explicitly modified by the terms of this Amendment, all other terms and conditions of the 2003 Agreement shall remain in full force and effect as set forth in the 2003 Agreement.

10. The Parties mutually warrant and acknowledge that no promise or inducement has been offered to any of them, other than as hereinabove set out, and that this Amendment is executed without reliance upon any statements or representations by any of the Parties or their representatives.

11. No Party shall be deemed to have drafted this Amendment or any terms herein, and it shall be deemed a joint effort of the Parties.

12. This Amendment shall be construed in accordance with and governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

IN WITNESS WHEREOF, the parties have agreed, accepted and signed this Amendment this 27th day of November, 2005.

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____

William A. Terlato, President & C.E.O.

Executed by
LION NATHAN ENTERPRISES PTY LIMITED
in accordance with Section 127(1) of the Corporations Act (2001)

Attest: _____

By: Robert Murray, DIRECTOR          Duncan Makeig SECRETARY
[Name, title]

# LION NATHAN AND PATERNO

## MARKETING AGREEMENT

Agreement made this _____ day of April 2003, by and between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) having its principal place of business at Level 30, 363 George Street, Sydney NSW 2000, Australia (hereinafter "*LN*") and Paterno Wines International, (an Illinois Corporation), having its principal place of business and offices at 900 Armour Drive, Lake Bluff, Illinois 60044, USA (hereinafter "*Paterno*").

## RECITALS

A     *LN* through its various subsidiaries carries on business as a premium winemaker and manufactures markets and sells premium wine in Australia and other areas throughout the world.

B     Paterno carries on business as a marketer and importer of wines and other related products.  Paterno has the expertise to import and market LN's products and to maintain and enhance the image and profile of *LN's* products.

C     Paterno has agreed to accept the appointment as the importer and marketer of the Products in the Territory on and subject to the terms and conditions of this Agreement.

## WITNESSETH

In consideration of the mutual promises and covenants herein contained, *LN* and *Paterno* agree as follows:

1.     APPOINTMENT

*LN* hereby grants to *Paterno* the exclusive rights to import, sell, distribute and market the wines specified in Exhibit C (hereinafter the "Products") effective from the date specified in the Product Migration Schedule for the relevant Product set out in that Exhibit C and as specified under the terms of this Agreement in the United States of America, the District of Colombia, and all possessions of the United States including Puerto Rico, and those in the Caribbean Islands as well as sales to cruise lines and airlines, originating in the Territory (hereinafter collectively the "Territory").  The Products shall not include wine sold directly to consumers

(not for resale) at the tasting rooms or through the Wine Clubs of *LN*'s licensed United States wineries or those of any LN Related Entity (as defined in Section (4)(B)(4))(hereinafter collectively "Winery Direct Sales").

The parties will co-operate in good faith in relation to the migration of the Products to the exclusive distribution of Paterno in the Territory in accordance with the Product Migration Schedule.

2.    COMMENCEMENT AND TERM OF AGREEMENT

This Agreement will come into effect from the date on which the following Exhibits to this Agreement are finalized and executed between the parties (such date referred to as the "Effective Date" of this Agreement.):

| | |
|---|---|
| Exhibit A | Initial Prices |
| Exhibit B | List of Trademarks, Trade Names and Domain Names |
| Exhibit C | Products and Product Migration Schedule |
| Exhibit D | Reporting Format |
| Exhibit F | Initial Target Case Sales |

The parties will exercise their respective best endeavors in good faith to complete such Exhibits on or before 30 April 2003 or such later date as may be agreed.

This Agreement shall be for an initial term of twenty (20) years, commencing on the Effective Date. This Agreement will automatically continue after the initial term for successive terms of twenty (20) years each unless written notice is given by registered mail by either party to the other of the intent not to renew, no later than two (2) years prior to the expiration of the original period or any subsequent period as applicable.

3.    TERMS OF SALE

A.    The agreed prices for the Products shall be stated F.O.B Port in US Dollars and are set forth in Exhibit A which Exhibit is incorporated and made part of this Agreement. Such prices shall be altered only in accordance with Section 5(b)(1) of this Agreement.

B.    The terms of payment shall be sixty (60) days from date of shipping and payment shall be in US dollars by wire transfer to an account specified by *LN*. *Paterno* is not entitled to withhold payment or to make any deduction from the price at which the Products are supplied to it or at its direction by *LN*.

C.    *Paterno* may, in its discretion from time to time, purchase the Products from *LN* and request that *LN* ship such Products to specific customers of *Paterno* in the

Territory for *Paterno's* account and at *Paterno's* expense. *Paterno,* in such cases, shall assume full liability for payment thereof upon the same terms and conditions as if *Paterno* were purchasing such products for direct delivery to *Paterno*

D.  Title and ownership of the Product which is shipped by *LN* to a *Paterno* warehouse, as opposed to a direct shipment to a specific customer of *Paterno's* as provided for in Section 3(b) above, will not pass to *Paterno* and is retained by *LN* until *LN* receives payment in full for the relevant Products.

4.    PERFORMANCE STANDARDS

A.    *Paterno* agrees:

1.    To use its best efforts to promote, distribute, market and sell the Products within the Territory;

2.    To use the channels of distribution, which in their reasonable discretion are best for the Products and their integrity or reputation as premium quality wines;

3.    That it will not distribute or sell the Products outside of the Territory or within the Territory for resale outside of the Territory;

4.    That it will hold *LN* harmless from any and all fines, levies, damages, and costs of judgments that *LN* may be required to pay as a result of *Paterno's* failure to comply with applicable laws in the Territory including, but not limited to, the payment of any taxes and the maintenance of appropriate licenses;

5.    To inform *LN* promptly (within thirty (30) days) of learning of any material quality problems or complaints about the Products;

6.    In the event that *Paterno* becomes aware of sales of the Products in *Paterno's* territory in violation of this exclusive agreement, *Paterno* shall immediately notify *LN* thereof in writing;

7.    That it will not alter or permit any alterations to the Products and that it will hold *LN* harmless from any accident, damage, loss or injury to any person or property or any other liability caused by any Products altered by *Paterno* or which *Paterno* knowingly permitted to be altered;

8.    That *Paterno* shall bear all costs and expenses of selling, promoting, advertising, and distributing the Products in the Territory except for those costs which *LN* shall incur in its sole discretion;

9.    That it will not do anything that might reasonably be expected to prejudice the integrity or reputation of the Products as premium quality wines;

10.    To at its own expense, comply with all laws and hold all licences and authorities necessary to enable it to lawfully promote, sell and distribute the Products in the Territory;

PWI Lion Nathan Agreement

11.    To purchase the Products only from *LN*;

12.    To provide *LN* with Reports in the format, containing the information and at the frequency as set forth in Exhibit D.

B.    *LN* agrees:

1.    That it will not ship or sell the Products to the Territory, except upon the order or by the direction of *Paterno*;

2.    That it will refer to *Paterno* any and all orders and inquiries for such Products that it may receive for shipment to customers located within the Territory;

3.    That *LN* agrees to cease doing business with a customer who is found violating this exclusive agreement by selling the Products to customers in *Paterno's* territory and who fails to cease doing so within 30 days of receipt of a notice requiring it to do so ;

4.    Should either (i) *LN*, (ii) any entity in the Lion Nathan Group of Companies or under its control, or (iii) any entity under the control of any person or entity in the Lion Nathan Group of Companies which controls *LN* ('*LN Related Entity*') decide to market in the Territory additional wine brands, which wine brands are not marketed in the Territory by *LN* as of the effective date of this Agreement ("New Product"), then *LN* shall, if this Agreement is in full force and effect, present to *Paterno* samples of the wines and their packaging, as well as proposed pricing and sales and marketing expectations. *Paterno* shall thereupon have thirty (30) days from the receipt of *LN's* notice within which to decide if it desires to market such New Product in the Territory. In the event that *Paterno* desires to market such New Product, the parties will be required to negotiate a separate agreement for the marketing of this product, which shall be substantially identical in form, remaining term and substance to this Agreement. If *Paterno* does not notify *LN* within the thirty (30) day period or should *Paterno* decline to distribute the New Product, then *LN* shall be free to sell the New Product in the Territory through another company. "Control" or "control" shall mean in relation to any entity either holding, directly or indirectly, the right to elect more than fifty percent (50%) of the directors or cast more than fifty percent (50%) of the votes of the shareholders, partners, or members on matters to be decided by the equity holders, or otherwise having the right to direct the affairs, transactions or management of the entity.

