**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATERNO IMPORTS LTD, | ) | |
| d/b/a Terlato Wines International | ) | |
| | ) | No. 08 C 1674 |
| v. | ) | Judge John W. Darrah |
| | ) | |
| LION NATHAN ENTERPRISES PTY LTD. | ) | |

**DEFENDANT'S MOTION FOR LEAVE TO FILE INSTANTER
MEMORANDUM OF LAW IN EXCESS OF FIFTEEN PAGES**

Defendant, by its undersigned local counsel, respectfully seeks leave to file instanter its Memorandum of Law In Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Defendant's Memo"), which is slightly in excess of fifteen pages.  In support of this Motion, Defendant further states:

1.      At approximately 3:30 p.m. Chicago time (4:30 p.m. New York time), on Good Friday, March 21, 2008, Plaintiff filed its Complaint and its Motion for Temporary Restraining Order and Preliminary Injunction ("Motion").

2.      Because the Motion had been noticed for a hearing at 10:00 a.m. on Monday, March 24, New York counsel for Defendant worked over the Easter weekend to prepare a responding memorandum (and supporting materials) and, because of the press of time, did not have the opportunity to edit the Memo to shorten it to fifteen pages.  Defendant's Memo, a copy of which is attached hereto, is nineteen pages long (the nineteenth page consists only of the date and the signature block).

WHEREFORE, for the foregoing reasons, Defendant respectfully asks the Court to grant its motion for leave to file instanter its Memo in excess of fifteen pages.

Dated:  March 24, 2008                                        Respectfully submitted,

       /s/ Arthur W. Friedman
         Arthur W. Friedman

Arthur W. Friedman
MILLER SHAKMAN & BEEM LLP
180 North LaSalle Street, Suite 3600
Chicago, IL 60601
Tel: 312.263.3700


Maura K. MonaghaN
Mark P. Goodman
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

| | |
|---|---|
| PATERNO IMPORTS LTD., d/b/a Terlato Wines International, | Case No. 08 C 1674 |
| | Before the Hon. John W. Darrah |
| Plaintiff, | |
| v. | |
| LION NATHAN ENTERPRISES PTY LTD., | |
| Defendant. | |

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

Counsel to Defendant Lion Nathan
Enterprises Pty Ltd.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT................................................................................................................ 7

I.   Paterno Cannot Demonstrate A Likelihood Of Success On The Merits. ...................... 8

II.  Paterno Does Not Lack An Adequate Remedy At Law. ............................................ 14

III. Paterno Cannot Demonstrate Irreparable Injury......................................................... 16

CONCLUSION ........................................................................................................... 18

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) ........................................................ 8

*David White Instruments, LLC v. TLZ, Inc.*, No. 02 C 7156, 2002 U.S. Dist.
    LEXIS 23410 (N.D. Ill. Dec. 4, 2002) .......................................................................... 7-8

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) .............................................................. 8

*Motor Werks Partners, L.P. v. BMW of North America, Inc.*, No. 01 C 7178, 2001
    WL 1607503 (N.D. Ill. Dec. 17, 2001) ......................................................................... 18

*Re/Max North Central, Inc. v. Cook*, 272 F.3d 424 (7th Cir. 2001) .................................... 8

*Second City Music, Inc. v. City of Chicago*, 333 F.3d 846 (7th Cir. 2003) ....................... 16

*Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001) ........................................ 8

### STATE CASES

*The Prime Group, Inc. v. Northern Trust Co.*, 215 Ill. App. 3d 1065 (1st Dist.
    1991) ............................................................................................................................. 10

### STATE STATUTES

810 ILCS § 5/2-305(2) .......................................................................................................... 6

22698123v1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

------------------------------X

PATERNO IMPORTS LTD., d/b/a Terlato Wines
International,

      Case No. 08 C 1674
      Before the Hon. John W. Darrah

            Plaintiff,

   v.

LION NATHAN ENTERPRISES PTY LTD.,

            Defendant.