LN will not be obliged to offer *Paterno* the distribution rights for any New Product in the Territory:

a.   where the New Product is acquired by *LN* or any *LN* Related Entity after the effective date of this Agreement and is subject to existing importation, distribution or marketing agreements in the Territory; provided that *LN* will work in good faith to migrate the New Products to *Paterno* as appropriate , but will not be obliged to break existing, binding importation, distribution or marketing agreements; or

b.   unless, at the time of granting of the distribution rights, *Paterno* has achieved the Target Case Sales in the immediately preceding Subject Year provided the Agreement has been in place for more than 12 months.

5.   **ANNUAL MEETING**

A.   The parties shall meet once each calendar year for the purpose of planning sales and marketing activities in the Territory ("Annual Meeting") for the coming year (Subject Year). The Annual Meeting shall normally take place in December of the preceding year and no later than February of the Subject Year or at such other time as the parties may mutually agree. The parties will meet in April 2003 for the purposes of planning sales and marketing activities for the period between the Effective Date and the commencement of the first Subject Year ("Initial Period") as well as the first Subject Year.

B.   During the Annual Meeting, the parties will consult about:

1.   The price for the Subject Year, and following such consultation, *LN* shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year. After the prices for the year have been established, *LN* will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by *Paterno* of notice of such change. The parties shall re-enter negotiations on Target Case Sales for the Subject Year under Section 5(b)(2) on account of any such price increases.

2.   The goal for total shipments of the Products to *Paterno* ("Target Case Sales") for the Subject Year. In establishing the Target Case Sales, the parties will take into account, among other factors, the price set under Section 5(b)(1), the quality of the vintage and the overall consumer

demand in the Territory for wines in the price category of the Products. If after mutual discussion and consultation the parties cannot agree upon the Target Case Sales, then such disagreement shall be resolved by binding arbitration under the provisions of Section 14. The Target Case Sales for the first Subject Year and Initial Period will be set out in Exhibit F. Once agreed and signed by both parties, the Target Case Sales for subsequent Subject Years will be deemed to replace that Exhibit F and to form part of this Agreement.

3. The overall price positioning of the Products in the Territory, but Paterno's resale price of the Products will be set in its sole discretion.

6.  TERMINATION

A.  Either party may terminate this Agreement, by written notice to the other party, effective sixty (60) days after delivery for any of the following reasons:

   1.  Insolvency of the other party; the filing of a voluntary petition in bankruptcy, reorganization or a similar proceeding by the other party; the filing of an involuntary petition in bankruptcy provided such petition is not vacated within thirty (30) days from the date of filing; the appointment of a receiver or trustee for all or a substantial part of the other party's property, provided such appointment is not vacated within thirty (30) days from the date of such appointment; or execution by the other party of an assignment for the benefit of creditors; or

   2.  The suspension of business, liquidation, dissolution, or termination of the existence of the other party; the condemnation, attachment, or appropriation of all or a material portion of the property of the other party; or

   3.  The failure of the other party to maintain, at all times, all federal licenses, permits, approvals, and consents necessary for the performance of its obligations hereunder, irrespective of the cause or reason for such failure, except that suspension of federal licenses or permits for a period of less than sixty (60) days shall not be construed as a failure for the purpose of this paragraph; or

   4.  The failure of the other party to cure a breach of this Agreement within ninety (90) days after notice of such breach is given by the non-breaching party.

5.     The failure of the other party to cure a monetary breach of this Agreement within ten (10) days after notice of such breach is given by the non-breaching party.

B.     Provided *LN* has complied with its material commitments which directly impact on *Paterno's* ability to meet the Target Case Sales, including those of Product quality and availability, as well as those made and acknowledged by *LN* in the written marketing plan(s), then *LN* shall have the option to terminate this Agreement if:

    1.     *Paterno* fails to achieve 90% of Target Case Sales (as set out in Section 5(b)(2) in any two (2) consecutive years of the term of this Agreement or for each of two years out of any three-year period. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the second failure. The effective date of the termination shall be not less than ninety (90) days and not more than one hundred eighty (180) days following the date of notice; or

    2.     *Paterno* fails to achieve 85% of Target Case Sales (as set out in Section 5(b)(2)) for any year. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the failure. The effective date of the termination shall be not less than ninety (90) days and no more than one hundred eighty (180) days following the date of notice.

C.     *LN* shall have the option to terminate this Agreement in the event of a change in Control of *Paterno* (with Control having the meaning set out above in Section 4(b)(4)), provided that immediately following the change in Control, the persons or entity in Control of *Paterno* shall be an Australian or New Zealand based competitor of *LN*.

## 7.   OBLIGATIONS FOLLOWING EXPIRATION OR TERMINATION

Upon the termination of this Agreement for any reason:

A.     *Paterno* shall discontinue the use of the Trademarks, except for reasonable use in connection with the liquidation and sale, in accordance with this Agreement, of any of the Products *Paterno* has in its inventory.

B.     *LN* agrees that in the event of a termination under Section 6(b) above, neither party shall have liability for damages, including but not limited to indirect, incidental, consequential or special damages or loss of profits or revenue due to the failure to achieve the Target Case Sales and *LN's* sole remedy will be

PWI Lion Nathan Agreement

termination of this Agreement. The foregoing shall not, however, prevent either party from pursuing any or all remedies available to it at law or in equity for any other breaches of this Agreement.

C.   LN shall repurchase the Products in saleable condition then in the possession of Paterno at Paterno's laid-in cost, excluding warehousing and storage charges, and with deduction for monies due or to become due to LN under this Agreement. Payment for such repurchase shall be made by certified check or wire transfer in US dollars at the time of transfer.

D.   The parties will follow the further termination and migration procedures set out in Exhibit F.

8.   **TRADEMARKS**

A.   LN hereby grants to Paterno for the term of this Agreement a right to use the trademarks, trade names, and domain names ("Trademarks") as set forth in Exhibit B solely in the Territory and solely in connection with and for the purpose of promoting, advertising, and selling the Products pursuant to the terms of this Agreement.   Nothing contained herein shall constitute an assignment of the Trademarks, or grant to Paterno any right, title, or interest therein, except the right to use the Trademarks as set forth herein.

B.   Paterno further agrees (i) not to remove the Trademarks from the Products; (ii) not to alter the Trademarks in any way; (iii) not to use any trademark, trade name, or designation of origin other than the Trademarks and Paterno's trade name in connection with the promotion, advertising, or sale of the Products; and (iv) not to use the Trademarks in connection with any products, goods, business or services other than the Products.

C.   LN represents and warrants that, to the best of its knowledge, it is the owner or licensee of the Trademarks listed on Exhibit B and has not assigned or licensed in the Territory any right or interest therein; there are no claims or demands in the Territory pertaining to such Trademarks and no proceeding has been instituted or is pending or threatened against it which would challenge the right of LN in respect thereof; and LN has not been charged with infringement or violation of any adversely-held trademark in connection with the sale of the Products and is not aware of any claim of or liability for any such infringement or violation.

D.   In the event that Paterno becomes aware of any infringement of the Trademarks, or any claim that the Trademarks infringe the proprietary rights of a third party, Paterno shall immediately notify LN thereof in writing.  Should LN in its sole

discretion, decide to take legal action in respect of the same, such action shall be at the sole cost and for the sole benefit (including any recovery of damages) of LN. Upon the request of LN, Paterno shall cooperate with LN in connection with any such action but at no additional expense to Paterno. Paterno shall not undertake any action against any purported infringement of the Trademarks or defend against any claim that the Trademarks infringe the rights of another, without the prior written consent of LN.