------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

Paterno Imports Ltd. d/b/a Terlato Wines International ("Paterno") filed this emergency motion for a temporary restraining order and a preliminary injunction at approximately 3:30 p.m. (approximately 4:30 p.m. New York time, where counsel for the Defendant is located) on Good Friday, seeking to "temporarily enjoin Defendant Lion Nathan Enterprises Pty Limited ("Lion Nathan") from implementing the March 1, 2008 price increases announced in its letter of February 28, 2008 until May 28, 2008" asserting that it will suffer irreparable injury if it attempts to immediately implement a price increase to its customers. Paterno Imports Ltd.'s Motion For Temporary Restraining Order and Preliminary Injunction, dated March 21, 2008 ("Paterno Motion") at 1.

There are several reasons, whether considered independently or collectively, that should foreclose entirely the availability or appropriateness of the extraordinary relief being sought by Paterno:

First, Lion Nathan has already voluntarily agreed to permit Paterno to continue paying Lion Nathan at the 2007 prices until the American Arbitration Association proceeding that Paterno chose to launch on February 5, 2008 regarding the price increase is resolved;

Second, Paterno alone is responsible for determining the price it charges its customers. All of the harm that Paterno argues will occur results from what it has characterized as its "implement[ation of] new pricing further down the supply chain resulting from Lion Nathan's new pricing to Paterno." Plaintiff's Memorandum In Support Of Its Motion For Temporary Restraining Order and Preliminary Injunction, dated March 21, 2008 ("Paterno Memorandum of Law") at 7. However, because Lion Nathan has agreed to permit Paterno to continue to pay the 2007 prices, Paterno can choose to maintain the 2007 prices it charges and if it ultimately prevails in the arbitration, as it believes it will, the 2007 prices will remain in effect from March 1, 2008 forward and Paterno will have suffered no damages. If Paterno loses in the arbitration, it will owe Lion Nathan money damages for the difference between the 2007 and the 2008 prices for the period from March 1, 2008 to the end of the arbitration, but will be free to argue to the arbitrator that it should be given relief from these damages.

Third, the language of the Marketing Agreement itself belies Paterno's claim that it will be irreparably harmed by the timing of Lion Nathan's price adjustment. The

2

Marketing Agreement explicitly contemplates that the Annual Meeting at which the parties will discuss pricing for the subject year can occur as late as the end of February of the subject year, making clear that the parties did not intend for Paterno to have 90 days notice prior to the March 1 prices becoming effective.

Indeed, the record makes clear that Paterno has concocted its current theory solely as a basis to justify resorting to the courts rather than dealing with the issues in the arbitration it commenced on February 5, 2008. Paterno communicated extensively with Lion Nathan concerning price between December 19, 2007 and March 1, 2008 – including in letters dated December 20, 2007 and January 7, 2008, at the "Annual Meeting" on January 24, 2008, in a notice of Demand for Arbitration concerning price dated February 5, 2008, and in a letter dated February 27, 2008 – and sought to persuade Lion Nathan in these various communications to revise downward its proposed 2008 Argyle prices. At no time in any of those communications did Paterno express any concern about its ability to meet any regulatory requirements or otherwise deal with what it now characterizes as the "complex web of interdependent relationships in the supply chain," Paterno Memorandum of Law at 3, should Lion Nathan agree to amend its proposed prices as requested by Paterno. It certainly never communicated that it would be harmed, much less irreparably damaged, if Lion Nathan acceded to its request to revise the proposed prices downward.[1]

---

[1] It is worth noting that Paterno has not submitted any evidence of the steps it took concerning supply chain and regulatory issues following the January 24, 2008 Annual Meeting at which the prices were discussed.

3

Nevertheless, when Lion Nathan agreed to reduce its prices in response to Paterno's repeated requests, Paterno was unwilling to let a good deed go unpunished and used the price reduction as the basis for this unmerited motion.