E.     LN will cooperate with Paterno to the fullest extent possible by supplying all information and/or documentation necessary to Paterno for purposes of recording LN's U.S. Registered Trademarks with the U.S. Customs Office for purposes of protecting both parties to this Agreement against the importation of counterfeit or confusingly similar trademarks.

F.     Paterno may only use, publish and display the Trademarks  and logos, and reproduce the copyright in labels, packaging, logos, get-up, sales brochures and other marketing material relating to the Products during the term of this Agreement and only to the extent that is reasonably necessary to give effect to this Agreement and will not damage the goodwill, reputation or integrity of the Trademarks or LN or its business. Paterno will not, without LN's prior written consent, make any change to the design or specification of the labels, packaging, logos.

G.     Paterno will provide LN with copies of sales aids, brochures, or any manuals or other like materials relating to the Products if requested to do so by LN.

9.     WARRANTIES AND PRODUCT LIABILITY

LN warrants that all Products sold or shipped under this Agreement will be of good quality, suitable for beverage consumption, properly packaged by LN, in conformity with the applicable laws, regulations, and requirements in force in the Territory. LN will hold Paterno harmless from any and all fines, levies, damages, and costs of judgments that Paterno may be required to pay as a result of LN's failure to comply with the provisions of this paragraph, subject to the provisions relating to defective products set out below. LN makes no further claims or warranties, either express or implied, concerning the Products.

Paterno will be responsible for advising LN of any amendments required to the packaging and labeling from time to time, required to ensure it complies with all applicable laws and regulations in all relevant parts of the Territory.

Notifications of defects

Paterno may, following receipt of the Products, reject any Products which it reasonably considers to be materially defective or not substantially compliant with any purchase order provided that the following procedure is complied with:

A. Paterno must give LN notice of any Product which is defective or not compliant within 30 days of discovery specifying the Product name, the nature of the defect and confirming that a sample of the defective Product will be available for inspection at a particular time and place;

B. Paterno and LN must confer and negotiate in good faith within 14 days of LN receiving the defect notice to determine whether the parties agree the product is defective. If the parties:

    i. Agree the Product is defective, LN will:

        A. At Paterno's option, either replace the Product which is defective or reimburse Paterno for the defective Product at Paterno's laid in cost; and

        B. Will be responsible for the costs incurred in shipping the defective Product to LN.

    ii. Cannot agree that the Product is defective within 14 days, the issue will be treated as a dispute under this Agreement.

**Costs of recall**

C. LN will indemnify Paterno against Paterno's reasonable direct costs and expenses (including but not limited to; freight, warehousing, advertising, reasonable legal costs, fines, customer reimbursements, and product testing) of any legitimate recall of any Product provided that:

    iii. LN will not be responsible and will not indemnify Paterno for costs or expenses which are attributable to a recall which is caused by an act of Paterno;

    iv. LN is previously advised of the recall; and

    v. the recall is required under the laws of the Territory or the parties have agreed to the recall.

**Complaints**

D. If LN or Paterno receives any complaint (including any notice or threat of recall) in relation to a Product from any customers or any third party in the Territory, the party who receives the complaint will in a reasonably prompt manner and in any event within 14 days inform the other party of the complaint. Paterno will be responsible for dealing with the complaint in consultation with LN and will in a reasonably prompt

manner investigate that complaint and take appropriate measures to rectify it. Neither party shall admit liability or settle the matter without the written consent of the other party.

10.  FORCE MAJEURE

Neither of the parties shall be responsible or liable in any way for any default in the performance of this Agreement arising directly or indirectly from events or causes beyond their control including, but not limited to, fire, flood, action of the elements, riots, wars, civil and common, strikes, lockouts, anomalous and unfavorable climate course, or any other unavoidable events or contingencies.

11.  NOTICES

All notices or other written communications required or referred to in this Agreement shall be in writing and sent to the address of the recipient as it appears in the introductory paragraph to this Agreement (or such other address as such party shall have notified to the sender) by registered air mail, return receipt requested, by DHL, Federal Express or other reputable commercial carrier, or by electronic or facsimile transmission, with all costs of delivery or transmission prepaid, and shall be deemed given when actually received.

12.  SEVERABILITY

This Agreement is intended for general use in the United States and in the event any term or provision hereof is in violation of, or prohibited by, any applicable law or regulation, including laws or regulations promulgated by particular states, such term or provision shall be deemed to be amended or deleted to conform to such law or regulation without invalidating or amending or deleting any other term of this Agreement.

13.  WAIVER

The failure or omission by either party to insist upon or enforce any of the terms of this Agreement shall not be deemed a waiver of such term unless the waiver is in writing and signed by the party against whom such waiver is sought to be enforced. Waiver of any one term shall not be deemed a waiver of any other term. Waiver of any one term on any one occasion shall not be deemed a waiver of the same term on any other occasion.

14.  DISPUTE RESOLUTION

In the event of any dispute under this Agreement, other than one under Section 5.b.2, which the parties have not been able to resolve through negotiation, shall be resolved upon the petition of either party by binding arbitration before the American Arbitration Association (AAA) pursuant to its Commercial Arbitration Rules. Such arbitration shall otherwise be conducted, pursuant to the AAA's Commercial Arbitration Rules. The site of any arbitration

PWI Lion Nathan Agreement

will be Chicago, Illinois. The award of the arbitrator may be enforced by any court of competent jurisdiction upon the petition of either party.

Disputes under Section 5(b)(2) (that is disputes in relation to setting the Target Case Sales for a Subject Year), shall be resolved in accordance with the following process:

A. A party claiming that a dispute under section 5(b)(2) has arisen must give written notice to the other party specifying the nature of the dispute

B. On receipt of the notice specified in Section 14(A) the parties to the dispute must immediately escalate the dispute to the Chief Executive Officer of *Paterno* and the *LN* Chief Executive Officer and *LN* Group Managing Director, Wines and Spirits;

C. If within 7 days after receipt of the notice, the parties are still unable to resolve the dispute, the parties must refer the dispute to an independent wine industry expert (i) agreed to by the parties and (ii) with no less than 10 years experience in the US market for super premium wine;

D. If *LN* and *Paterno* fail to agree to an expert within the same seven day period in which the referral to the expert was to be made pursuant to Section 14(C), then within five days, *LN* shall obtain the services of JAMS, or a similar alternative dispute resolution organization, which such organization, in its sole discretion, shall appoint one arbitrator, notice of whose appointment must be furnished to *Paterno* by *LN* within two days following *LN's* receipt of notice of the appointment;

E. Within seven days following *Paterno's* receipt of notice of the arbitrator's appointment, *LN* and *Paterno* shall submit to the arbitrator each party's best case for its suggested expert;

F. Within five days following the parties' submissions, and based solely on such submissions, the arbitrator shall (i) select the expert suggested either by *LN* or *Paterno*, such decision to be binding on the parties and (ii) provide notice to each party of the decision;

G. Each party shall, within 30 days of the appointment of the expert, submit to the expert and exchange with each other in advance of the hearing their respective last best proposals as to the correct Target Case Sales for the Products; and

H. The expert will act as an arbitrator pursuant to the AAA's Commercial Arbitration Rules and his opinion will be binding on the parties. The expert shall be limited to awarding only one of the two competing proposals for the

Target Case Sales of the Product submitted, such award to be made within seven days following the hearing.

15.   **RESTRICTIVE COVENANTS**

A. <u>Acknowledgement</u>. Each party acknowledges that as a result of entering into this Agreement it will be provided with access to the other's Confidential Information (as defined below), business relationships and methods of doing business, and that such Confidential Information, business relationships and methods of doing business constitute valuable assets of the other party and a significant part of its goodwill, the preservation of which is essential to the success of its business, and that a party has a legitimate interest in restricting the other's ability to take advantage of such Confidential Information, business relationships and methods of doing business.