The Court can dispose of this application by asking one simple question: exactly what harm is Paterno asserting would result if it simply maintained its own present price structure through the pendency of the arbitration, as it is entirely free to do and as Lion Nathan voluntarily decided to do with respect to its prices to Paterno, and Paterno wins the arbitration? The answer is simple: none. Because the law is clear that a party cannot seek a TRO or preliminary injunction in order to avoid self-inflicted irreparable injury, Paterno's application should be denied.

Paterno is the exclusive United States distributor of wines produced by Argyle Winery, Inc. ("Argyle"), an Oregon winery which is wholly owned by Lion Nathan. Lion Nathan and Paterno entered into a Marketing Agreement in 2003, which is attached as Exhibit A to the accompanying Declaration of Maura K. Monaghan ("Monaghan Decl."). Pursuant to that Agreement, Lion Nathan provides wine to Paterno, which Paterno in turn supplies to the state-based wholesalers who are its customers. The wholesalers distribute the wine to restaurants and retailers, who ultimately make the Argyle wines available to consumers. Under Paragraph 5(B) of the Marketing Agreement, the parties are to conduct an annual meeting anytime between December and the end of February of each year, during which the parties will consult about "[t]he price for the Subject Year, and following such consultation, [Lion Nathan] shall have the sole discretion to establish the price for each Product to become effective on March 1st of the

4

Subject Year." Exhibit A to Monaghan Decl., Marketing Agreement at ¶ 5(B)(1). Lion

Nathan thus enjoys the sole discretion to establish its prices to Paterno. Paterno in turn is

required to consult with Lion Nathan during the Annual Meeting regarding "[t]he overall

price positioning of the Products in the Territory, but Paterno's resale price of the

Products will be set in its sole discretion." Exhibit A to Monaghan Decl., Marketing

Agreement at ¶ 5(B)(3). ***Thus, Paterno alone sets the prices it charges to the***

***wholesalers***.

On December 19, 2007, Lion Nathan sent a letter to Paterno alerting Paterno that

it intended to raise the prices it charges Paterno for Argyle wines in 2008 and attaching a

proposed new price list. *See* December 19, 2007 letter from Anthony Roberts to William

Terlato, attached as Exhibit B to Monaghan Decl. The Annual Meeting contemplated by

the Marketing Agreement was held on January 24, 2008. Lion Nathan considered

Paterno's views expressed in correspondence and at the Annual Meeting, and based on

those views, revised its price list downwards from the December proposal. On February

28, 2008, Lion Nathan transmitted its final price list to Paterno. *See* February 28, 2008

letter from Anthony Roberts to William Terlato, attached as Exhibit C to Monaghan

Decl. Along with the price list, Lion Nathan provided a competitive set analysis that

demonstrated that the increased prices Lion Nathan would charge Paterno, even if passed

along to consumers at a level that preserved the much-higher-than-industry-standard

margins that Paterno charges, would appropriately position Argyle's pricing with respect

to its competitors.

Paterno (like most purchasers) would prefer to pay lower prices. On February 5, 2008, Paterno filed a Demand for Arbitration with the American Arbitration Association pursuant to the dispute resolution clause contained in Paragraph 14 of the Marketing Agreement. Lion Nathan's Response and Counterclaims were filed on March 21, 2008. In its Demand, Paterno alleged that "although the Agreement provides that Lion Nathan has the 'sole discretion' to establish a price, Lion Nathan has not acted in good faith in setting the price and is therefore in breach of the Agreement," citing 810 ILCS § 5/2-305(2). Affidavit of William A. Terlato ("Terlato Aff."), Exhibit H. Lion Nathan vigorously disputes Paterno's claims. On March 21, 2008, Lion Nathan filed its Response and Counterclaims in the arbitration.