B. <u>Non-solicitation</u>. In light of the foregoing and in order to protect the value of the each party's business, each party covenants and agrees that during the term of this Agreement and during the three (3) year period (the "Restricted Period") following the date that this Agreement expires or is terminated (whether with or without cause) it shall not directly or indirectly (whether as a principal, agent, independent contractor, partner, officer, director, owner, lender or otherwise):

(i) solicit, encourage or induce any customer of the other party to cease doing business with that party or otherwise interfere with that party's relationships with any of its customers,

(ii) solicit, encourage or induce any employee of the other party to leave the employment of that party or employ or engage as a consultant or otherwise any employee of the other party or otherwise interfere with that party's relationship with any of its employees,

(iii) make, whether orally or in writing, disparaging statements or inferences regarding *Paterno*, its business, officers or directors, and

(iv) solicit, encourage or induce any of the other party's vendors or suppliers to terminate, curtail or restrict their relationship with that party or in any way interfere with the relationship between any such vendor or supplier and that party.

C. <u>Nondisclosure</u>. Each agrees that during the term of this Agreement and during the Restricted Period it will not, directly or indirectly, disclose to any third party or use for the benefit of itself or any other person or entity, any Confidential Information of the other party. As used in this Agreement, the term "Confidential Information" shall mean any information of a party or any information used by a party in the course of conducting its business, in either case which is not generally known to the

public or the disclosure of which could result in a competitive or other disadvantage to that party. Confidential Information includes information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including, by way of example and without limitation, trade secrets, ideas, concepts, designs, configurations, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, processes, techniques, formulas, software, improvements, inventions, domain names, data, know-how, discoveries, copyrightable materials, marketing plans and strategies, sales and financial reports and forecasts, customer lists, studies, reports, records, books, contracts, instruments, surveys, computer disks, diskettes, tapes, computer programs and business plans, methods of doing business, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management of the relevant party  Confidential Information also includes the confidential information of others with which a party has a business relationship. Each party further agrees that even if such information is developed or contributed to, in whole or in part, by it pursuant to this Agreement, such information is and shall remain the sole and exclusive property of the party which originated the information. Notwithstanding the foregoing, Confidential Information does not include information in the public domain, unless due to breach of a party's duties under this Agreement.

D. Breach. The parties agree that any breach of Section 15(b) or Section 15(c) above will result in irreparable damage to *the other party* for which *that party* will have no adequate remedy at law. Each party acknowledges that the restrictions contained in this Section 15 are reasonable, and are reasonably related to the legitimate business interests of the other  In the event that any portion of this Section 15 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a period of time or too large a geographic area or over too great a range of activities, it shall be interpreted to extend only over the maximum lesser period of time, geographic area, or range of activities as to which it may be enforceable. Each of the covenants herein shall be deemed a separate and severable covenant.  In the event that *a party* or any of its officers, directors or employees breaches any provision of this Section 15, *the other party* shall be entitled to recover from the breaching party all costs of enforcement, including reasonable attorneys' fees.

E. Severability. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

F. **Termination.** The terms and provisions of this Section 15 shall apply as of the date hereof, as shall continue in effect whether or not this Agreement shall be subsequently terminated or expire.

## 16.    GOVERNING LAW

Any disputes arising under this Agreement are to be governed and construed in accordance with the laws of the state of Illinois; provided, however, that it is subject to the U.S. Federal Alcohol Administration Act and all regulations promulgated pursuant to such Act.

## 17.    NATURE OF AGREEMENT

The parties hereto acknowledge that they are dealing with one another hereunder as independent contractors and not as partners, joint venturers or principal and agent. Neither party is granted any right or authority to act or hold itself out as the legal agent of the other, or to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of the other or any person or entity affiliated with the other or to bind the other in any manner whatsoever except as may otherwise be expressly agreed upon by the parties in writing for purposes of compliance with applicable state or federal laws or requirements.

## 18.    ENTIRE AGREEMENT

This Agreement shall constitute the entire understanding by and between the parties as to the subject matter hereof, replacing and superseding all previous agreements and understandings between the parties hereto or their predecessors concerning such subject matter. No modification of this Agreement shall be of any effect unless set forth in writing and signed by both parties. All notices required by this Agreement shall be in writing and shall be deemed given on the date of delivery.

## 19.    BINDING AGREEMENT

This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

PWI Lion Nathan Agreement

20.    ASSIGNMENT

Neither party may assign or transfer its rights or obligations under this Agreement which would materially change the duties owed by the parties, materially increase the burden or risk imposed on either party by this Agreement, materially impair either party's chance of obtaining return performance, or materially reduce the Agreement's value to either party, without the prior consent of the other, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of this Agreement without such consent will constitute a breach of this Agreement. Notwithstanding this, *LN* may assign this agreement to any company which is controlled by or under common control with *LN*.

21.    *LN* PERFORMANCE

*LN* is a holding entity for Lion Nathan Wine Group interests. Accordingly, any obligation of *LN* under this Agreement shall be deemed to be duly performed if it is performed by any *LN* Related Entity (as defined in Section 4(b)(4)). Any act or omission of any such *LN* Related Entity in furtherance of this Agreement shall be deemed to be the act or omission of *LN* and in relation to that act or omission this Agreement shall be read as if a reference to *LN* includes a reference to that *LN* Related Entity.

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the parties have signed the Agreement as of the dates first above written.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____

Gordon Cairns, Chief Executive Officer

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____

William A. Terlato, President & COO

# EXHIBIT A

## Initial Prices

Per Case
(12/750ml)
FOB " ___ " Port

# EXHIBIT B

## List of Trademarks, Trade Names, and Domain Names

**EXHIBIT C**

**PRODUCTS AND PRODUCT MIGRATION SCHEDULE**

**EXHIBIT D**

**REPORTING FORMAT**

## EXHIBIT 8

## TERMINATION AND MIGRATION PROCEDURES

On termination of this Agreement:

a) all orders of the Product placed by Paterno with LN which are undelivered at the termination date, will be deemed to have been cancelled;

b) *Paterno* must return to *LN* or a person nominated by *LN* or destroy, as required by *LN* (at *LN's* sole discretion) all current and usable samples of Product, supply records, point of sale materials, brochures, specifications, designs, instruction materials, brochures, manuals, advertising or display materials featuring or referring to the Product or other information or material supplied by *LN* or acquired by *Paterno* in any way relating to the Product and any other items that relate to the distribution of the Products within 30 days of the termination date at *LN's* cost ;

c) *Paterno* will, immediately upon request by *LN*, provide *LN* with full particulars of all unfulfilled orders and enquiries received by Paterno in respect of the Product;

d) *Paterno* will remove any signs from its premises using or incorporating the Trade Mark and all other trade marks of *LN* and discontinue the use of any material bearing such trade marks;

e) *Paterno* will cease to hold itself out as being associated in any way with *LN* or the Product;

f) *LN* and *Paterno* must not do anything to prejudice each other's business or goodwill;

g) each party must advise the other party of all monies which are owing under the terms of this Agreement;

h) to the extent legally possible, *Paterno* will assign to *LN* or its nominee free of charge all permissions, consents and licences (if any) relating to the marketing, distribution and sale of the Products and execute all documents and do all things necessary to ensure *LN* or its nominee will enjoy the benefit of the permissions, consents and licences from the termination date;

i) *Paterno* and *LN* will continue to perform their obligations under this Agreement diligently until the termination of this Agreement becomes effective;

PWI Lion Nathan Agreement

j)  *LN* and *Paterno*, in good faith, will take whatever actions are reasonably necessary to effect as orderly a transition as possible;

k)  at least 30 days prior to the termination of this agreement, Paterno will advise LN of its then outstanding:

- orders and the approximate volume and location of its inventory of the Products; and

- contractual commitments in relation to the supply of Products after the termination of this Agreement.