On March 12, 2008, by letter from Lion Nathan's counsel to Derek Meyer, counsel for Paterno (attached as Exhibit D to the Monaghan Decl.), ***Lion Nathan voluntarily agreed that it would permit Paterno to continue to pay the 2007 prices until the pricing arbitration was concluded.*** Lion Nathan will invoice Paterno at the 2008 prices (so that the record is clear that there has been no waiver), but has expressly agreed that Paterno can continue to pay at the 2007 prices throughout the pendency of the arbitration. After the arbitration has concluded, if Lion Nathan prevails, it proposes to charge the 2008 prices from March 1, 2008 forward, and Paterno would, in that event, owe Lion Nathan for the difference between the 2008 and 2007 prices for the time covered by the arbitration. Of course, however, Paterno can make any arguments it wishes to the arbitrator about why this arrangement should be adjusted so that even if

6

Lion Nathan prevails, Paterno should be protected against the effect of the price increase after March 1, 2008.

Notwithstanding that concession, Paterno has come to this Court seeking a TRO and a preliminary injunction. The application should be denied. Paterno appears to be in the incongruous position of seeking an injunction **against itself**. Lion Nathan has already voluntarily determined to continue to charge Paterno at 2007 prices until the pricing arbitration is concluded. What happens thereafter can be, and should be, decided by the arbitrator. All of the harm that Paterno has identified relates exclusively to the price that Paterno charges wholesalers, prices that it alone determines pursuant to paragraph 5(B)(3) of the Marketing Agreement. Lion Nathan has never demanded, and does not demand, that Paterno raise those prices (let alone that Paterno raise those prices without observing the proper regulatory posting periods that may apply in various jurisdictions). Lion Nathan has similarly never demanded, and does not demand, that Paterno post higher prices in the jurisdictions that require such postings. If Paterno believes that raising the prices it charges the wholesalers, or posting higher prices to wholesalers, will be harmful to Paterno, then it should simply refrain from doing so. If Paterno wins the pricing arbitration, it will be in exactly the position it prefers because it will be both paying and charging 2007 prices.

## ARGUMENT

As this Court has held, "[a] TRO is an 'extraordinary and drastic' remedy that should only be granted upon a clear showing of need." *David White Instruments, LLC v.*

7

*TLZ, Inc.*, No. 02 C 7156, 2002 U.S. Dist. LEXIS 23410, at *4-*5 (N.D. Ill. Dec. 4,

2002) (Darrah, J.) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam);

*Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)).  To obtain a preliminary

injunction, Paterno must show (1) a likelihood of success on the merits; (2) that it lacks

an adequate remedy at law; and (3) that it will suffer irreparable harm if the injunction is

not granted. *See, e.g., Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 429 (7th Cir. 2001)

(internal citations omitted); *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir.

2001) (internal citation omitted).  Paterno cannot meet any of the three required elements.

## I.     Paterno Cannot Demonstrate A Likelihood Of Success On The Merits.

Paterno's sole claim in support of its application for a TRO and/or preliminary

injunction consists of its argument that the Marketing Agreement requires Lion Nathan to

give 90 days' notice of any increase in the prices it charges Paterno.  Contrary to its

position in the arbitration, in this proceeding Paterno appears to concede that Lion Nathan

can charge Paterno any price it establishes in its sole discretion, but asserts that if a price

constitutes a change to a previously-established price for the Subject Year, 90 days'

notice is required. *See* Complaint at ¶ 10 ("Section 5(B)(1) of the Agreement permits

Lion Nathan to change the price of its wines, provided that Lion Nathan provides Paterno

ninety (90) days notice of any such change.").  This is a new theory, different from and

contradictory to the bad faith rationale presented in the arbitration, and apparently

concocted in an effort to justify resort to a different forum.  Paterno is highly unlikely to

succeed on the merits of this latest claim for breach and latest effort to delay, if it cannot

8

deny, Lion Nathan's discretion to establish the prices it charges Paterno from March 1, 2008 forward.