**EXHIBIT F**

**INITIAL TARGET CASE SALES**

**EXHIBIT A**
**INITIAL PRICES**

This is Exhibit A referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: _____
Peter Cowan, Director

Date: 25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest:

By: _____
William A. Terlato, President & COO

Date: 6/26/03

**Product, Vintage, Case Pack & Price Information**
(All pricing to be in US dollars.)

| | Vintage | 750 ml Case Pk | Pricing to Paterno |
|---|---|---|---|
| **Petaluma** | | | |
| Riesling (Clare Valley) | 2003 | 12 $ | 52.00 |
| Chardonnay (Picadilly, Adelaide Hills) | 2001 | 12 $ | 82.00 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 $ | 120.00 |
| Shiraz (Adelaide Hills) | 2001 | 12 $ | 99.00 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 $ | 100.00 |
| | | | |
| **St Hallett** | | | |
| Faith Shiraz | 2001/2002 | 12 $ | 64.00 |
| Blackwell Shiraz | 1999 | 12 $ | 99.00 |
| Old Block Shiraz | 1999 | 6 $ | 85.00 |
| | | | |
| **Mitchelton** | Assumes 1 January 2004 start | | |
| Airstrip | 2001 | 12 $ | 64.00 |
| Crescent | 2000 | 12 $ | 64.00 |
| Print Shiraz | 1999 | 6 $ | 68.00 |
| | | | |
| **Wither Hills** | | | |
| Sauvignon Blanc | 2003 | 12 $ | 64.00 |
| Chardonnay | 2002 | 12 $ | 64.00 |
| Pinot Noir | 2002 | 6 $ | 56.00 |
| | | | |
| **Argyle (including Oregon)** | Assumes 1 August 2003 start | | |
| Willamette Valley Pinot Noir | 2001 | 12 $ | 71.00 |
| Reserve Pinot Noir | 2000 | 6 $ | 59.00 |
| Nuthouse Pinot Noir | 2001 | 6 $ | 78.00 |
| Spirithouse Pinot Noir | 2000 | 6 $ | 99.00 |
| | | | |
| Willamette Valley Chardonnay | 2001 | 12 $ | 48.00 |
| Nuthouse Chardonnay | 2000 | 6 $ | 60.00 |
| Reserve Chardonnay | | | |
| | | | |
| **Brut NV** | 1998 | 12 $ | 57.00 |
| Extended Tirage Brut | 1991 | 6 $ | 61.00 |

## EXHIBIT B
### LIST OF TRADEMARKS, TRADE NAMES AND DOMAIN NAMES

This is Exhibit B referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 32 100 773 260 (an Australian corporation) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

| LION NATHAN ENTERPRISES PTY LIMITED | PATERNO WINES INTERNATIONAL |
|---|---|
| Attest: | Attest: |
| By: | By: |
| Peter Cowan, Director | William A. Terlato, President & COO |
| Date: 25/06/03 (Effective) | Date: 6/26/03 |

| Product Family | Relevant US Registered Mark | Registration Number |
|---|---|---|
| **Petaluma** | Petaluma Australia | 2036676 |
| Riesling (Clare Valley) | | |
| Chardonnay (Piccadilly, Adelaide Hills) | | |
| Cabernet Merlot (Coonawarra) | | |
| Shiraz (Adelaide Hills) | | |
| Tiers Chardonnay (Adelaide Hills) | | |
| **St Hallett** | St Hallett | 2739740 |
| Faith Shiraz | Faith Shiraz | 2513993 |
| Blackwell Shiraz | | No |
| Old Block Shiraz | Old Block | 2379734 |
| **Mitchelton** | Mitchelton | 1580249 |
| Airstrip | | |
| Crescent | | |
| Print Shiraz | | |
| **Wither Hills** | Wither Hills | 2384094 |
| Sauvignon Blanc | | |
| Chardonnay | | |
| Pinot Noir | | |
| **Argyle (including Oregon)** | Argyle | 2425260 |
| Willamette Valley Pinot Noir | Willamette | Pending |
| Reserve Pinot Noir | | |
| Nuthouse Pinot Noir | | |
| Spirithouse Pinot Noir | | |
| Willamette Valley Chardonnay | Willamette Valley Vineyards | Pending |
| Nuthouse Chardonnay | | |
| Reserve Chardonnay | | |

Brut NV
Extended Tirage Brut

## EXHIBIT C
## PRODUCTS AND PRODUCT MIGRATION SCHEDULE

This is Exhibit C referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By:

Peter Cowan, Director

Date: 25 / 06 / 03 ( Effective )

PATERNO WINES INTERNATIONAL

Attest:

By:

William A. Terlato, President & COO

Date: 6/26/03

**Migration Date to Paterno (subject to expiration of releases with any current distributors for the relevant Product)**

**Petaluma**
| | |
|---|---|
| Riesling (Clare Valley) | 23-Jun-03 |
| Chardonnay (Picadilly, Adelaide Hills) | 23-Jun-03 |
| Cabernet Merlot (Coonawarra) | 23-Jun-03 |
| Shiraz (Adelaide Hills) | 23-Jun-03 |
| Tiers Chardonnay (Adelaide Hills) | 23-Jun-03 |

**St Hallett**
| | |
|---|---|
| Faith Shiraz | 23-Jun-03 |
| Blackwell Shiraz | 23-Jun-03 |
| Old Block Shiraz | 23-Jun-03 |

**Mitchelton**
| | |
|---|---|
| Airstrip | 01-Jan-04 |
| Crescent | 01-Jan-04 |
| Print Shiraz | 01-Jan-04 |

**Wither Hills**
| | |
|---|---|
| Sauvignon Blanc | 23-Jun-03 |
| Chardonnay | 23-Jun-03 |
| Pinot Noir | 23-Jun-03 |

**Argyle (including Oregon)**
| | |
|---|---|
| Willamette Valley Pinot Noir | 01-Aug-03 |
| Reserve Pinot Noir | 01-Aug-03 |
| Nuthouse Pinot Noir | 01-Aug-03 |
| Spirithouse Pinot Noir | 01-Aug-03 |
| Willamette Valley Chardonnay | 01-Aug-03 |
| Nuthouse Chardonnay | 01-Aug-03 |
| Reserve Chardonnay | 01-Aug-03 |
| Brut NV | 01-Aug-03 |
| Extended Tirage Brut | 01-Aug-03 |

## EXHIBIT D
## REPORTING FORMAT

This is Exhibit D referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

**LION NATHAN ENTERPRISES PTY LIMITED**

Attest:

By:

Peter Cowan, Director

Date: 25 / 06 / 03 (Effective)

**PATERNO WINES INTERNATIONAL**

Attest:

By:

William A. Terlato, President & COO

Date: 6/26/03

## Paterno Wines International
## Monthly Sales and Marketing Activity Report

KPI's

| 1. Volume | Month | | | YTD (Subj/out Year to date) | | | Balance To Go | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Target Case Sales | % + (-) | Actual | Target Case Sales | % + (-) | Vol | % to go |
| Brand: | - | | | | | | | |
| | - | | | | | | | |
| Product x, y, z | - | | | | | | | |
| | - | | | | | | | |
| Total Volume | - | | | | | | | |
| | - | | | | | | | |

2. Revenue – per case $          Actual          Plan

3. Advertising and Promotional Expenditure (A+P $)

4. Commentary with Exhibits (where applicable)

- Volume – causes of deviation, key actions as required
- Pricing – Ability to achieve targets and key actions
- A+P$ – Expenditure type to date and key support activities
- Marketing Highlights – PR/Accolades/Customer + key influencer response/relevant market and competitor activity (Australian)
- Distribution
  - Progress/Issues/Channel Update/Significant account update
  - Wine List achievements
- Red flags – pro-emptive exposure/risks to any issues

## EXHIBIT F
## INITIAL TARGET CASE SALES

This is Exhibit F referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

**LION NATHAN ENTERPRISES PTY LIMITED**

Attest:

By: _____
    Peter Cowan, Director

Date: 25/06/03 (Effective)

**PATERNO WINES INTERNATIONAL**

Attest:

By: _____
    William A. Terlato, President & COO

Date: 6/26/03

| | Vintage | 750 ml Case Pk | Pricing to Paterno | Minimum Commitment (Initial Target Case Sales) |
|---|---|---|---|---|
| **Petaluma** | | | | |
| Riesling (Clare Valley) | 2003 | 12 $ | 52.00 | 400 |
| Chardonnay (Picadilly, Adelaide Hills) | 2001 | 12 $ | 52.00 | 500 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 $ | 120.00 | 1,200 |
| Shiraz (Adelaide Hills) | 2001 | 12 $ | 99.00 | 1,200 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 $ | 100.00 | 300 |
| **Total Petaluma** | | | | **3,600** |
| | | | | |
| **St Hallett** | | | | |
| Faith Shiraz | 2001/2002 | 12 $ | 64.00 | 5,000 |
| Blackwell Shiraz | 1999 | 12 $ | 99.00 | 500 |
| Old Block Shiraz | 1999 | 6 $ | 85.00 | 300 |
| **Total St Hallett** | | | | **5,800** |
| | | | | |
| **Mitchelton** | | | | |
| Airstrip | 2001 | 12 $ | 64.00 | |
| Crescent | 2000 | 12 $ | 64.00 | 500 |
| Print Shiraz | 1999 | 6 $ | 68.00 | 500 |
| **Total Mitchelton** | | | | **1,000** |
| | | | | |
| **Wither Hills** | | | | |
| Sauvignon Blanc | 2003 | 12 $ | 64.00 | 5,000 |
| Chardonnay | 2002 | 12 $ | 64.00 | 750 |
| Pinot Noir | 2002 | 6 $ | 56.00 | 750 |
| **Total Wither Hills** | | | | **6,500** |
| | | | | |
| **Argyle (including Oregon)** | Assumes 6/1/03 start | | | |
| Willamette Valley Pinot Noir | 2001 | 12 $ | 71.00 | 9,200 |
| Reserve Pinot Noir | 2000 | 6 $ | 59.00 | 3,000 |
| Nuthouse Pinot Noir | 2001 | 6 $ | 78.00 | 2,000 |
| Spirithouse Pinot Noir | 2000 | 6 $ | 99.00 | 800 |
| Willamette Valley Chardonnay | 2001 | 12 $ | 45.00 | 8,000 |
| Nuthouse Chardonnay | 2000 | 6 $ | 60.00 | 800 |
| Reserve Chardonnay | | | | |
| Brut NV | | | | |
| Extended Tirage Brut | 1998 | 12 $ | 87.00 | 7,500 |
| | 1991 | 6 $ | 51.00 | 700 |
| **Total Argyle** | | | | **32,000** |
| | | | | |
| **Total Lion Nathan** | | | | **48,900** |

# EXHIBIT I



LION NATHAN

Lion Nathan Wine Group ABN 11 007 982 818
Level 11, 20 Hunter Street, Sydney, NSW, 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225  Australia
Telephone (02) 9290 6611, Facsimile (02) 8284 3698 Web Site www.lion-nathan.com.au

28 February 2008

Mr William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL  60044

**VIA EMAIL**

Re:    **2008 Pricing and Target Case Sales**

Dear Bill,

I refer to the following correspondence received from Paterno over the past month or so: your 22 January 2008 email to me, your 11 (not 8) February 2008 letter to Rollin, and your 25 February 2008 email to Rollin.

We have also, of course, received Paterno's Demand for Arbitration, which surprised and disappointed us. We will respond to the Demand in accordance with AAA procedures in due course, but you will not be surprised to hear that we find the Demand to be based on a fundamental failure to appreciate key terms of the Lion Nathan and Paterno Marketing Agreement and its dispute resolution mechanism.  It is regrettable that we now have to do business with that hanging over our heads.

Regardless, we need to finalise the process spelled out in the Agreement regarding pricing and Target Case Sales for the 2008 sales year so that we can get on with business. That is the issue to which this letter is addressed.  We reserve our right separately to address other allegations and issues raised in Paterno's recent correspondence.

Turning to the matter at hand, the Agreement sets out a process for setting both annual prices and Target Case Sales.

**Pricing**

With respect to pricing, we tabled our discussions with Paterno prior to the Annual Meeting on 24 January 2008.  Paterno provided comments.  I conveyed to you some of our rationale for the decision to increase prices in my 17 January letter to you, and of course Paterno has previously encouraged us to consider substantially increasing the price of our wines.  We also

undertook our own competitive set pricing analysis over a period commencing in (your) summer of 2007 (please see attached). This analysis supports our proposed increases. Paterno has on a number of occasions in the past promised to provide its own competitive set analysis, but has to date failed to do so.

We have consulted with Paterno with respect to our proposed pricing and considered the views expressed. We do not agree with all of them, but were persuaded by Paterno's view that whilst the pricing we originally proposed is justifiable in the market place it might be preferable to move price up over a period of time. We have accordingly modified our pricing somewhat from the initial discussion, and attach the final price list to this letter. These are the prices at which we will sell to Paterno on and from 1 March 2008.

Please note that this price list is final. Under the very explicit provision contained in Section 5(B)(1) of the Agreement, "LN shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year." Lion Nathan thus enjoys the exclusive right to set the prices at which it will supply its wines to Paterno. Neither Paterno nor any third party (including any arbitrator) has any ability to compel Lion Nathan to sell at a different price than the one it sets.

Moreover, the price list is eminently reasonable. By your own account (per your 11 February letter), Paterno is able to sell tens of thousands of cases at price points somewhat higher than the attached final pricing. If Paterno fails to purchase at the prices set forth on the attached list, it will be in material breach of the agreement. In that event, Lion Nathan reserves all rights and remedies.

**Target Case Sales**

With respect to Target Case Sales, we indicated prior to and during our Annual Meeting that a number in the 50,000 case range made sense to us.

Your 11 February letter purported to propose a two tiered approach – 41,600 cases if pricing remained as per 2007, or something in the range of 20,000-24,000 cases if the pricing that we had discussed for 2008 at that point was adopted.

We can only interpret the first proposal as a counter-proposal on pricing, not Target Case Sales. As per above, the pricing process has run its course and the attached prices are our prices from 1 March.

The second proposal is a range, which does not work for the purposes of a Target Case Sales number, so we do not presently consider that Paterno has offered a counter-proposal.

We have nevertheless further considered our Target Case Sales number in the meantime in light of Paterno's perspective on our number, the attached final pricing, the outstanding quality of and strong demand for our wines, previous unsatiated demand due to significant supply constraints and an analysis of the distribution volumes of our competitive set. Our revised proposal for Target Case Sales for 2008 is 46,750 cases, as per the attached.

Please provide Paterno's acceptance of our Target Case Sales number, or a firm counter-proposal, within 5 business days of the date of this letter, failing which we will consider that we are in dispute regarding the Target Case Sales number for 2008. In that case, Lion Nathan will consider all remedies available to it, including the arbitration provided for by Section 14 for disputes arising under Section 5(B)(2) of the Agreement.

One final point re communications channels. Given that Paterno has commenced arbitration I am obliged to request that you direct all relevant correspondence to me (not Rollin) or to our attorney, Randolph Foster at Stoel Rives.