First, the language of the Marketing Agreement clearly does not allow for the 90-day notice period prior to the establishment of annual prices to take effect on March 1 of each Subject Year that Paterno would now like to interpose. The relevant language of the Marketing Agreement is contained in Paragraph 5. Paragraph 5(A) provides:

> The parties shall meet once each calendar year for the purpose of planning sales and marketing activities in the Territory ("Annual Meeting") for the coming year (Subject Year). **The Annual Meeting shall normally take place** in December of the preceding year and **no later than February of the Subject Year** or at such other time as the parties may mutually agree.

Exhibit A to Monaghan Decl., Marketing Agreement at ¶ 5(A) (emphasis added).

Paragraph 5(B) then goes on to state:

> B.    During the Annual Meeting, the parties will consult about:
>
>     1.    The price for the Subject Year, and **following such consultation, LN shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year.** After the prices for the year have been established, LN will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by Paterno of notice of such change.

Exhibit A to Monaghan Decl., Marketing Agreement at ¶ 5(B)(1) (emphasis added).

The Marketing Agreement thus plainly contemplates that the parties can hold an Annual Meeting at any time up until the end of February, with the prices that Lion Nathan charges Paterno for the Subject Year to be established "following" such

9

consultation and taking effect on March 1. There is simply no room for the 90-day notice period that Paterno seeks to impose. Indeed, Paterno's theory would completely eviscerate the contractual determination that the price for each Product is "to become effective on March 1st of the Subject Year" unless the Annual Meeting is held on December 1 itself in a Leap Year. The Marketing Agreement provides that the Annual Meeting is to be held no earlier than December, and March 1 is less than ninety days beyond any date other than December 1 in a Leap Year. The 90-day notice period that the Marketing Agreement does provide for is triggered only if Lion Nathan decides to *change* prices "*[a]fter the prices for the year have been established.*" Exhibit A to Monaghan Decl., Marketing Agreement at ¶ 5(B)(1) (emphasis added). The difference in treatment is logical: the March 1 annual prices are the product of discussion at the Annual Meeting and thereafter. As a result of those contract mechanisms, Paterno cannot claim any lack of forewarning about a price increase. A mid-year price change, by contrast, does not follow consultation at the Annual Meeting, and for that reason the Marketing Agreement provides for 90-days' notice in that situation. Courts will not transfer a timing provision applicable to one eventuality in a contract to another, where the contract language does not support the conclusion. *See, e.g., The Prime Group, Inc. v. N. Trust Co.*, 215 Ill. App. 3d 1065, 1071-1072 (1st Dist. 1991) (court refused to apply a "time is of the essence" clause from paragraph 17 of the relevant contract to paragraph 9 of the contract, noting that "we will not give effect to such clause unless it clearly applies to the contract requirement against which it is sought to be applied." (internal citation omitted)).

10

Here, Lion Nathan submitted a proposal to Paterno on December 19, 2007 in preparation for a timely Annual Meeting that was held on January 24, 2008. *See* Exhibit B to Monaghan Decl. The parties continued negotiating over what both sides characterized as a "proposed" price increase from Lion Nathan to Paterno until Lion Nathan transmitted its final price list by letter dated February 28, 2008, to take effect on March 1, 2008. *See* Exhibit C to Monaghan Decl. The February 28, 2008 price list was revised downward slightly from the December 19, 2007 proposal, based on the consultation that occurred at the Annual Meeting and the views exchanged thereafter, just as the Marketing Agreement provides.

Paterno attempts to evade the Marketing Agreement on these points by claiming that the February 28 price list was not the price list emanating from the Annual Meeting and consultation process (which Paterno implicitly concedes does not require 90-day notice prior to implementation) but a change from the December 19 price list, which Paterno now seeks after the fact to recharacterize as a final price list. This argument is fallacious for a number of reasons:

- Both parties treated the December 19 price list as a proposal to be discussed at the Annual Meeting and not a final price list. The final price list was set on February 28, 2008, to take effect on March 1, 2008, as the Marketing Agreement contemplates.