Yours sincerely

Anthony Roberts
General Manager
Lion Nathan Wine Group


cc. Mr Randolph Foster
Stoel Rives LLP
900 SW Fifth Avenue, Suite 1700
Portland, Oregon 97204
Fax: +1 503 220 2480

EXHIBIT A

Terlato International - Argyle Winery
Targeted Case Sales and Pricing 2008/2009
Feburary 28, 2008

Target Case Sales April 2008 to March 2009

| Wine | Proposed Target Case Sales | Vintage | Release | April - June 08 | July - Sept 08 | Oct - Dec 08 | Jan - Mar 09 | Bottle/case | Final 08/09 Pricing |
|---|---|---|---|---|---|---|---|---|---|
| Brut | 6900 | 2003/5 | April | 3450 | 3450 | | | 12 | $ 115.00 |
| Ext. Trage | 750 | 1998 | September | | 263 | 487 | | 6 | $ 117.00 |
| WVPN | 20500 | 2007 | August | | 7175 | 10250 | 3075 | 12 | $ 115.00 |
| ResPN | 7000 | 2006 | May | 3500 | 3500 | | | 6 | $ 86.00 |
| ResPN - 375ml | 500 | 2006 | May | 250 | 250 | | | 12 | $ 75.00 |
| NHPN | 4000 | 2005 | April | 4000 | | | | 6 | $ 118.00 |
| SHPN | 1000 | 2006 | Oct | | | 1000 | | 6 | $ 175.00 |
| NHCH | 2500 | 2007 | April | 2500 | | | | 12 | $ 76.00 |
| WVCH | 2400 | 2007 | August | | 1200 | 1200 | | 6 | $ 95.00 |
| Rose | 400 | 2005 | April | 400 | | | | 6 | $ 96.00 |
| Blanc Blancs | 300 | 2000 | April | 300 | | | | 6 | $ 87.00 |
| Riesling | 500 | 2007 | July | | 250 | 250 | | 12 | $ 120.00 |
| Total | 46750 | | | | | | | | |

| Name | | | | | 750ml |
|------|------|------|------|------|------|
| **ARGYLE BRUT** | $25.00 | $20.00 | | | |
| | | | CA | DOMAINE CARNEROS BRUT NV | $26.00 |
| | | | CA | J BRUT NV | $30.00 |
| | | | CA | ROEDERER ESTATE BRUT NV | $22.00 |
| | | | CA | GLORIA FERRER SONOMA BRUT | $20.00 |
| | | | CA | SCHRAMSBERG BRUT BLANC DE NOIRS | $37.00 |
| **ARGYLE BRUT - EXTENDED TIRAGE** | $40.00 | $59.00 | | | |
| | | | CA | DOMAINE CARNEROS LA REVE - BOB | $88.00 |
| | | | CA | J BRUT - RUSSIAN RIVER 1997 LD | $115.00 |
| | | | CA | ROEDERER ESTATE - L'ERMITAGE | $46.00 |
| | | | CA | GLORIA FERRER CARNEROS CUVEE LD | $50.00 |
| | | | CA | SCHRAMSBERG BRUT ANDERSON | $65.00 |
| **BRUT ROSE** | $35.00 | $49.00 | | | |
| | | | CA | DOMAINE CARNEROS ROSE NV | $36.00 |
| | | | CA | J BRUT ROSE NV | $35.00 |
| | | | CA | ROEDERER ESTATE L'ERMITAGE ROSE | $56.00 |
| | | | CA | GLORIA FERRER BRUT ROSE | $42.00 |
| | | | CA | SCHRAMSBERG 'J. SCHRAM' BRUT ROSE | $90.00 |
| | | | CA | SOTER | $45.00 |
| **ARGYLE RIESLING** | $28.00 | $20.00 | | | |
| | | | WA | EROICA | $25.00 |
| | | | GR | PRUM KABINETT - MOSEL - WEHLENER | $30.00 |
| | | | FR | JOSMEYER KOTTABE | $23.00 |
| | | | OR | BERGSTROM | $26.00 |
| | | | WA | WOODWARD CANYON | $25.00 |
| | | | FR | TRIMBACH | $20.00 |
| **NUTHOUSE CHARDONNAY** | $30.00 | $30.00 | | | |
| | | | OR | DOMAINE SERENE - CLOS DU SOLEIL | $45.00 |
| | | | OR | DOMAINE SERENE - COTE SUD | $60.00 |
| | | | CA | CHALK HILL | $45.00 |
| | | | CA | ROMBAUER | $30.00 |
| | | | CA | JORDAN | $27.00 |
| | | | CA | SONOMA CUTRER - LESPIERRES | $40.00 |
| | | | CA | MER SOLEIL | $42.00 |
| | | | OR | DOMAINE DROUHIN - ARTHUR | $30.00 |
| | | | OR | HAMACHER CUVEE FORETS | $30.00 |
| | | | OR | PONZI RESERVE | $30.00 |
| | | | OR | CHEHALEM- IANS RESERVE | $32.00 |
| | | | OR | ADELSHEIM - CAITLIN'S RESERVE | $38.00 |
| **ARGYLE WILLAMETTE VALLEY PINOT NOIR** | $25.00 | $29.00 | | | |
| | | | CA | BYRON - NIELSON VINEYARD | $25.00 |
| | | | CA | CALERA - CENTRAL COAST | $24.00 |
| | | | CA | CAMBRIA - JULIA'S VINEYARD | $20.00 |
| | | | CA | CHEHALEM - THREE VINEYARD | $32.00 |
| | | | CA | COSTA DE ORO - SANTA BARBARA COUNTY | $27.00 |
| | | | OR | ADELSHEIM WILLAMETTE VALLEY | $31.00 |
| | | | CA | AU BON CLIMAT - LE BON CLIMAT | $33.00 |
| | | | CA | FOXEN - SANTA MARIA VALLEY | $34.00 |
| | | | CA | GLORIA FERRER - JOSE FERRER SELECTION | $35.00 |
| | | | CA | J VINEYARDS - RUSSIAN RIVER | $38.00 |
| | | | CA | MONDAVI - CARNEROS | $27.00 |
| | | | CA | MORGAN - 12 CLONES | $31.00 |
| | | | OR | PONZI - TAVOLA | $26.00 |
| | | | OR | REX HILL WILLAMETTE VALLEY | $28.00 |
| | | | OR | SIDURI - WILLAMETTE VALLEY ARBRE VERT | $30.00 |
| | | | CA | WILD HORSE - CENTRAL COAST | $25.00 |
| **ARGYLE RESERVE PINOT NOIR** | $35.00 | $44.00 | | | |
| | | | OR | ARCHERY SUMMIT PREMIER CUVEE | $45.00 |
| | | | OR | DOMAINE DROUHIN - WILLAMETTE VALLEY | $46.00 |
| | | | OR | DOMAINE SERENE - YAMHILL CUVEE | $40.00 |
| | | | OR | PONZI- WILLAMETTE VALLEY | $38.00 |
| | | | OR | SHEA - ESTATE | $40.00 |

| | | | | | | 750ml |
|---|---|---|---|---|---|---|
| | | | | CA | ETUDE-CARNEROS ESTATE | $42.00 |
| | | | | CA | MORGAN - 12 CLONES | $31.00 |
| | | | | CA | WILLIAMS SELYEM - RUSSIAN RIVER | $65.00 |
| | | | | CA | ROBERT SINSKEY - CARNEROS | $40.00 |
| | | | | CA | ROCCHIOLI | $45.00 |
| ARGYLE NUTHOUSE PINOT NOIR | $46.00 | $59.00 | | | | |
| | | | | OR | ARCHERY SUMMIT ARCUS | $65.00 |
| | | | | OR | DOMAINE DROUHIN - LAURENE | $85.00 |
| | | | | OR | DOMAINE SERENE - SINGLE VINEYARDS | $90.00 |
| | | | | OR | PONZI RESERVE | $80.00 |
| | | | | OR | SHEA - BLOCK SERIES | $45.00 |
| | | | | CA | ETUDE-TEMBLOR/DEER CAMP | $80.00 |
| | | | | CA | BELLE GLOS- TAYLOR LANE/CLARK TELEPHONE | $55.00 |
| | | | | CA | J VINEYARDS - NICOLE'S VINEYARD | $85.00 |
| | | | | CA | MORGAN - SINGLE VINEYARDS- VAR | $55.00 |
| | | | | CA | WILLIAMS SELYEM - WESTSIDE | $85.00 |
| | | | | CA | ROBERT SINSKEY - SINGLE VINEYARDS | $65.00 |
| ARGYLE SPRITHOUSE PINOT NOIR | $70.00 | $87.00 | | | | |
| | | | | OR | ARCHERY SUMMIT RED HILLS | $85.00 |
| | | | | OR | DOMAINE DROUHIN - LOUISE | $85.00 |
| | | | | OR | DOMAINE SERENE - MONOGRAM | $200.00 |
| | | | | OR | PONZI - SINGLE VINEYARDS | $100.00 |
| | | | | CA | WILLIAMS SELYEM - SINGLE VINEYARDS | $100.00 |

# EXHIBIT J



**TERLATO WINES
INTERNATIONAL**

**William A. Terlato**
President and Chief Executive Officer

March 13, 2008

Mr. Anthony Roberts
Level 30
363 George Street
Sydney, NSW 2000
Australia

Dear Anthony:

I have reviewed Maura Monaghan's March 12, 2008 letter. The proposal she made on behalf of Lion Nathan poses no risks to Lion Nathan. In contrast, if we do not prevail in the price arbitration, under your proposal Paterno will be out of pocket significant dollars because we would be unable to go back to our distributors and retroactively raise our prices to them, as you are proposing to do to us. Because of regulatory requirements, we also would not be able to increase prices immediately upon receipt of an adverse decision, which would further aggravate our losses.