- Paterno's argument would penalize Lion Nathan for entertaining (and to some extent accommodating) Paterno's views and eviscerate the Marketing Agreement by changing the effective date of prices set after the Annual Meeting from March 1 to June 1 if the parties continue any discussions after the Annual Meeting.

- Even if Paterno's arguments were accepted, the result would be that the December 19, 2007 price list was in their view timely and since they have

complained to this Court only about the timing of new price increases, not their magnitude, that price list – which is actually higher than the final price list attached to the February 28, 2008 letter – would be effective.

Paterno's attempted after-the-fact recharacterization of the December 19 price list is specious, as the correspondence between the parties plainly illustrates. In fact, neither side ever considered the December 19 price list to be a final price list but instead regarded it as a proposal. Indeed, the exhibit that Mr. Terlato states in his Affidavit confirmed that the December proposal was final recaps the Annual Meeting by stating that discussions at the meeting "focused on Argyle's ***proposed*** 2008 Target Case Sales and pricing." Terlato Aff., Exhibit F. Further evidence that the parties considered the December 19 price list a proposal, rather than a final establishment of 2008 prices, abounds. *See, e.g.*:

- December 20, 2007 e-mail from William Terlato to Anthony Roberts, attached as Exhibit E to Monaghan Decl: "Thank you for forwarding the potential availability by item. Obviously, we need to study your ***proposal*** in greater detail, but it seems like the winery is proposing rather extraordinary price increases. That is inconsistent with all our previous conversations and communications....Can you please review the pricing information you sent us for accuracy and confirm the prices that the winery is ***proposing*** to sell each item to Paterno."

- January 7, 2008 email from William Terlato to Anthony Roberts, attached as Exhibit F to Monaghan Decl.: "I would like to remind you that in my e-mail of December 20th, I requested that you review and confirm to us the accuracy of the pricing information that ***appears to have been proposed*** for 2008 in your letter of December 19th."

- January 17, 2008 letter from Anthony Roberts to William Terlato, attached as Exhibit G to Monaghan Decl.: "With regard to the ***proposed*** price increase let me provide further explanation...We acknowledge that you were requesting price increases last year which we were uncomfortable agreeing to. The fact that prices have indeed been held back in recent years, the apparently insatiable domestic

12

demand for Oregon wine, in particular pinot noir, increases in pricing of other comparable Oregon brands, the continuing accolades in the wine press for Argyle wines, increased production costs, a need for greater return on investment, as well as the need for us to accumulate capital to sustain and potentially expand our business in Oregon, have caused us to reconsider our decision and to adopt a more realistic and profitable pricing structure."

- February 27, 2008 letter from Tom Steffanci of Paterno to Rollin Soles of Argyle, attached as Exhibit H to Monaghan Decl.: "We are concerned about the effect that these extraordinary increases will have on the brand and we _ask once again that you reconsider._"

By contrast, Lion Nathan's letter dated February 28, 2008 clearly sets forth that the price list it attaches is a final price list for the year, not subject to further renegotiation. The letter states:

> We have consulted with Paterno with respect to our proposed pricing and considered the views expressed. We do not agree with all of them, but were persuaded by Paterno's view that whilst the pricing we originally proposed is justifiable in the market place it might be preferable to move price up over a period of time. We have accordingly modified our pricing somewhat from the original discussion, and attach the _final_ price list to this letter. These are the prices at which we will sell to Paterno on and from 1 March 2008. Please note that this price list is _final_.

Exhibit C to Monaghan Decl. at 2. Notably, although the chart attached to the December 19, 2007 letter lists a "Price/case", Exhibit B to Monaghan Decl., the chart attached to the February 28, 2008 letter refers to a "Final 08/09 Pricing," Exhibit C to Monaghan Decl.

Moreover, Paterno appears not to have thought through the consequences of its argument. According to its Motion, "Paterno requests that the Court temporarily enjoin Lion Nathan Enterprises Pty Limited ("Lion Nathan") from implementing the March 1, 2008 price increases announced in its letter of February 28, 2008 until May 28, 2008."