I believe Paterno will prevail in the price arbitration but remain concerned your proposal will aid what appears to be Lion Nathan's desire to delay the price arbitration. It is also clear that, for whatever reason, the March 12, 2008 proposal was prepared without any consideration of how price increases are actually implemented in the heavily-regulated wine industry.

With this in mind, I offer two alternative proposals for your consideration and ask that you select one of the proposals. Under our first proposal, Paterno will accept Lion Nathan's March 12, 2008 proposal provided the proposal is modified to reflect that Lion Nathan agrees that (1) the price arbitration will be completed, and a decision rendered, by April 15, 2008, and (2) new pricing, if any, will not go into effect until June 15, 2008 to allow Paterno time to notify distributors of the new pricing and post such pricing with regulatory authorities throughout the country. Alternatively, we propose that the parties agree to maintain 2007 pricing through the date of the arbitration decision in the price arbitration. If we win, pricing will remain at that level subject to the terms our agreement, which requires ninety days notice to Paterno before price increases can become effective, and the arbitration decision. If the arbitrator leaves your most recently proposed pricing in place, that pricing shall take effect sixty days following the arbitration decision, notwithstanding the ninety day notice requirement in our contract. Under either proposal, Lion Nathan would need to honor any orders at the 2007 prices that were placed for delivery before the new prices, if any, become effective. Please specify which of these two alternatives is acceptable to Lion Nathan.

An interim agreement on pricing is in both our interests for many reasons. Most importantly, it will eliminate the need for us to begin notifying distributors and regulators of the dramatic price increases you are demanding during the pendency of the arbitration, which will be detrimental to your brand and even more so if we prevail and the prices are then reduced.

900 Armour Drive
Lake Bluff, IL 60044
Tel: 847-604-8900



**TERLATO WINES**
**INTERNATIONAL**

Absent agreement on one of the options offered above by March 15, 2008, this letter serves as notice of an additional breach relating to your February 28, 2008 letter. Apart from the fact that the February 28, 2008 pricing was not set in good faith and without consulting Paterno, in that letter you proposed new pricing to become effective March 1, 2008, only two days following receipt of your letter. For the reasons noted above, our agreement requires ninety days notice for price changes. Paterno reserves all rights and claims relating to this breach.

Thank you.

Bill Terlato

Cc: Rollin Soles

900 Armour Drive
Lake Bluff, IL  60044         Page 2
Tel:  847-604-8900

# EXHIBIT K

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
Fax 212 909 6836
www.debevoise.com

March 18, 2008

BY FACSIMILE AND EMAIL

Derek J. Meyer, Esq.
McDermott Will & Emery
227 West Monroe Street
Chicago, Illinois 60606-5906

**Paterno Imports Ltd. v. Lion Nathan Enterprises Pty Ltd.**
**AAA No. 50 181 T 00043 08**

Dear Rick:

This will respond to Mr. Terlato's letter to Anthony Roberts dated March 13, 2008, which was sent in response to my letter to you of March 12, 2008. Mr. Terlato's letter raises two points regarding the contract, both of which are based on mistaken premises. He then makes alternative requests for further concessions beyond the one that Lion Nathan voluntarily extended via my letter, which will preserve the status quo during the pendency of the arbitration. Lion Nathan is not rejecting those proposals, but does require further information to evaluate them.

First, Mr. Terlato asserts that there was no prior consultation regarding the 2008 prices. This is demonstrably false, as will be addressed further in other correspondence. The record is clear that Lion Nathan sent a proposed price list on December 19, 2007, well in advance of the annual meeting on January 24, 2008. The proposed price list was discussed at the annual meeting. On February 28, 2008, Lion Nathan sent a revised price list that had been adjusted downwards from the December proposal, in part to take account of issues raised by Paterno.

Second, Mr. Terlato mistakenly concludes that because the Marketing Agreement provides for 90-days' advance notice of a *mid-year* price change, a 90-day waiting period is required before the prices set in Lion Nathan's February 28, 2008 letter can take effect. In fact, Paragraph 5(A) of the Marketing Agreement provides for an Annual Meeting to "take place in December of the preceding year and no later than February of the Subject Year or at such other time as the parties may mutually agree." Paragraph 5(B)(1) of the Marketing Agreement further provides that "[d]uring the Annual Meeting, the parties will consult about…[t]he price for the Subject Year, and following such consultation, LN

DEBEVOISE & PLIMPTON LLP                            ☑003

Derek J. Meyer, Esq.                          2                          March 18, 2008

shall have the sole discretion to establish the price for each Product *to become effective on March 1st of the Subject Year. After the prices for the year have been established,* LN will have the right *to change* such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by Paterno of notice of such change." (emphasis added). The prices established in the February 28, 2008 letter were prices for the Subject Year, set after the relevant Annual Meeting, not a mid-year change in prices. The Marketing Agreement permits the Annual Meeting to be held anytime up until February 28, 2008 with new prices to take effect on March 1, 2008, so there is simply no room for the 90-day waiting period that Mr. Terlato seeks to interpose.

Lion Nathan needs to understand more about the harm that Mr. Terlato fears from the implementation of price increases to address the request for further concessions. First, it appears that all of Paterno's concerns relate to the pricing from Paterno to distributors. But under Paragraph 5(B)(3), "Paterno's resale price of the Products will be set in its sole discretion."

If Paterno is confident in its position in the arbitration, then it need not consider raising its prices to distributors in response to Lion Nathan's increased pricing to Paterno, and Lion Nathan's offer to allow Paterno to continue paying at 2007 pricing during the pendency of the arbitration eliminates any risk to Paterno that it will be out of pocket during that interim period.

If Paterno is not confident in its position in the arbitration, it has two options (undoubtedly plus a number of "blended" options in between these two extremes). The first option is to determine, notify and implement its corresponding increased pricing to distributors (set in Paterno's sole discretion) immediately. Perhaps Paterno has already done so, and/or indeed perhaps it should already have done so as soon as it had received Lion Nathan's final pricing for 2008, but ultimately that is and was Paterno's decision to make. The second option is to continue pricing to distributors at current pricing and accept that, if Lion Nathan prevails on its pricing in the arbitration, Paterno will have earned smaller margins during the period in respect of which the arbitration ultimately determines that Lion Nathan was entitled to charge Paterno the increased pricing. Paterno is of course free in those circumstances to make submissions as to when that period should rightly commence, and if Paterno's concerns about regulatory notice periods for price increases to distributors are valid (which Lion Nathan does not presently concede), the arbitration will undoubtedly factor that in to the determination. On both these options, of course, Lion Nathan's offer to allow Paterno to continue to pay at 2007 pricing in the interim remains open and will protect Paterno if it ultimately prevails. Indeed on the first option, there would appear to be the prospect of a windfall for Paterno!

In order to progress this further, Lion Nathan will need to understand why Paterno feels that a 60-day period is the regulatory requirement for notice to distributors. Please advise which states impose such a regulatory requirement and which states, in Paterno's

Derek J. Meyer, Esq.                  3                      March 18, 2008

experience, impose those requirements as a matter of course.  Finally, as you know, it is impossible for any party to guarantee that an arbitration will be concluded and a decision rendered on any particular date (particularly one less than 30 days hence).  Nonetheless, we would be happy to talk about ways to ensure that the arbitration is handled expeditiously.

Sincerely,

*Maura K. Monaghan*

Maura K. Monaghan