13

Paterno Motion at 1. The only breach charged by its Complaint in this proceeding is that "Lion Nathan breached the Agreement by giving Paterno only two days notice of the new March 1, 2008 pricing." Complaint at ¶ 11. But even if all of Paterno's arguments were accepted, the result would not be that no price increase was effective March 1, 2008 but that the December 19, 2007 price list – which is *higher* than the February 28, 2008 price list – was in effect. The incongruity highlights the weakness of Paterno's claim.

For all these reasons, Paterno is unable to show that it is likely to succeed on the merits of its claim, which alone is fatal to its application for a preliminary injunction. But perhaps even more devastating to its claim for injunctive relief are Paterno's inability to show that it lacks an adequate remedy at law and that it will suffer irreparable injury if an injunction is not granted.

## II.    Paterno Does Not Lack An Adequate Remedy At Law.

Paterno claims that it lacks an adequate remedy at law because it cannot implement a price hike to its customers immediately because, due to either market realities or regulatory notice requirements, it needs time to phase in a price increase. But the price increase that Paterno is concerned with is a price increase from Paterno to its distributors – not a price increase from Lion Nathan to Paterno. Lion Nathan has already voluntarily suspended the effect of its price increase to Paterno until the arbitration is concluded. By agreeing to allow Paterno to continue to pay at 2007 prices during the pendency of the arbitration, Lion Nathan has relieved Paterno of any arguable need to raise its prices to its customers immediately and preserved the status quo pending

14

resolution of the arbitration. Indeed, were Paterno to raise its prices to its customers now while paying Lion Nathan 2007 prices, it would enjoy a windfall.

If in fact there were some period of time during which Paterno could not raise its prices to wholesalers without causing intractable difficulties, then an easy solution is at hand: Paterno shouldn't do it. To be clear, Lion Nathan disagrees with Paterno regarding the parade of horribles that Paterno insists would result from a near-term price increase to its distributors. Lion Nathan's analysis supports that the wholesalers can and would pay higher prices for Argyle wines at this time. In addition, in the past, Paterno has implemented price increases on its own initiative (not in response to a price increase from Lion Nathan) on short notice with no difficulty. But Paterno cannot have it both ways. If Paterno truly believes that a price increase to distributors would be harmful, it should be confident of prevailing in the arbitration and see no need to raise its prices in the near term, while it is being permitted to pay Lion Nathan at 2007 prices.

If Paterno loses the arbitration and it has preserved its prices at 2007 levels, then it may make less money than it would have if it had raised its prices. If it cannot implement a price increase right away after the arbitrator rules, because of regulatory posting requirements or market realities, then perhaps the period of time during which it will be paying more but charging less will be extended. It is difficult to see a valid claim for relief based on the premise that a party will lose the ultimate litigation. But even if Paterno can make such a claim, it is clear that an award of money damages will make it whole for that harm. The damages would be readily quantifiable: Paterno can simply show what it would have collected if it raised its prices versus what it did collect.

15

### III.    Paterno Cannot Demonstrate Irreparable Injury.

It is also crystal clear that Paterno faces no risk of irreparable injury. While Paterno has raised numerous unsupported claims of the harm that will befall the Argyle brand and its market position if Paterno attempts to raise (and then later even lowers) the price it charges its wholesalers, Paterno's arguments ignore two critical facts: (1) the Argyle brand belongs to Lion Nathan, not Paterno; and (2) this supposed harm would be self-inflicted, because Paterno is under no obligation to raise its prices immediately or indeed, at any particular time not of its choosing.

As the Court of Appeals for the Seventh Circuit held in *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003), "self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose." Paterno is in exactly the position that the Seventh Circuit cautioned against, because any irreparable injury it might suffer would be entirely of its own making.

Nothing in the Marketing Agreement obligates Paterno to raise its prices to its distributors proportionally to any increase that Lion Nathan establishes with respect to what it charges Paterno. To the contrary, Section 5(B)(3) of the Marketing Agreement is crystal clear that "Paterno's resale price of the Products will be set in its sole discretion." Exhibit A to Monaghan Decl. Lion Nathan has never demanded that Paterno increase its prices. Similarly, nothing in the Marketing Agreement requires Paterno to change its pricing to its distributors simultaneously with any increase in the prices that Lion Nathan charges Paterno for Argyle wines. When and to what extent Paterno raises its prices to its customers is within Paterno's sole discretion.

16

In addition, Lion Nathan has gone well beyond what is contractually required and voluntarily agreed not to require Paterno to pay at the 2008 prices until the arbitration is concluded. Thus, Lion Nathan has absolved Paterno from any pressing financial need to raise its prices while the status of Lion Nathan's prices is under challenge. If Paterno wins that challenge, it may never need to pay the increased prices to Lion Nathan.

Paterno argues that "corresponding business and regulatory considerations noted above weigh in favor of Paterno immediately beginning the process to implement the price increases it seeks to minimize the harm to its relationships with its customers associated with large increases on short notice." But if Paterno wins the arbitration, then even under its own views, no price increases to its customers – large or small, on short notice or long – will be required.

If Paterno loses the arbitration, it may argue that it would have been better off raising prices to its customers, or at least notifying them of the prospects of an increase, sooner. But this would be a paradigmatic example of self-inflicted injury: Paterno's difficulties would stem from its choice to bring unsuccessful arbitration rather than to accept Lion Nathan's pricing, which the arbitrator will at that point have found to be a reasonable exercise of its discretion. Moreover, Paterno would be fully able to mitigate that harm by implementing any post-arbitration price increase to its customers in smaller segments over a gradual period of time.

17

**CONCLUSION**

When a case has been presented to arbitration, courts are appropriately hesitant to invade the province of the arbitrator and will issue a preliminary injunction only when necessary to preserve the status quo pending a decision by the arbitration panel, or to preserve the meaningfulness of the arbitration remedy. *See Motor Werks Partners, L.P. v. BMW of N. America, Inc.*, No. 01 C 7178, 2001 WL 1607503, at *4 (N.D. Ill. Dec. 17, 2001). Here, there is no need for the Court to take that step: Lion Nathan has voluntarily agreed to preserve the status quo by agreeing to allow Paterno to pay 2007 prices until the arbitration is concluded. All of the harm that Paterno is at pains to project would be avoided if Paterno merely made a parallel decision that it would continue to charge its customers 2007 prices for the same period of time. Its hesitancy to do so can only stem from a lack of confidence in its position in the arbitration: if Paterno convinces the arbitrator that Lion Nathan should not be permitted to raise its prices to Paterno, then self-evidently Paterno suffers no harm from similarly maintaining its prices at the 2007 level. The only "harm" occurs if Paterno loses the arbitration and is paying at a higher level while charging at a lower level for some period of time. There is no reason that a party should be indemnified against the consequences of a decision to bring an unsuccessful arbitration, but even if there were, the remedy would clearly be monetary damages and would be in the discretion of the arbitrator, and not this Court, to award. Paterno has not demonstrated any of the elements that would entitle it to a preliminary injunction.

18

Dated:  March 24, 2008

Respectfully submitted,

Debevoise & Plimpton LLP

By: *Maura K Monaghan /pr*
    Mark P. Goodman
    Maura K. Monaghan
919 Third Avenue
New York, New York  10022
(212) 909-7459

Counsel to Defendant Lion Nathan Enterprises Pty Ltd.

19

## CERTIFICATE OF SERVICE

I, Maura K. Monaghan, a partner at Debevoise & Plimpton LLP, herein certify that I am over eighteen (18) years of age and that on the 24th day of March 2008, I caused copies of the Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction to be served by hand upon Derek J. Meyer, counsel for Paterno Imports, Ltd.

I certify under penalty of perjury that the foregoing is true and correct. Executed on March 24, 2008.

*Maura K. Monaghan /TB*