UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

PATERNO IMPORTS LTD., d/b/a Terlato Wines
International,

Case No. 08 C 1674
Before the Hon. John W. Darrah

Plaintiff,

v.

LION NATHAN ENTERPRISES PTY LTD.,

Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – X

## <u>DECLARATION OF MAURA K. MONAGHAN, ESQ.</u>

I, Maura K. Monaghan, declare as follows:

1.  I am a partner at the law firm of Debevoise & Plimpton LLP, counsel to Lion Nathan Enterprises Pty Ltd. ("Lion Nathan"). I am admitted to practice law in the state of New York.

2.  I submit this declaration in opposition to Paterno Imports Ltd., d/b/a Terlato Wines International's ("Paterno") Motion for Temporary Restraining Order and Preliminary Injunction, filed on March 21, 2008.

3.  Attached hereto as Exhibit A is a true and correct copy of the 2003 Marketing Agreement between Lion Nathan and Paterno and the subsequent November 2005 Amendment to the Marketing Agreement.

4.      Attached hereto as Exhibit B is a true and correct copy of a letter from Anthony Roberts of Lion Nathan, to William Terlato of Terlato Wine Group, dated December 19, 2007.

5.      Attached hereto as Exhibit C is a true and correct copy of a letter from Anthony Roberts of Lion Nathan, to William Terlato of Terlato Wine Group, dated February 28, 2008.

6.      Attached hereto as Exhibit D is a true and correct copy of a letter from Maura K. Monaghan, counsel to Lion Nathan, to Derek J. Meyer, counsel to Paterno, dated March 12, 2008.

7.      Attached hereto as Exhibit E is a true and correct copy of an email from William Terlato of Terlato Wine Group to Anthony Roberts of Lion Nathan, dated December 20, 2007.

8.      Attached hereto as Exhibit F is a true and correct copy of an email from William Terlato of Terlato Wine Group to Anthony Roberts of Lion Nathan and Rollin Soles of Argyle Winery, Inc., dated January 7, 2008.

9.      Attached hereto as Exhibit G is a true and correct copy of a letter from Anthony Roberts of Lion Nathan Wine Group, to William Terlato of Terlato Wine Group, dated January 17, 2008.

10.      Attached hereto as Exhibit H is a true and correct copy of a letter from Tom Steffanci of Paterno to Rollin Soles of Argyle Winery, Inc., dated February 27, 2008.

I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York, this 24 day of March, 2008.

*Maura K. Monaghan /π*

Maura K. Monaghan

# EXHIBIT A

# LION NATHAN AND PATERNO

# MARKETING AGREEMENT

Agreement made this _____ day of April 2003, by and between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) having its principal place of business at Level 30, 363 George Street, Sydney NSW 2000, Australia (hereinafter "*LN*") and Paterno Wines International, (an Illinois Corporation), having its principal place of business and offices at 900 Armour Drive, Lake Bluff, Illinois 60044, USA (hereinafter "*Paterno*").

## RECITALS

A   *LN* through its various subsidiaries carries on business as a premium winemaker and manufactures markets and sells premium wine in Australia and other areas throughout the world.

B   Paterno carries on business as a marketer and importer of wines and other related products. Paterno has the expertise to import and market LN's products and to maintain and enhance the image and profile of *LN's* products.

C   Paterno has agreed to accept the appointment as the importer and marketer of the Products in the Territory on and subject to the terms and conditions of this Agreement.

## WITNESSETH

In consideration of the mutual promises and covenants herein contained, *LN* and *Paterno* agree as follows:

## 1.    APPOINTMENT

*LN* hereby grants to *Paterno* the exclusive rights to import, sell, distribute and market the wines specified in Exhibit C (hereinafter the "Products") effective from the date specified in the Product Migration Schedule for the relevant Product set out in that Exhibit C and as specified under the terms of this Agreement in the United States of America, the District of Colombia, and all possessions of the United States including Puerto Rico, and those in the Caribbean Islands as well as sales to cruise lines and airlines, originating in the Territory (hereinafter collectively the "Territory"). The Products shall not include wine sold directly to consumers

(not for resale) at the tasting rooms or through the Wine Clubs of *LN's* licensed United States wineries or those of any LN Related Entity (as defined in Section (4)(B)(4))(hereinafter collectively "Winery Direct Sales").

The parties will co-operate in good faith in relation to the migration of the Products to the exclusive distribution of Paterno in the Territory in accordance with the Product Migration Schedule.

2.    COMMENCEMENT AND TERM OF AGREEMENT

This Agreement will come into effect from the date on which the following Exhibits to this Agreement are finalized and executed between the parties (such date referred to as the "Effective Date" of this Agreement.):

| | |
|---|---|
| Exhibit A | Initial Prices |
| Exhibit B | List of Trademarks, Trade Names and Domain Names |
| Exhibit C | Products and Product Migration Schedule |
| Exhibit D | Reporting Format |
| Exhibit F | Initial Target Case Sales |

The parties will exercise their respective best endeavors in good faith to complete such Exhibits on or before 30 April 2003 or such later date as may be agreed.

This Agreement shall be for an initial term of twenty (20) years, commencing on the Effective Date. This Agreement will automatically continue after the initial term for successive terms of twenty (20) years each unless written notice is given by registered mail by either party to the other of the intent not to renew, no later than two (2) years prior to the expiration of the original period or any subsequent period as applicable.

3.    TERMS OF SALE

A.    The agreed prices for the Products shall be stated F.O.B Port in US Dollars and are set forth in Exhibit A which Exhibit is incorporated and made part of this Agreement. Such prices shall be altered only in accordance with Section 5(b)(1) of this Agreement.

B.    The terms of payment shall be sixty (60) days from date of shipping and payment shall be in US dollars by wire transfer to an account specified by *LN*. *Paterno* is not entitled to withhold payment or to make any deduction from the price at which the Products are supplied to it or at its direction by *LN*.

C.    *Paterno* may, in its discretion from time to time, purchase the Products from *LN* and request that *LN* ship such Products to specific customers of *Paterno* in the

Territory for *Paterno*'s account and at *Paterno*'s expense. *Paterno,* in such cases, shall assume full liability for payment thereof upon the same terms and conditions as if *Paterno* were purchasing such products for direct delivery to *Paterno*

D.   Title and ownership of the Product which is shipped by *LN* to a *Paterno* warehouse, as opposed to a direct shipment to a specific customer of *Paterno*'s as provided for in Section 3(b) above, will not pass to *Paterno* and is retained by *LN* until *LN* receives payment in full for the relevant Products.

4.    PERFORMANCE STANDARDS

A.    *Paterno* agrees:

1.    To use its best efforts to promote, distribute, market and sell the Products within the Territory;

2.    To use the channels of distribution, which in their reasonable discretion are best for the Products and their integrity or reputation as premium quality wines;

3.    That it will not distribute or sell the Products outside of the Territory or within the Territory for resale outside of the Territory;

4.    That it will hold *LN* harmless from any and all fines, levies, damages, and costs of judgments that *LN* may be required to pay as a result of *Paterno's* failure to comply with applicable laws in the Territory including, but not limited to, the payment of any taxes and the maintenance of appropriate licenses;

5.    To inform *LN* promptly (within thirty (30) days) of learning of any material quality problems or complaints about the Products;

6.    In the event that *Paterno* becomes aware of sales of the Products in *Paterno's* territory in violation of this exclusive agreement, *Paterno* shall immediately notify *LN* thereof in writing;

7.    That it will not alter or permit any alterations to the Products and that it will hold *LN* harmless from any accident, damage, loss or injury to any person or property or any other liability caused by any Products altered by *Paterno* or which *Paterno* knowingly permitted to be altered;

8.    That *Paterno* shall bear all costs and expenses of selling, promoting, advertising, and distributing the Products in the Territory except for those costs which *LN* shall incur in its sole discretion;

9.    That it will not do anything that might reasonably be expected to prejudice the integrity or reputation of the Products as premium quality wines;

10.    To at its own expense, comply with all laws and hold all licences and authorities necessary to enable it to lawfully promote, sell and distribute the Products in the Territory;

11.    To purchase the Products only from *LN*;

12.    To provide *LN* with Reports in the format, containing the information and at the frequency as set forth in Exhibit D.

B.    *LN* agrees:

1.    That it will not ship or sell the Products to the Territory, except upon the order or by the direction of *Paterno*;

2.    That it will refer to *Paterno* any and all orders and inquiries for such Products that it may receive for shipment to customers located within the Territory;

3.    That *LN* agrees to cease doing business with a customer who is found violating this exclusive agreement by selling the Products to customers in *Paterno's* territory and who fails to cease doing so within 30 days of receipt of a notice requiring it to do so ;

4.    Should either (i) *LN*, (ii) any entity in the Lion Nathan Group of Companies or under its control, or (iii) any entity under the control of any person or entity in the Lion Nathan Group of Companies which controls *LN* ('*LN Related Entity*') decide to market in the Territory additional wine brands, which wine brands are not marketed in the Territory by *LN* as of the effective date of this Agreement ("New Product"), then *LN* shall, if this Agreement is in full force and effect, present to *Paterno* samples of the wines and their packaging, as well as proposed pricing and sales and marketing expectations. *Paterno* shall thereupon have thirty (30) days from the receipt of *LN's* notice within which to decide if it desires to market such New Product in the Territory. In the event that *Paterno* desires to market such New Product, the parties will be required to negotiate a separate agreement for the marketing of this product, which shall be substantially identical in form, remaining term and substance to this Agreement. If *Paterno* does not notify *LN* within the thirty (30) day period or should *Paterno* decline to distribute the New Product, then *LN* shall be free to sell the New Product in the Territory through another company. "Control" or "control" shall mean in relation to any entity either holding, directly or indirectly, the right to elect more than fifty percent (50%) of the directors or cast more than fifty percent (50%) of the votes of the shareholders, partners, or members on matters to be decided by the equity holders, or otherwise having the right to direct the affairs, transactions or management of the entity.

*LN* will not be obliged to offer *Paterno* the distribution rights for any New Product in the Territory:

a.   where the New Product is acquired by *LN* or any *LN* Related Entity after the effective date of this Agreement and is subject to existing importation, distribution or marketing agreements in the Territory; provided that *LN* will work in good faith to migrate the New Products to *Paterno* as appropriate , but will not be obliged to break existing, binding importation, distribution or marketing agreements; or

b.   unless, at the time of granting of the distribution rights, *Paterno* has achieved the Target Case Sales in the immediately preceding Subject Year provided the Agreement has been in place for more than 12 months.

5.    ANNUAL MEETING

A.    The parties shall meet once each calendar year for the purpose of planning sales and marketing activities in the Territory ("Annual Meeting") for the coming year (Subject Year). The Annual Meeting shall normally take place in December of the preceding year and no later than February of the Subject Year or at such other time as the parties may mutually agree. The parties will meet in April 2003 for the purposes of planning sales and marketing activities for the period between the Effective Date and the commencement of the first Subject Year ("Initial Period") as well as the first Subject Year.

B.    During the Annual Meeting, the parties will consult about:

1.   The price for the Subject Year, and following such consultation, *LN* shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year. After the prices for the year have been established, *LN* will have the right to change such prices, provided that such changes shall not take effect until ninety (90) days following the receipt by *Paterno* of notice of such change. The parties shall re-enter negotiations on Target Case Sales for the Subject Year under Section 5(b)(2) on account of any such price increases.

2.   The goal for total shipments of the Products to *Paterno* ("Target Case Sales") for the Subject Year. In establishing the Target Case Sales, the parties will take into account, among other factors, the price set under Section 5(b)(1), the quality of the vintage and the overall consumer

demand in the Territory for wines in the price category of the Products. If after mutual discussion and consultation the parties cannot agree upon the Target Case Sales, then such disagreement shall be resolved by binding arbitration under the provisions of Section 14. The Target Case Sales for the first Subject Year and Initial Period will be set out in Exhibit F. Once agreed and signed by both parties, the Target Case Sales for subsequent Subject Years will be deemed to replace that Exhibit F and to form part of this Agreement.

3.    The overall price positioning of the Products in the Territory, but Paterno's resale price of the Products will be set in its sole discretion.

6.    TERMINATION

A.    Either party may terminate this Agreement, by written notice to the other party, effective sixty (60) days after delivery for any of the following reasons:

1.    Insolvency of the other party; the filing of a voluntary petition in bankruptcy, reorganization or a similar proceeding by the other party; the filing of an involuntary petition in bankruptcy provided such petition is not vacated within thirty (30) days from the date of filing; the appointment of a receiver or trustee for all or a substantial part of the other party's property, provided such appointment is not vacated within thirty (30) days from the date of such appointment; or execution by the other party of an assignment for the benefit of creditors; or

2.    The suspension of business, liquidation, dissolution, or termination of the existence of the other party; the condemnation, attachment, or appropriation of all or a material portion of the property of the other party; or

3.    The failure of the other party to maintain, at all times, all federal licenses, permits, approvals, and consents necessary for the performance of its obligations hereunder, irrespective of the cause or reason for such failure, except that suspension of federal licenses or permits for a period of less than sixty (60) days shall not be construed as a failure for the purpose of this paragraph; or

4.    The failure of the other party to cure a breach of this Agreement within ninety (90) days after notice of such breach is given by the non-breaching party.

5. The failure of the other party to cure a monetary breach of this Agreement within ten (10) days after notice of such breach is given by the non-breaching party.

B. Provided *LN* has complied with its material commitments which directly impact on *Paterno's* ability to meet the Target Case Sales, including those of Product quality and availability, as well as those made and acknowledged by *LN* in the written marketing plan(s), then *LN* shall have the option to terminate this Agreement if:

1. *Paterno* fails to achieve 90% of Target Case Sales (as set out in Section 5(b)(2) in any two (2) consecutive years of the term of this Agreement or for each of two years out of any three-year period. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the second failure. The effective date of the termination shall be not less than ninety (90) days and not more than one hundred eighty (180) days following the date of notice; or

2. *Paterno* fails to achieve 85% of Target Case Sales (as set out in Section 5(b)(2)) for any year. Notice of exercise of this option must be given to *Paterno* no later than the June 30th following the failure. The effective date of the termination shall be not less than ninety (90) days and no more than one hundred eighty (180) days following the date of notice.

C. *LN* shall have the option to terminate this Agreement in the event of a change in Control of *Paterno* (with Control having the meaning set out above in Section 4(b)(4)), provided that immediately following the change in Control, the persons or entity in Control of *Paterno* shall be an Australian or New Zealand based competitor of *LN*.

7. OBLIGATIONS FOLLOWING EXPIRATION OR TERMINATION

Upon the termination of this Agreement for any reason:

A. *Paterno* shall discontinue the use of the Trademarks, except for reasonable use in connection with the liquidation and sale, in accordance with this Agreement, of any of the Products *Paterno* has in its inventory.

B. *LN* agrees that in the event of a termination under Section 6(b) above, neither party shall have liability for damages, including but not limited to indirect, incidental, consequential or special damages or loss of profits or revenue due to the failure to achieve the Target Case Sales and *LN's* sole remedy will be

termination of this Agreement. The foregoing shall not, however, prevent either party from pursuing any or all remedies available to it at law or in equity for any other breaches of this Agreement.

C.  *LN* shall repurchase the Products in saleable condition then in the possession of *Paterno* at *Paterno's* laid-in cost, excluding warehousing and storage charges, and with deduction for monies due or to become due to *LN* under this Agreement. Payment for such repurchase shall be made by certified check or wire transfer in US dollars at the time of transfer.

D.  The parties will follow the further termination and migration procedures set out in Exhibit F.

## 8.    TRADEMARKS

A.  *LN* hereby grants to *Paterno* for the term of this Agreement a right to use the trademarks, trade names, and domain names ("Trademarks") as set forth in Exhibit B solely in the Territory and solely in connection with and for the purpose of promoting, advertising, and selling the Products pursuant to the terms of this Agreement.    Nothing contained herein shall constitute an assignment of the Trademarks, or grant to *Paterno* any right, title, or interest therein, except the right to use the Trademarks as set forth herein.

B.  *Paterno* further agrees (i) not to remove the Trademarks from the Products; (ii) not to alter the Trademarks in any way; (iii) not to use any trademark, trade name, or designation of origin other than the Trademarks and *Paterno's* trade name in connection with the promotion, advertising, or sale of the Products; and (iv) not to use the Trademarks in connection with any products, goods, business or services other than the Products.

C.  *LN* represents and warrants that, to the best of its knowledge, it is the owner or licensee of the Trademarks listed on Exhibit B and has not assigned or licensed in the Territory any right or interest therein; there are no claims or demands in the Territory pertaining to such Trademarks and no proceeding has been instituted or is pending or threatened against it which would challenge the right of *LN* in respect thereof; and *LN* has not been charged with infringement or violation of any adversely-held trademark in connection with the sale of the Products and is not aware of any claim of or liability for any such infringement or violation.

D.  In the event that *Paterno* becomes aware of any infringement of the Trademarks, or any claim that the Trademarks infringe the proprietary rights of a third party, *Paterno* shall immediately notify *LN* thereof in writing.    Should *LN* in its sole

discretion, decide to take legal action in respect of the same, such action shall be at the sole cost and for the sole benefit (including any recovery of damages) of *LN*. Upon the request of *LN*, *Paterno* shall cooperate with *LN* in connection with any such action but at no additional expense to *Paterno*. *Paterno* shall not undertake any action against any purported infringement of the Trademarks or defend against any claim that the Trademarks infringe the rights of another, without the prior written consent of *LN*.

E.    *LN* will cooperate with *Paterno* to the fullest extent possible by supplying all information and/or documentation necessary to *Paterno* for purposes of recording *LN's* U.S. Registered Trademarks with the U.S. Customs Office for purposes of protecting both parties to this Agreement against the importation of counterfeit or confusingly similar trademarks.

F.    *Paterno* may only use, publish and display the Trademarks  and logos, and reproduce the copyright in labels, packaging, logos, get-up, sales brochures and other marketing material relating to the Products during the term of this Agreement and only to the extent that is reasonably necessary to give effect to this Agreement and will not damage the goodwill, reputation or integrity of the Trademarks or *LN* or its business. *Paterno* will not, without *LN's* prior written consent, make any change to the design or specification of the labels, packaging, logos.

G.    *Paterno* will provide *LN* with copies of sales aids, brochures, or any manuals or other like materials relating to the Products if requested to do so by *LN*.

## 9.    WARRANTIES AND PRODUCT LIABILITY

*LN* warrants that all Products sold or shipped under this Agreement will be of good quality, suitable for beverage consumption, properly packaged by *LN*, in conformity with the applicable laws, regulations, and requirements in force in the Territory. *LN* will hold *Paterno* harmless from any and all fines, levies, damages, and costs of judgments that *Paterno* may be required to pay as a result of *LN's* failure to comply with the provisions of this paragraph, subject to the provisions relating to defective products set out below. *LN* makes no further claims or warranties, either express or implied, concerning the Pro ducts.

*Paterno* will be responsible for advising *LN* of any amendments required to the packaging and labeling from time to time, required to ensure it complies with all applicable laws and regulations in all relevant parts of the Territory.

**Notifications of defects**

Paterno may, following receipt of the Products, reject any Products which it reasonably considers to be materially defective or not substantially compliant with any purchase order provided that the following procedure is complied with:

A. Paterno must give *LN* notice of any Product which is defective or not compliant within 30 days of discovery specifying the Product name, the nature of the defect and confirming that a sample of the defective Product will be available for inspection at a particular time and place;

B. Paterno and *LN* must confer and negotiate in good faith within 14 days of *LN* receiving the defect notice to determine whether the parties agree the product is defective. If the parties:

    i.    Agree the Product is defective, *LN* will:

        A.    At Paterno's option, either replace the Product which is defective or reimburse Paterno for the defective Product at Paterno's laid in cost; and

        B.    Will be responsible for the costs incurred in shipping the defective Product to *LN*.

    ii.    Cannot agree that the Product is defective within 14 days, the issue will be treated as a dispute under this Agreement.

**Costs of recall**

C. *LN* will indemnify *Paterno* against *Paterno*'s reasonable direct costs and expenses (including but not limited to; freight, warehousing, advertising, reasonable legal costs, fines, customer reimbursements, and product testing) of any legitimate recall of any Product provided that:

    iii.    *LN* will not be responsible and will not indemnify Paterno for costs or expenses which are attributable to a recall which is caused by an act of Paterno;

    iv.    *LN* is previously advised of the recall; and

    v.    the recall is required under the laws of the Territory or the parties have agreed to the recall.

**Complaints**

D. If *LN* or *Paterno* receives any complaint (including any notice or threat of recall) in relation to a Product from any customers or any third party in the Territory, the party who receives the complaint will in a reasonably prompt manner and in any event within 14 days inform the other party of the complaint. *Paterno* will be responsible for dealing with the complaint in consultation with *LN* and will in a reasonably prompt

manner investigate that complaint and take appropriate measures to rectify it. Neither party shall admit liability or settle the matter without the written consent of the other party.

10.    FORCE MAJEURE

Neither of the parties shall be responsible or liable in any way for any default in the performance of this Agreement arising directly or indirectly from events or causes beyond their control including, but not limited to, fire, flood, action of the elements, riots, wars, civil and common, strikes, lockouts, anomalous and unfavorable climate course, or any other unavoidable events or contingencies.

11.    NOTICES

All notices or other written communications required or referred to in this Agreement shall be in writing and sent to the address of the recipient as it appears in the introductory paragraph to this Agreement (or such other address as such party shall have notified to the sender) by registered air mail, return receipt requested, by DHL, Federal Express or other reputable commercial carrier, or by electronic or facsimile transmission, with all costs of delivery or transmission prepaid, and shall be deemed given when actually received.

12.    SEVERABILITY

This Agreement is intended for general use in the United States and in the event any term or provision hereof is in violation of, or prohibited by, any applicable law or regulation, including laws or regulations promulgated by particular states, such term or provision shall be deemed to be amended or deleted to conform to such law or regulation without invalidating or amending or deleting any other term of this Agreement.

13.    WAIVER

The failure or omission by either party to insist upon or enforce any of the terms of this Agreement shall not be deemed a waiver of such term unless the waiver is in writing and signed by the party against whom such waiver is sought to be enforced. Waiver of any one term shall not be deemed a waiver of any other term. Waiver of any one term on any one occasion shall not be deemed a waiver of the same term on any other occasion.

14.    DISPUTE RESOLUTION

In the event of any dispute under this Agreement, other than one under Section 5.b.2, which the parties have not been able to resolve through negotiation, shall be resolved upon the petition of either party by binding arbitration before the American Arbitration Association (AAA) pursuant to its Commercial Arbitration Rules. Such arbitration shall otherwise be conducted, pursuant to the AAA's Commercial Arbitration Rules. The site of any arbitration

PWI Lion Nathan Agreement

will be Chicago, Illinois. The award of the arbitrator may be enforced by any court of competent jurisdiction upon the petition of either party.

Disputes under Section 5(b)(2) (that is disputes in relation to setting the Target Case Sales for a Subject Year), shall be resolved in accordance with the following process:

    A. A party claiming that a dispute under section 5(b)(2) has arisen must give written notice to the other party specifying the nature of the dispute

    B. On receipt of the notice specified in Section 14(A) the parties to the dispute must immediately escalate the dispute to the Chief Executive Officer of *Paterno* and the *LN* Chief Executive Officer and *LN* Group Managing Director, Wines and Spirits;

    C. If within 7 days after receipt of the notice, the parties are still unable to resolve the dispute, the parties must refer the dispute to an independent wine industry expert (i) agreed to by the parties and (ii) with no less than 10 years experience in the US market for super premium wine;

    D. If *LN* and *Paterno* fail to agree to an expert within the same seven day period in which the referral to the expert was to be made pursuant to Section 14(C), then within five days, *LN* shall obtain the services of JAMS, or a similar alternative dispute resolution organization, which such organization, in its sole discretion, shall appoint one arbitrator, notice of whose appointment must be furnished to *Paterno* by *LN* within two days following *LN's* receipt of notice of the appointment;

    E. Within seven days following *Paterno's* receipt of notice of the arbitrator's appointment, *LN* and *Paterno* shall submit to the arbitrator each party's best case for its suggested expert;

    F. Within five days following the parties' submissions, and based solely on such submissions, the arbitrator shall (i) select the expert suggested either by *LN* or *Paterno*, such decision to be binding on the parties and (ii) provide notice to each party of the decision;

    G. Each party shall, within 30 days of the appointment of the expert, submit to the expert and exchange with each other in advance of the hearing their respective last, best proposals as to the correct Target Case Sales for the Products; and

    H. The expert will act as an arbitrator pursuant to the AAA's Commercial Arbitration Rules and his opinion will be binding on the parties. The expert shall be limited to awarding only one of the two competing proposals for the

Target Case Sales of the Product submitted, such award to be made within seven days following the hearing.

15. RESTRICTIVE COVENANTS

A. Acknowledgement. Each party acknowledges that as a result of entering into this Agreement it will be provided with access to the other's Confidential Information (as defined below), business relationships and methods of doing business, and that such Confidential Information, business relationships and methods of doing business constitute valuable assets of the other party and a significant part of its goodwill, the preservation of which is essential to the success of its business, and that a party has a legitimate interest in restricting the other's ability to take advantage of such Confidential Information, business relationships and methods of doing business.

B. Non-solicitation. In light of the foregoing and in order to protect the value of the each party's business, each party covenants and agrees that during the term of this Agreement and during the three (3) year period (the "Restricted Period") following the date that this Agreement expires or is terminated (whether with or without cause) it shall not directly or indirectly (whether as a principal, agent, independent contractor, partner, officer, director, owner, lender or otherwise):

(i) solicit, encourage or induce any customer of the other party to cease doing business with that party or otherwise interfere with that party's relationships with any of its customers,

(ii) solicit, encourage or induce any employee of the other party to leave the employment of that party or employ or engage as a consultant or otherwise any employee of the other party or otherwise interfere with that party's relationship with any of its employees,

(iii) make, whether orally or in writing, disparaging statements or inferences regarding *Paterno*, its business, officers or directors, and

(iv) solicit, encourage or induce any of the other party's vendors or suppliers to terminate, curtail or restrict their relationship with that party or in any way interfere with the relationship between any such vendor or supplier and that party.

C. Nondisclosure. Each agrees that during the term of this Agreement and during the Restricted Period it will not, directly or indirectly, disclose to any third party, or use for the benefit of itself or any other person or entity, any Confidential Information of the other party. As used in this Agreement, the term "Confidential Information" shall mean any information of a party or any information used by a party in the course of conducting its business, in either case which is not generally known to the

public or the disclosure of which could result in a competitive or other disadvantage to that party. Confidential Information includes information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including, by way of example and without limitation, trade secrets, ideas, concepts, designs, configurations, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, processes, techniques, formulas, software, improvements, inventions, domain names, data, know-how, discoveries, copyrightable materials, marketing plans and strategies, sales and financial reports and forecasts, customer lists, studies, reports, records, books, contracts, instruments, surveys, computer disks, diskettes, tapes, computer programs and business plans, methods of doing business, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management of the relevant party  Confidential Information also includes the confidential information of others with which a party has a business relationship. Each party further agrees that even if such information is developed or contributed to, in whole or in part, by it pursuant to this Agreement, such information is and shall remain the sole and exclusive property of the party which originated the information. Notwithstanding the foregoing, Confidential Information does not include information in the public domain, unless due to breach of a party's duties under this Agreement.

D. <u>Breach.</u> The parties agree that any breach of Section 15(b) or Section 15(c) above will result in irreparable damage to *the other party* for which *that party* will have no adequate remedy at law. Each party acknowledges that the restrictions contained in this Section 15 are reasonable, and are reasonably related to the legitimate business interests of the other  In the event that any portion of this Section 15 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a period of time or too large a geographic area or over too great a range of activities, it shall be interpreted to extend only over the maximum lesser period of time, geographic area, or range of activities as to which it may be enforceable. Each of the covenants herein shall be deemed a separate and severable covenant. In the event that *a party* or any of its officers, directors or employees breaches any provision of this Section 15, *the other party* shall be entitled to recover from the breaching party all costs of enforcement, including reasonable attorneys' fees.

E. <u>Severability.</u> Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

F. <u>Termination</u>. The terms and provisions of this Section 15 shall apply as of the date hereof, as shall continue in effect whether or not this Agreement shall be subsequently terminated or expire.

16.    GOVERNING-LAW

Any disputes arising under this Agreement are to be governed and construed in accordance with the laws of the state of Illinois; provided, however, that it is subject to the U.S. Federal Alcohol Administration Act and all regulations promulgated pursuant to such Act.

17.    NATURE OF AGREEMENT

The parties hereto acknowledge that they are dealing with one another hereunder as independent contractors and not as partners, joint venturers or principal and agent. Neither party is granted any right or authority to act or hold itself out as the legal agent of the other, or to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of the other or any person or entity affiliated with the other or to bind the other in any manner whatsoever except as may otherwise be expressly agreed upon by the parties in writing for purposes of compliance with applicable state or federal laws or requirements.

18.    ENTIRE AGREEMENT

This Agreement shall constitute the entire understanding by and between the parties as to the subject matter hereof, replacing and superseding all previous agreements and understandings between the parties hereto or their predecessors concerning such subject matter. No modification of this Agreement shall be of any effect unless set forth in writing and signed by both parties. All notices required by this Agreement shall be in writing and shall be deemed given on the date of delivery.

19.    BINDING AGREEMENT

This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

20.   ASSIGNMENT

Neither party may assign or transfer its rights or obligations under this Agreement which would materially change the duties owed by the parties, materially increase the burden or risk imposed on either party by this Agreement, materially impair either party's chance of obtaining return performance, or materially reduce the Agreement's value to either party, without the prior consent of the other, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of this Agreement without such consent will constitute a breach of this Agreement.   Notwithstanding this, LN may assign this agreement to any company which is controlled by or under common control with LN.

21.   LN PERFORMANCE

LN is a holding entity for Lion Nathan Wine Group interests. Accordingly, any obligation of LN under this Agreement shall be deemed to be duly performed if it is performed by any LN Related Entity (as defined in Section 4(b)(4)). Any act or omission of any such LN Related Entity in furtherance of this Agreement shall be deemed to be the act or omission of LN and in relation to that act or omission this Agreement shall be read as if a reference to LN includes a reference to that LN Related Entity.

**(SIGNATURE PAGE FOLLOWS)**

IN WITNESS WHEREOF, the parties have signed the Agreement as of the dates first above written.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____
Gordon Cairns, Chief Executive Officer


PATERNO WINES INTERNATIONAL

Attest: _____

By: _____
William A. Terlato, President & COO

## EXHIBIT A

### Initial Prices

Per Case
(12/750ml)
FOB "_____" Port

**EXHIBIT B**

**List of Trademarks, Trade Names, and Domain Names**

# EXHIBIT C

## PRODUCTS AND PRODUCT MIGRATION SCHEDULE

# EXHIBIT D

## REPORTING FORMAT

## EXHIBIT E

### TERMINATION AND MIGRATION PROCEDURES

On termination of this Agreement:

a) all orders of the Product placed by Paterno with LN which are undelivered at the termination date, will be deemed to have been cancelled;

b) *Paterno* must return to *LN* or a person nominated by *LN* or destroy, as required by *LN* (at *LN*'s sole discretion) all current and usable samples of Product, supply records, point of sale materials, brochures, specifications, designs, instruction materials, brochures, manuals, advertising or display materials featuring or referring to the Product or other information or material supplied by *LN* or acquired by *Paterno* in any way relating to the Product and any other items that relate to the distribution of the Products within 30 days of the termination date at *LN*'s cost ;

c) *Paterno* will, immediately upon request by *LN*, provide *LN* with full particulars of all unfulfilled orders and enquiries received by Paterno in respect of the Product;

d) *Paterno* will remove any signs from its premises using or incorporating the Trade Mark and all other trade marks of *LN* and discontinue the use of any material bearing such trade marks;

e) *Paterno* will cease to hold itself out as being associated in any way with *LN* or the Product;

f) *LN* and *Paterno* must not do anything to prejudice each other's business or goodwill;

g) each party must advise the other party of all monies which are owing under the terms of this Agreement;

h) to the extent legally possible, *Paterno* will assign to *LN* or its nominee free of charge all permissions, consents and licences (if any) relating to the marketing, distribution and sale of the Products and execute all documents and do all things necessary to ensure *LN* or its nominee will enjoy the benefit of the permissions, consents and licences from the termination date;

i) *Paterno* and *LN* will continue to perform their obligations under this Agreement diligently until the termination of this Agreement becomes effective;

j)  *LN* and *Paterno*, in good faith, will take whatever actions are reasonably necessary to effect as orderly a transition as possible;

k)  at least 30 days prior to the termination of this agreement, Paterno will advise LN of its then outstanding:

- orders and the approximate volume and location of its inventory of the Products; and

- contractual commitments in relation to the supply of Products after the termination of this Agreement.

# EXHIBIT F

## INITIAL TARGET CASE SALES

## EXHIBIT A
## INITIAL PRICES

This is Exhibit A referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed "Effective Date" of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: _____
Peter Cowan, Director

Date: 25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest:

By: _____
William A. Terlato, President & COO

Date: 6/26/03

**Product, Vintage, Case Pack & Price Information**
**(All pricing to be in US dollars.)**

|  | Vintage | 750 ml Case Pk | Pricing to Paterno |
|---|---|---|---|
| **Petaluma** |  |  |  |
| Riesling (Clare Valley) | 2003 | 12 $ | 52.00 |
| Chardonnay (Picadilly, Adelaide Hills) | 2001 | 12 $ | 52.00 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 $ | 120.00 |
| Shiraz (Adelaide Hills) | 2001 | 12 $ | 99.00 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 $ | 100.00 |
|  |  |  |  |
| **St Hallett** |  |  |  |
| Faith Shiraz | 2001/2002 | 12 $ | 64.00 |
| Blackwell Shiraz | 1999 | 12 $ | 99.00 |
| Old Block Shiraz | 1999 | 6 $ | 85.00 |
|  |  |  |  |
| **Mitchelton** | Assumes 1 January 2004 start |  |  |
| Airstrip | 2001 | 12 $ | 64.00 |
| Crescent | 2000 | 12 $ | 64.00 |
| Print Shiraz | 1998 | 6 $ | 68.00 |
|  |  |  |  |
| **Wither Hills** |  |  |  |
| Sauvignon Blanc | 2003 | 12 $ | 64.00 |
| Chardonnay | 2002 | 12 $ | 64.00 |
| Pinot Noir | 2002 | 6 $ | 56.00 |
|  |  |  |  |
| **Argyle (including Oregon)** | Assumes 1 August 2003 start |  |  |
| Willamette Valley Pinot Noir | 2001 | 12 $ | 71.00 |
| Reserve Pinot Noir | 2000 | 6 $ | 59.00 |
| Nuthouse Pinot Noir | 2001 | 6 $ | 78.00 |
| Spirithouse Pinot Noir | 2000 | 6 $ | 99.00 |
|  |  |  |  |
| Willamette Valley Chardonnay | 2001 | 12 $ | 48.00 |
| Nuthouse Chardonnay | 2000 | 6 $ | 60.00 |
| Reserve Chardonnay |  |  |  |
|  |  |  |  |
| Brut NV | 1998 | 12 $ | 87.00 |
| Extended Tirage Brut | 1991 | 6 $ | 61.00 |

## EXHIBIT B
## LIST OF TRADEMARKS, TRADE NAMES AND DOMAIN NAMES

This is Exhibit B referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003.  The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement.  Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: _____
    Peter Cowan, Director

Date:   25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest:

By: _____
    William A. Terlato, President & COO

Date:   6/26/03

| Product Family | Relevant US Registered Mark | Registration Number |
|---|---|---|
| **Petaluma** | Petaluma Australia | 2038676 |
| Riesling (Clare Valley) | | |
| Chardonnay (Picadilly, Adelaide Hills) | | |
| Cabernet Merlot (Coonawarra) | | |
| Shiraz (Adelaide Hills) | | |
| Tiers Chardonnay (Adelaide Hills) | | |
| **St Hallett** | St Hallett | 2739740 |
| Faith Shiraz | Faith Shiraz | 2513993 |
| Blackwell Shiraz | | No |
| Old Block Shiraz | Old Block | 2379734 |
| Mitchelton | Mitchelton | 1589249 |
| Airstrip | | |
| Crescent | | |
| Print Shiraz | | |
| **Wither Hills** | Wither Hills | 2384094 |
| Sauvignon Blanc | | |
| Chardonnay | | |
| Pinot Noir | | |
| **Argyle (including Oregon)** | Argyle | 2425280 |
| Willamette Valley Pinot Noir | Willamette | Pending |
| Reserve Pinot Noir | | |
| Nuthouse Pinot Noir | | |
| Spirithouse Pinot Noir | | |
| Willamette Valley Chardonnay | Willamette Valley Vineyards | Pending |
| Nuthouse Chardonnay | | |
| Reserve Chardonnay | | |
| Brut NV | | |
| Extended Tirage Brut | | |

## EXHIBIT C
## PRODUCTS AND PRODUCT MIGRATION SCHEDULE

This is Exhibit C referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____
Peter Cowan, Director

Date: 25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____
William A. Terlato, President & COO

Date: 6/26/03

| | Migration Date to Paterno (subject to execution of releases with any current distributors for the relevant Product) |
|---|---|
| **Petaluma** | |
| Riesling (Clare Valley) | 23–Jun–03 |
| Chardonnay (Picadilly, Adelaide Hills) | 23–Jun–03 |
| Cabernet Merlot (Coonawarra) | 23–Jun–03 |
| Shiraz (Adelaide Hills) | 23–Jun–03 |
| Tiers Chardonnay (Adelaide Hills) | 23–Jun–03 |
| | |
| **St Hallett** | |
| Faith Shiraz | 23–Jun–03 |
| Blackwell Shiraz | 23–Jun–03 |
| Old Block Shiraz | 23–Jun–03 |
| | |
| **Mitchelton** | |
| Airstrip | 01–Jan–04 |
| Crescent | 01–Jan–04 |
| Print Shiraz | 01–Jan–04 |
| | |
| **Wither Hills** | |
| Sauvignon Blanc | 23–Jun–03 |
| Chardonnay | 23–Jun–03 |
| Pinot Noir | 23–Jun–03 |
| | |
| **Argyle (including Oregon)** | |
| Willamette Valley Pinot Noir | 01–Aug–03 |
| Reserve Pinot Noir | 01–Aug–03 |
| Nuthouse Pinot Noir | 01–Aug–03 |
| Spirithouse Pinot Noir | 01–Aug–03 |
| | |
| Willamette Valley Chardonnay | 01–Aug–03 |
| Nuthouse Chardonnay | 01–Aug–03 |
| Reserve Chardonnay | 01–Aug–03 |
| | |
| Brut NV | 01–Aug–03 |
| Extended Tirage Brut | 01–Aug–03 |

## EXHIBIT D
## REPORTING FORMAT

This is Exhibit D referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest: _____

By: _____
Peter Cowan, Director

Date: 25 / 06 / 03 ( Effective )

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____
William A. Terlato, President & COO

Date: 6/26/03

## Paterno Wines International
## Monthly Sales and Marketing Activity Report

KPI's

| 1. Volume | Month | | | YTD (Subject Year to date) | | | Balance To Go | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Target Case Sales | % + (-) | Actual | Target Case Sales | % + (-) | Vol | % to go |
| Brand: | - | | | | | | | |
| Product x, y, z | - | | | | | | | |
| Total Volume | - | | | | | | | |

Actual    Plan

2. Revenue – per case $

3. Advertising and Promotional Expenditure (A+P $)

4. Commentary with Exhibits (where applicable)

- Volume – causes of deviation, key actions as required
- Pricing – Ability to achieve targets and key actions
- A+P $ – Expenditure type to date and key support activities
- Marketing Highlights – PR/Accolades/Customer + key influencer response/relevant market and competitor activity (Australian)
- Distribution
  - Progress/Issues/Channel Update/Significant account update
  - Wine List achievements
- Red flags – pre-emptive exposure/risks to any issues

## EXHIBIT F
## INITIAL TARGET CASE SALES

This is Exhibit F referred to in Section 2 of the Marketing Agreement between Lion Nathan Enterprises Pty Limited ABN 52 100 773 260 (an Australian corporation ) and Paterno Wines International (an Illinois corporation) dated 23 April 2003. The provisions of this Exhibit are hereby agreed and deemed incorporated into that Marketing Agreement. Notwithstanding the provisions of Section 2 of the Marketing Agreement, the parties agree that the deemed 'Effective Date' of the Marketing Agreement is 23 June 2003.

LION NATHAN ENTERPRISES PTY LIMITED

Attest:

By: Peter Cowan, Director

Date: 25/06/03 (Effective)

PATERNO WINES INTERNATIONAL

Attest:

By: William A. Terlato, President & COO

Date: 6/26/03

| | | 750 ml | | Pricing | Minimum Commitment (Initial Target Case Sales) |
|---|---|---|---|---|---|
| | Vintage | Case Pk | | to Paterno | |
| **Petaluma** | | | | | |
| Riesling (Clare Valley) | 2003 | 12 | $ | 52.00 | 400 |
| Chardonnay (Piccadilly, Adelaide Hills) | 2001 | 12 | $ | 82.00 | 500 |
| Cabernet Merlot (Coonawarra) | 2000 | 12 | $ | 120.00 | 1,200 |
| Shiraz (Adelaide Hills) | 2001 | 12 | $ | 99.00 | 1,200 |
| Tiers Chardonnay (Adelaide Hills) | 2001 | 6 | $ | 100.00 | 300 |
| **Total Petaluma** | | | | | **3,600** |
| | | | | | |
| **St Hallett** | | | | | |
| Faith Shiraz | 2001/2002 | 12 | $ | 64.00 | 5,000 |
| Blackwell Shiraz | 1999 | 12 | $ | 99.00 | 500 |
| Old Block Shiraz | 1999 | 6 | $ | 85.00 | 300 |
| **Total St Hallett** | | | | | **5,800** |
| | | | | | |
| **Mitchelton** | | | | | |
| Airstrip | 2001 | 12 | $ | 64.00 | 500 |
| Crescent | 2000 | 12 | $ | 64.00 | 500 |
| Print Shiraz | 1998 | 6 | $ | 68.00 | - |
| **Total Mitchelton** | | | | | **1,000** |
| | | | | | |
| **Wither Hills** | | | | | |
| Sauvignon Blanc | 2003 | 12 | $ | 64.00 | 5,000 |
| Chardonnay | 2002 | 12 | $ | 64.00 | 750 |
| Pinot Noir | 2002 | 6 | $ | 56.00 | 750 |
| **Total Wither Hills** | | | | | **6,500** |
| | | | | | |
| **Argyle (including Oregon)** | Assumes 8/1/03 start | | | | |
| Willamette Valley Pinot Noir | 2001 | 12 | $ | 71.00 | 9,200 |
| Reserve Pinot Noir | 2000 | 6 | $ | 59.00 | 3,000 |
| Nuthouse Pinot Noir | 2001 | 6 | $ | 78.00 | 2,000 |
| Spirithouse Pinot Noir | 2000 | 6 | $ | 99.00 | 800 |
| | | | | | |
| Willamette Valley Chardonnay | 2001 | 12 | $ | 48.00 | 8,000 |
| Nuthouse Chardonnay | 2000 | 6 | $ | 60.00 | 800 |
| Reserve Chardonnay | | | | | |
| | | | | | |
| Brut NV | 1998 | 12 | $ | 87.00 | 7,500 |
| Extended Tirage Brut | 1991 | 6 | $ | 61.00 | 700 |
| **Total Argyle** | | | | | **32,000** |
| | | | | | |
| **Total Lion Nathan** | | | | | **48,900** |

# AMENDMENT TO LION NATHAN AND PATERNO

## MARKETING AGREEMENT

This Amendment to the June 23, 2003 Lion Nathan and Paterno Marketing Agreement ("Amendment" and "2003 Agreement," respectively) is entered into between Lion Nathan Enterprises Pty Limited, on the one hand, and Paterno Imports, Ltd., d/b/a Paterno Wines International ("Paterno"), on the other hand, both of which are sometimes collectively referred to below as the "Parties" and individually as "Party."

WHEREAS, the Parties wish to amend their 2003 Agreement;

IT IS AGREED by the Parties, in consideration of the mutual undertakings and releases contained herein and for other valuable consideration, the sufficiency of which is hereby acknowledged, that:

1. All capitalized terms in this Amendment shall have the same meaning as in the Agreement.

2. Paterno claims that it fully achieved 2005 Target Case Sales and Lion Nathan claims that it never reached agreement on a 2005 Target Case Sales goal with Paterno. Each Party releases the other Party and its representatives of any and all claims relating to whether Paterno fully achieved its 2005 Target Case Sales goal and/or whether the Parties reached Agreement on a 2005 Target Case Sales goal under Section 5(B) of the 2003 Agreement. All issues regarding 2005 Target Case Sales have been resolved and the terms of Section 6(B) of the 2003 Agreement shall not apply for purposes of 2005 Target Case Sales.

3. Effective April 1, 2006 or such earlier date as may be agreed in good faith by the parties, all current and future SKU's or variants of the Petaluma, St. Hallet, Mitchelton, and Wither Hills brands (collectively, "the Lion Nathan Australasian Brands") will be excluded from the definition of Products in the 2003 Agreement. The Lion Nathan Australasian Brands will also not be included in the forthcoming discussions for 2006 Target

Case Sales and there will be no target for those brands through April 1, 2006. Prior to that date, Paterno shall continue to carry the Lion Nathan Australasian Brands in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement.

4. Other than paragraph 2 above, nothing in this Amendment shall be construed to affect each Party's rights and obligations relative to the Argyle Brand, which shall remain within the definition of Products in the 2003 Agreement.

5. On or after December 1, 2005, representatives of Lion Nathan and Paterno will meet to discuss a new agreement relative to the Lion Nathan Australasian Brands. In the event they do not come to Agreement by December 31, 2005 or such later date as the parties may mutually agree upon, Lion Nathan will be free to enter an agreement with another entity relative to those brands to become effective April 1, 2006. At the request of Lion Nathan, Paterno shall continue to carry the Lion Nathan Australasian Brands for up to 90 days after April 1, 2006, in the ordinary course of business consistent with the terms of this Amendment and the 2003 Agreement. With effect from the date on which the Lion Nathan Australasian Brands are released from distribution by Paterno pursuant to this clause, the parties will release each other from all claims relating to the Lion Nathan Australasian Brands, excluding any claims related to the parties' rights and obligations under Section 7 below, including the payment obligations of Paterno for stock purchases in excess of amounts due for returned inventory, if any, and Section 9 of the 2003 Agreement.

6. Section 4(B)(4) of the 2003 Agreement is amended to exclude from New Products which Lion Nathan or a LN Related Entity decides to market in the Territory those additional wine brands which are produced in Australia or New Zealand.

7. In the event that Lion Nathan and Paterno do not enter a new agreement relative to the Lion Nathan Australasian Brands, the terms of Section 7 of the 2003 Agreement shall govern the procedures regarding those brands.

8. The term "Agreement" in the 2003 Agreement shall be deemed to include this Amendment and this Amendment is incorporated into the 2003 Agreement by reference.

9. Unless explicitly modified by the terms of this Amendment, all other terms and conditions of the 2003 Agreement shall remain in full force and effect as set forth in the 2003 Agreement.

10. The Parties mutually warrant and acknowledge that no promise or inducement has been offered to any of them, other than as hereinabove set out, and that this Amendment is executed without reliance upon any statements or representations by any of the Parties or their representatives.

11. No Party shall be deemed to have drafted this Amendment or any terms herein, and it shall be deemed a joint effort of the Parties.

12. This Amendment shall be construed in accordance with and governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

IN WITNESS WHEREOF, the parties have agreed, accepted and signed this Amendment this 27 day of November, 2005.

PATERNO WINES INTERNATIONAL

Attest: _____

By: _____

William A. Terlato, President & C.E.O.

Executed by
LION NATHAN ENTERPRISES PTY LIMITED
in accordance with Section 127 (1) of the Corporations Act (2001)

Attest: _____

By: Robert Murray, DIRECTOR          Duncan Makeig SECRETARY
[Name, title]

# EXHIBIT B



## LION NATHAN

Lion Nathan Limited, ABN 34 093 160 448
Level 30, 363 George Street, Sydney NSW 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225 Australia
Telephone 61 2 9290 6600  Facsimile 61 2 9290 6699  Web Site www.lion-nathan.com.au

19 December 2007

Mr. William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL  60044

**VIA E-MAIL**

Re:    2008 Annual Lion Nathan/Paterno Meeting

Dear Bill,

Section 5 of the Lion Nathan and Paterno Marketing Agreement requires an annual meeting between our two companies for the purpose of planning marketing and sales activities for 2008. The annual meeting this year is to occur between December 2007 and February of 2008.

The agreement does not specify a location for the annual meeting.  This year we propose that the meeting be held in Dundee, Oregon, in January 2008 in order to allow Mr. Rollin Soles, the General Manager and Chief Winemaker of Argyle, to participate.  While we prefer a face-to-face meeting, we are prepared to arrange for a discussion via teleconference if you or your representatives are not able to travel to Oregon.

We look forward initially to consulting with and reaching agreement on the Target Case Sales (total number of cases to be shipped to Paterno) in 2008.  In light of the continuing popularity of and high demand for wines from Oregon and Argyle Winery in particular, the 2008 case totals by product and associated pricing are set out on Exhibit A to this letter.

Lion Nathan will need to work closely with Paterno to develop and to implement the 2008 marketing and sales plans, particularly with the increased volumes and new product lines envisaged.  It therefore wishes to ensure that the appropriate processes and information flows are in place to achieve this.  Accordingly, in keeping with Paterno's obligations under the agreement "[t]o use its best efforts to promote, distribute, market and sell [Argyle's wines]" as well as its obligation to "[n]ot do anything that might reasonably be expected to prejudice the integrity or reputation of [Argyle's wines]...as premium quality wines..." we specifically request that Paterno agree to the following:

1.  Paterno to provide Lion Nathan a proposed annual marketing and sales plan prior to each Annual Meeting.  This should include any strategy for placing still and sparkling wine with wine retailers, chain restaurants or chain grocery stores.

2.  2008 Target Case Sales by individual product line for the quantities shown on Exhibit A hereto.

3.  Paterno/Wholesalers submit all purchase orders to Lion Nathan within 30 days of release for the quantities shown on Exhibit A.



Mr. William Terlato
19 December 2007
Page 2

4.  Paterno to require wholesalers to fully deplete their inventory of Lion Nathan wines within the time periods shown on Exhibit A.

5.  Set and notify Lion Nathan of a minimum resale price for each product to avoid "dumping" and maintain brand value/reputation.

6.  Provide Lion Nathan with a copy of Paterno's 2008 budget for marketing and sales and a quarterly report showing actual expenditures on a quarterly/annual basis for these categories.

7.  Paterno to notify Lion Nathan of sales calls to all national accounts, the 25 largest retail accounts, and any chain restaurants or chain grocery stores and allow one or more LN representatives to accompany Paterno's sales person(s).

8.  The provision to Lion Nathan on a quarterly basis of details of Paterno sales personnel coverage for each State and distributor in the Territory (including an organizational chart showing distributors and Paterno personnel responsible for liaising with those distributors).

9.  The provision to Lion Nathan of the reports set out in Exhibit D of the current Marketing Agreement at the frequency and in the format set out in that Exhibit D, including the commentary referenced in Exhibit D4.

Lion Nathan looks forward to meeting with you and/or your representatives in the near future to finalize agreement on these critical sales and marketing issues.

Please feel free to contact me if you have any questions in the meantime .

Yours sincerely,

Anthony Roberts
General Manager
Lion Nathan Wine Group

EXHIBIT A

Terlato International - Argyle Winery
Targeted Case Sales 2008/2009

**Target Case Sales April 2008 to March 2009**

| Wine | Cases | Vintage | Release | April-June | July-Sept | Oct-Dec | Jan-Mar | bottle/case | Price/case |
|------|-------|---------|---------|-----------|-----------|---------|---------|-------------|------------|
| Brut | 6900 | 2003/5 | April | 3450 | 3450 | | | 12 | $124.00 |
| Ext. Tirage | 750 | 1998 | September | | 263 | 487 | | 6 | $162.00 |
| WVPN | 20500 | 2007 | August | | 7175 | 10250 | 3075 | 12 | $120.00 |
| ResPN | 9600 | 2006 | May | 4800 | 4800 | | | 6 | $90.00 |
| ResPN | 1000-375ml | 2006 | May | 500 | 500 | | | 12 | $70.00 |
| NHPN | 4000 | 2005 | April | 4000 | | | | 6 | $140.00 |
| SHPN | 1200 | 2006 | Oct | | | 1200 | | 6 | $200.00 |
| NHCH | 3000 | 2006 | April | 3000 | | | | 6 | $84.00 |
| WVCH | 2400 | 2007 | August | | 1200 | 1200 | | 12 | $100.00 |
| Rose | 400 | 2005 | April | 400 | | | | 6 | $100.00 |
| Blanc Blancs | 300 | 2000 | April | 300 | | | | 6 | $110.00 |
| Riesling | 500 | 2007 | July | | 250 | 250 | | 12 | $120.00 |



# EXHIBIT C



## LION NATHAN

Lion Nathan Wine Group ABN 11 007 982 818
Level 11, 20 Hunter Street, Sydney, NSW, 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225 Australia
Telephone (02) 9290 6611, Facsimile (02) 8284 3698 Web Site www.lion-nathan.com.au

28 February 2008

Mr William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL  60044

**VIA EMAIL**

Re:     **2008 Pricing and Target Case Sales**

Dear Bill,

I refer to the following correspondence received from Paterno over the past month or so: your 22 January 2008 email to me, your 11 (not 8) February 2008 letter to Rollin, and your 25 February 2008 email to Rollin.

We have also, of course, received Paterno's Demand for Arbitration, which surprised and disappointed us. We will respond to the Demand in accordance with AAA procedures in due course, but you will not be surprised to hear that we find the Demand to be based on a fundamental failure to appreciate key terms of the Lion Nathan and Paterno Marketing Agreement and its dispute resolution mechanism. It is regrettable that we now have to do business with that hanging over our heads.

Regardless, we need to finalise the process spelled out in the Agreement regarding pricing and Target Case Sales for the 2008 sales year so that we can get on with business. That is the issue to which this letter is addressed. We reserve our right separately to address other allegations and issues raised in Paterno's recent correspondence.

Turning to the matter at hand, the Agreement sets out a process for setting both annual prices and Target Case Sales.

### Pricing

With respect to pricing, we tabled our discussions with Paterno prior to the Annual Meeting on 24 January 2008. Paterno provided comments. I conveyed to you some of our rationale for the decision to increase prices in my 17 January letter to you, and of course Paterno has previously encouraged us to consider substantially increasing the price of our wines. We also

1

undertook our own competitive set pricing analysis over a period commencing in (your) summer of 2007 (please see attached). This analysis supports our proposed increases. Paterno has on a number of occasions in the past promised to provide its own competitive set analysis, but has to date failed to do so.

We have consulted with Paterno with respect to our proposed pricing and considered the views expressed. We do not agree with all of them, but were persuaded by Paterno's view that whilst the pricing we originally proposed is justifiable in the market place it might be preferable to move price up over a period of time. We have accordingly modified our pricing somewhat from the initial discussion, and attach the final price list to this letter. These are the prices at which we will sell to Paterno on and from 1 March 2008.

Please note that this price list is final. Under the very explicit provision contained in Section 5(B)(1) of the Agreement, "LN shall have the sole discretion to establish the price for each Product to become effective on March 1st of the Subject Year." Lion Nathan thus enjoys the exclusive right to set the prices at which it will supply its wines to Paterno. Neither Paterno nor any third party (including any arbitrator) has any ability to compel Lion Nathan to sell at a different price than the one it sets.

Moreover, the price list is eminently reasonable. By your own account (per your 11 February letter), Paterno is able to sell tens of thousands of cases at price points somewhat higher than the attached final pricing. If Paterno fails to purchase at the prices set forth on the attached list, it will be in material breach of the agreement. In that event, Lion Nathan reserves all rights and remedies.

**Target Case Sales**

With respect to Target Case Sales, we indicated prior to and during our Annual Meeting that a number in the 50,000 case range made sense to us.

Your 11 February letter purported to propose a two tiered approach – 41,600 cases if pricing remained as per 2007, or something in the range of 20,000-24,000 cases if the pricing that we had discussed for 2008 at that point was adopted.

We can only interpret the first proposal as a counter-proposal on pricing, not Target Case Sales. As per above, the pricing process has run its course and the attached prices are our prices from 1 March.

The second proposal is a range, which does not work for the purposes of a Target Case Sales number, so we do not presently consider that Paterno has offered a counter-proposal.

We have nevertheless further considered our Target Case Sales number in the meantime in light of Paterno's perspective on our number, the attached final pricing, the outstanding quality of and strong demand for our wines, previous unsatiated demand due to significant supply constraints and an analysis of the distribution volumes of our competitive set. Our revised proposal for Target Case Sales for 2008 is 46,750 cases, as per the attached.

Please provide Paterno's acceptance of our Target Case Sales number, or a firm counter-proposal, within 5 business days of the date of this letter, failing which we will consider that we are in dispute regarding the Target Case Sales number for 2008. In that case, Lion Nathan will consider all remedies available to it, including the arbitration provided for by Section 14 for disputes arising under Section 5(B)(2) of the Agreement.

One final point re communications channels.  Given that Paterno has commenced arbitration I am obliged to request that you direct all relevant correspondence to me (not Rollin) or to our attorney, Randolph Foster at Stoel Rives.

Yours sincerely

Anthony Roberts
General Manager
Lion Nathan Wine Group


cc. Mr Randolph Foster
Stoel Rives LLP
900 SW Fifth Avenue, Suite 1700
Portland, Oregon  97204
Fax: +1 503 220 2480

EXHIBIT A

Terlato International - Argyle Winery
Targeted Case Sales and Pricing 2008/2009
Feburary 28, 2008

Target Case Saels April 2008 to March 2009

| Wine | Proposed Target Case Sales | Vintage | Release | April - June 08 | July - Sept 08 | Oct - Dec 08 | Jan - Mar 09 | Bottle/case | Final 08/09 Pricing |
|------|------|------|------|------|------|------|------|------|------|
| Brut | 6900 | 2003/5 | April | 3450 | 3450 | | | 12 | $ 115.00 |
| Ext. Tirage | 750 | 1998 | September | | 263 | 487 | | 6 | $ 117.00 |
| WVPN | 20500 | 2007 | August | | 7175 | 10250 | 3075 | 12 | $ 115.00 |
| ResPN | 7000 | 2006 | May | 3500 | 3500 | | | 6 | $ 86.00 |
| ResPN - 375ml | 500 | 2006 | May | 250 | 250 | | | 12 | $ 75.00 |
| NHPN | 4000 | 2005 | April | 4000 | | | | 6 | $ 118.00 |
| SHPN | 1000 | 2006 | Oct | | | 1000 | | 6 | $ 175.00 |
| NHCH | 2500 | 2006 | April | 2500 | | | | 6 | $ 76.00 |
| WVCH | 2400 | 2007 | August | | 1200 | 1200 | | 12 | $ 95.00 |
| Rose | 400 | 2005 | April | 400 | | | | 6 | $ 96.00 |
| Blanc Blancs | 300 | 2000 | April | 300 | | | | 6 | $ 87.00 |
| Riesling | 500 | 2007 | July | | 250 | 250 | | 12 | $ 120.00 |
| Total | 46750 | | | | | | | | |

| BRAND | CURRENT | S.R.P. | ORIGIN | COMPETITIVE BRAND | RETAIL 750ml |
|---|---|---|---|---|---|
| ARGYLE BRUT | $25.00 | $29.00 | | | |
| | | | CA | DOMAINE CARNEROS BRUT NV | $26.00 |
| | | | CA | J BRUT NV | $30.00 |
| | | | CA | ROEDERER ESTATE BRUT NV | $22.00 |
| | | | CA | GLORIA FERRER SONOMA BRUT | $20.00 |
| | | | CA | SCHRAMSBERG BRUT BLANC DE NOIRS | $37.00 |
| ARGYLE BRUT - EXTENDED TIRAGE | $40.00 | $59.00 | | | |
| | | | CA | DOMAINE CARNEROS LA REVE - BDB | $85.00 |
| | | | CA | J BRUT - RUSSIAN RIVER 1997 LD | $115.00 |
| | | | CA | ROEDERER ESTATE - L'ERMITAGE | $45.00 |
| | | | CA | GLORIA FERRER CARNEROS CUVEE LD | $50.00 |
| | | | CA | SCHRAMSBERG BRUT ANDERSON | $85.00 |
| BRUT ROSE | $35.00 | $49.00 | | | |
| | | | CA | DOMAINE CARNEROS ROSE NV | $36.00 |
| | | | CA | J BRUT ROSE NV | $35.00 |
| | | | CA | ROEDERER ESTATE L'ERMITAGE ROSE | $56.00 |
| | | | CA | GLORIA FERRER BRUT ROSE | $42.00 |
| | | | CA | SCHRAMSBERG 'J. SCHRAM' BRUT ROSE | $90.00 |
| | | | CA | SOTER | $45.00 |
| ARGYLE RIESLING | $28.00 | $28.00 | | | |
| | | | WA | EROICA | $25.00 |
| | | | GR | PRUM KABINETT - MOSEL - WEHLENER | $30.00 |
| | | | FR | JOSMEYER KOTTABE | $23.00 |
| | | | OR | BERGSTROM | $26.00 |
| | | | WA | WOODWARD CANYON | $26.00 |
| | | | FR | TRIMBACH | $20.00 |
| NUTHOUSE CHARDONNAY | $30.00 | $39.00 | | | |
| | | | OR | DOMAINE SERENE - CLOS DU SOLEIL | $45.00 |
| | | | OR | DOMAINE SERENE - COTE SUD | $80.00 |
| | | | CA | CHALK HILL | $45.00 |
| | | | CA | ROMBAUER | $30.00 |
| | | | CA | JORDAN | $27.00 |
| | | | CA | SONOMA CUTRER - LESPIERRES | $40.00 |
| | | | CA | MER SOLEIL | $42.00 |
| | | | OR | DOMAINE DROUHIN - ARTHUR | $30.00 |
| | | | OR | HAMACHER CUVEE FORETS | $30.00 |
| | | | OR | PONZI RESERVE | $30.00 |
| | | | OR | CHEHALEM- IAN'S RESERVE | $32.00 |
| | | | OR | ADELSHEIM - CAITLIN'S RESERVE | $38.00 |
| ARGYLE WILLAMETTE VALLEY PINOT NOIR | $25.00 | $29.00 | | | |
| | | | CA | BYRON - NIELSON VINEYARD | $25.00 |
| | | | CA | CALERA - CENTRAL COAST | $24.00 |
| | | | CA | CAMBRIA - JULIA'S VINEYARD | $20.00 |
| | | | CA | CHEHALEM - THREE VINEYARD | $32.00 |
| | | | CA | COSTA DE ORO - SANTA BARBARA COUNTY | $27.00 |
| | | | OR | ADELSHEIM WILLAMETTE VALLEY | $31.00 |
| | | | CA | AU BON CLIMAT - LE BON CLIMAT | $35.00 |
| | | | CA | FOXEN - SANTA MARIA VALLEY | $34.00 |
| | | | CA | GLORIA FERRER - JOSE FERRER SELECTION | $35.00 |
| | | | CA | J VINEYARDS - RUSSIAN RIVER | $36.00 |
| | | | CA | MONDAVI - CARNEROS | $27.00 |
| | | | CA | MORGAN - 12 CLONES | $31.00 |
| | | | OR | PONZI - TAVOLA | $25.00 |
| | | | OR | REX HILL WILLAMETTE VALLEY | $28.00 |
| | | | OR | SIDURI - WILLAMETTE VALLEY ARBRE VERT | $30.00 |
| | | | CA | WILD HORSE - CENTRAL COAST | $25.00 |
| ARGYLE RESERVE PINOT NOIR | $35.00 | $44.00 | | | |
| | | | OR | ARCHERY SUMMIT PREMIER CUVEE | $45.00 |
| | | | OR | DOMAINE DROUHIN - WILLAMETTE VALLEY | $45.00 |
| | | | OR | DOMAINE SERENE - YAMHILL CUVEE | $40.00 |
| | | | OR | PONZI- WILLAMETTE VALLEY | $35.00 |
| | | | OR | SHEA - ESTATE | $40.00 |

| BRAND | CURRENT | S.R.P. | ORIGIN | COMPETITIVE BRAND | RETAIL 750ml |
|---|---|---|---|---|---|
| | | | CA | ETUDE-CARNEROS ESTATE | $42.00 |
| | | | CA | MORGAN - 12 CLONES | $31.00 |
| | | | CA | WILLIAMS SELYEM - RUSSIAN RIVER | $65.00 |
| | | | CA | ROBERT SINSKEY- CARNEROS | $40.00 |
| | | | CA | ROCCHIOLI | $45.00 |
| ARGYLE NUTHOUSE PINOT NOIR | $45.00 | $59.00 | | | |
| | | | OR | ARCHERY SUMMIT ARCUS | $85.00 |
| | | | OR | DOMAINE DROUHIN - LAURENE | $65.00 |
| | | | OR | DOMAINE SERENE - SINGLE VINEYARDS | $90.00 |
| | | | OR | PONZI RESERVE | $60.00 |
| | | | OR | SHEA - BLOCK SERIES | $45.00 |
| | | | CA | ETUDE-TEMBLOR/DEER CAMP | $60.00 |
| | | | CA | BELLE GLOS- TAYLOR LANE/CLARK TELEPHONE | $55.00 |
| | | | CA | J VINEYARDS - NICOLE'S VINEYARD | $65.00 |
| | | | CA | MORGAN - SINGLE VINEYARDS- VAR | $55.00 |
| | | | CA | WILLIAMS SELYEM - WESTSIDE | $85.00 |
| | | | CA | ROBERT SINSKEY - SINGLE VINEYARDS | $55.00 |
| ARGYLE SPRITHOUSE PINOT NOIR | $70.00 | $87.00 | | | |
| | | | OR | ARCHERY SUMMIT RED HILLS | $85.00 |
| | | | OR | DOMAINE DROUHIN - LOUISE | $85.00 |
| | | | OR | DOMAINE SERENE - MONOGRAM | $200.00 |
| | | | OR | PONZI - SINGLE VINEYARDS | $100.00 |
| | | | CA | WILLIAMS SELYEM - SINGLE VINEYARDS | $100.00 |

# EXHIBIT D

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
www.debevoise.com

Maura K. Monaghan
Partner
Tel 212 909 7459
Fax 212 521 7759
mkmonaghan@debevoise.com

March 12, 2008

BY FACSIMILE AND EMAIL

Derek J. Meyer, Esq.
McDermott Will & Emery
227 West Monroe Street
Chicago, Illinois 60606-5906

### Paterno Imports Ltd. v. Lion Nathan Enterprises Pty Ltd.
### AAA No. 50 181 T 00043 08

Dear Rick:

You have expressed a concern about the pricing at which Lion Nathan provides Argyle wines to Paterno during the pendency of the above-referenced arbitration. While pursuant to the sole discretion conferred on Lion Nathan under Paragraph 5(B)(1) of the Marketing Agreement, the prices contained in Lion Nathan's February 28, 2008 letter to Mr. Terlato are the prices at which Lion Nathan will supply wine to Paterno from March 1, 2008 forward, Lion Nathan is prepared to offer a concession that should eliminate Paterno's concern.

During the pendency of the arbitration, Lion Nathan will invoice Paterno at the prices set forth in the February 28, 2008 letter, but will allow Paterno to pay at the 2007 prices on its usual terms. If Lion Nathan prevails in the arbitration, Paterno can then have some reasonable period of time (e.g., ten days) to pay the balance representing the difference between the 2008 and 2007 price lists under any invoices rendered from March 1, 2008 forward. From the conclusion of the arbitration forward (if Lion Nathan prevails), Paterno will both be invoiced and expected to pay at the 2008 prices. Of course, if Paterno prevails in the arbitration, it will be no worse off. As always, Paterno enjoys the sole discretion to set its own prices to its customers pursuant to Paragraph 5(B)(3) of the Marketing Agreement.

I trust that this concession answers your concern. Best regards.

Sincerely,

Maura K. Monaghan

New York • Washington, D.C. • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

# EXHIBIT E

**From:** Bill Terlato [bt@twg.com]
**Sent:** Thursday, December 20, 2007 2:06 PM
**To:** Jennifer Thomason
**Subject:** FW: Argyle 2008 Target Case Sales

**From:** Bill Terlato
**Sent:** Thursday, December 20, 2007 2:05 PM
**To:** 'Anthony Roberts - LNWG'
**Cc:** Rollin Soles; IAN MORDEN - LNCORP; Tom Steffanci; David Lane; John Scribner
**Subject:** RE: Argyle 2008 Target Case Sales

Dear Anthony:

Thank you for your letter. We have sent several requests to Rollin over the past few weeks requesting dates when he could participate in the Annual Meeting in Chicago. Last year we were able to accommodate Rollin's request to meet in Oregon, but unfortunately early in 2008 we have a very tight schedule are unable to do that. Given that we have more people on our side participating in the meeting, and all our data and resources are located here, we believe Chicago is the best location to hold these annual meetings.  While we feel it would be more productive to meet in person in Chicago as anticipated, a video-conference is an acceptable alternative if Rollin Soles is not available to meet with us at our office.

Thank you for forwarding the potential availability by item. Obviously, we need to study your proposal in greater detail, but it seems like the winery is proposing rather extraordinary price increases. That is inconsistent with all our previous conversations and communications (in fact last year the winery was adamantly opposed to any price increases). Can you please review the pricing information you sent us for accuracy and confirm the prices that the winery is proposing to sell each item to Paterno.

We look forward to reviewing all of the relevant factors and to agreeing upon a final Target Case Sales number for the upcoming year. While we understand your letter provides us with availability by product, we would like to reiterate that Target Case Sales for purposes of the minimum shipments obligation is a total brand and not an individual item number.  For example, the Target Case Sales figure for 2007 is 30,844, and we are happy to report that we will once again exceed our annual commitment.

In terms of the numbered requests in your letter, we will provide a marketing plan consistent with the format of prior years at our 2008 meeting and, of course, provide you the information specified in our agreement.  However, we disagree with the suggestion that the two contractual provisions you quoted create obligations on Paterno to provide the other information you requested or to take any of the additional undertakings you have requested, which are not contemplated in our agreement.  While we are happy to discuss your preferences with you at our meeting, our agreement is clear on the rights, responsibilities and risks allocated to each party, and Lion Nathan cannot unilaterally impose new obligations for Paterno as set forth in your letter.

In terms of a meeting date, my team and I are available on Tuesday January 15th to meet either in Chicago or by video-conference.  We look forward to the meeting.

Sincerely,

Bill

# EXHIBIT F

| | |
|---|---|
| **From:** | Bill Terlato [bt@twg.com] |
| **Sent:** | Monday, January 07, 2008 3:31 PM |
| **To:** | anthony.roberts@lion-nathan.com.au; rollin@argylewinery.com |
| **Cc:** | John Scribner; Tom Steffanci; David Lane; Jennifer Thomason |
| **Subject:** | Argyle Annual Meeting |

Dear Anthony,

While I have not received a response to my letter of December 20th, this morning Rollin did send some proposed dates for our annual meeting to our Argyle Brand Manager. We can confirm our availability for the morning of January 24th. Unfortunately, Rollin is unable to come to Chicago for the face-to-face meeting which was our preference, so we will agree to the alternative of a videoconference. I understand that Argyle does not have videoconferencing capabilities and have asked that they find a videoconferencing facility near their offices. While videoconferencing is not an ideal substitute for a face-to-face meeting, a teleconference is probably ineffectual for such an important meeting. It should be relatively easy for Rollin to find a videoconferencing facility.

I would like to remind you that in my email of December 20th, I requested that you review and confirm to us the accuracy of the pricing information that appears to have been proposed for 2008 in your letter of December 19th. Given the nearness of the proposed annual meeting date, I ask for your timely response so we can have sufficient time to prepare for the meeting.

Sincerely,
Bill

# EXHIBIT G



## LION NATHAN

Lion Nathan Limited, ABN 34 093 160 448
Level 30, 363 George Street, Sydney NSW 2000, Locked Bag 14, Royal Exchange, Sydney NSW 1225 Australia
Telephone 61 2 9290 6600  Facsimile 61 2 9290 6699  Web Site www.lion-nathan.com.au

17 January 2008

Mr. William Terlato
President and CEO
Terlato Wine Group
Lake Bluff, IL  60044

**VIA E-MAIL**

Dear Bill,

Thank you for your email responding to my letter regarding the 2008 Marketing meeting and for Jennifer Thomason's email confirming that January 24th works at your end for holding the annual marketing meeting.

I must, however, in the spirit of open communication which is necessary to the success of our commercial relationship express my disappointment that the key members of your sales and marketing team, Tom Steffanci, Dave Lane and our brand manager Jennifer Thomason, cannot find time to travel to Oregon for the annual meeting. While it is true that they came out to Oregon for the annual meeting last year, the meeting was much shorter than planned eliminating the opportunity to visit the facility, taste the new wines, or tour the vineyards telling the story of Argyle. The abbreviated nature of the meeting and visit resulted in no discussion of long term strategy or specific actions required to implement that strategy. This was truly a missed opportunity for your people. Unlike our previous experience with Dreyfus Ashby, neither your brand manager nor your top sales and marketing people have visited the winery on a regular basis to become familiar with our wines and the Oregon terroir from which they emerge.

Given Rollin's schedule and your team's inability to schedule a West Coast meeting at any time over the next six weeks it appears that a video or telephone conference will have to do this year. While it may be difficult for your team to find time to travel out to Oregon for the annual meeting this year we believe it is very important to the success of the 2008 marketing effort for Tom, Dave and Jennifer to make time for the trip. By being in Oregon they and Rollin could not only plan at length for 2008, but also discuss the recent vintages, taste through the array of Argyle's splendid wines and visit the wine growing area. A follow up visit by Terlato's top sales managers would benefit any programming decided upon for the 2008/9 period. This would no doubt make a great difference in the ability of your team to understand and successfully promote Argyle's wines in 2008 and beyond.

Given the long term nature of the marketing agreement between our companies, having Tom, Dave and Jennifer make the trip this year with enough time budgeted and spent for a meaningful meeting, as well as having members of your Sales and Marketing team visit on at least a semi-annual basis to taste the wines, is not only a wise investment of your company's time, but is essential to Terlato's ability to adequately represent the Argyle brand.



With regard to the proposed price increases let me provide further explanation. We acknowledge that you were requesting price increases last year which we were uncomfortable agreeing to. The fact that prices have indeed been held back in recent years, the apparently insatiable domestic demand for Oregon wine, in particular pinot noir, increases in pricing of other comparable Oregon brands, the continuing accolades in the wine press for Argyle wines, increased production costs, a need for greater return on investment, as well as the need for us to accumulate capital to sustain and potentially expand our business in Oregon, have caused us to reconsider our decision and to adopt a more realistic and profitable pricing structure. While we realize this may cause upward adjustments in the wholesale and retail price structure for our wines we are confident, given the assurances you have given us that your sales people are the best in the business, that the proposed price increases will not have an adverse impact on total sales. Furthermore, we do not anticipate in the current wine sales climate that you will have difficulty selling through the wines allocated under our Agreement to you in a manner that is reasonably profitable for you as well as for us.

We are pleased that you did not object to the total proposed Target Case Sales number. We provided target case sales numbers on a product by product basis to provide you with a clear understanding of our expectations for sales on a product by product basis. We believe that providing this expectation and reaching agreement on it beforehand is the best way for the parties to work together to achieve the maximum possible Target Case Sales.

As far as the numbered requests are concerned we are puzzled by your reaction. We developed the numbered requests in order to provide a clear framework for the parties to work together to increase sales, which as we all know is the fundamental goal shared by the parties under our marketing agreement. It is also our understanding that the information we have requested is or could be readily available to you. We are prepared to discuss at the annual meeting how best to address any concerns you have to the extent that any of our requests for information are not readily available or which in your view impose unreasonable burdens on your team. Otherwise, we again request that pursuant to your duty to use best efforts to promote, distribute, market and sell Argyle wines that you agree to the numbered requests.

Given the ever increasing popularity of and demand for Oregon wine in the U.S. market we look forward to discussing and implementing a marketing strategy which will be most likely to enable you to achieve the Target Case Sales figures contained in my December letter to you.

Finally, we request that you reconsider your decision not to send Tom, Dave and Jennifer to participate in the annual meeting in Oregon. We feel strongly that their participation in a productive meeting in Oregon this year is critical to the future of the Argyle brand and our successful collaboration in 2008. I look forward to hearing from you.

Sincerely,

Anthony Roberts
General Manager
Lion Nathan Wine Group

# EXHIBIT H

Rollin,

Thank you for your note. I understand you have been out of the office lately, and I have as well. In an effort to continue our dialogue, I want to respond to a few of the topics you addressed and also think it would be helpful for us to speak in the near future.

<u>Pricing Strategy</u>

After receiving confirmation of the extraordinary price increases that Lion Nathan announced prior to the Annual Meeting, our first priority in the conference call was to attempt to understand Argyle's new strategy and what led to the dramatic change in your pricing strategy. From our perspective, as we have repeatedly advised this type of unprecedented price adjustment is very detrimental to the brand's success. Therefore, before revising our marketing plan, we still need to understand your rationale for repositioning the brand. Even after our lengthy conference call in January, we are unclear as to what motivated such a dramatic change in pricing and corresponding brand positioning because you were not able to offer any insight on these issues.

In fact, in your letter, you note that you do not think you are "required to provide justification" to Terlato for your price strategy change. Putting aside the legal issues that might be associated with such a comment and recognizing that the issue of price was already the subject of an arbitration when you sent your recap of our January meeting, I am disappointed to hear that from you. First, I would think that you would want for us to understand the thinking behind your pricing strategy. Last year when we wanted to take a modest increase, you were opposed and I had several calls with you to explain why we felt that that was appropriate for the brand. While there was no requirement to do so, I did that because it was the right thing to do not because of the contents of the contract. It is just good business and basic professional courtesy. Second, the contract requires Lion Nathan to "consult" with Terlato before setting a new price. We believe that determining a price (particularly a price that is so inconsistent with your prior strategy), in the absence of that consultation, violates both the letter and the spirit of the contract. Third, even assuming that the price increase was to occur --a decision which TWI is challenging in the price arbitration noted above--we would nevertheless need to understand the rationale for the price adjustment in order to explain it to our distributors and their customers in the event the price increase is allowed. We even asked you several times during the meeting how you plan to explain the price change to your tasting room visitors and club members and never received an answer. We would once again ask you to provide us information regarding your planned strategy.

It is still very hard for us to believe that you personally agree with and support the price increases that Lion Nathan apparently intends to pursue in the event we do not prevail in the price arbitration. Although you criticize TWI for "not positioning Argyle higher," you were on the exact opposite side of that debate less than 12 months ago. We have had no discussion whatsoever during the past year about any, let alone this dramatic, repositioning of the brand and your criticisms of us this year are at odds with your views last year. You acknowledged during our meeting that last year you were adamantly

opposed to even the modest price increases that we had proposed. In the end, we agreed to move forward with those price adjustments and, as you acknowledged, our judgment proved to be right last year. What has changed that warrants dramatic price increases this year?

We are concerned about the effect that these extraordinary increases will have on the brand and we ask once again that you reconsider. In fact, while you are quick to tout Argyle's Wine Spectator reviews, you are taking a risk relative to future reviews if the proposed price increases become a reality, as price is one of the factors considered by the Wine Spectator in determining their ratings. Given our experience in the business and the success we have achieved with Argyle, we hope that you recognize that our judgment may again be right.

Although we would support a well thought out and long-term strategy to raise prices gradually over time, we think a sudden increase of this magnitude will be perceived in the market as unreasonable. Many great brands have taken steady price increases over the years but few, if any, US brands of Argyle's scale have increased prices on its entire range of items from 22-97% in one year. We agree that the quality of your wines is excellent, but that has been true for many years. Argyle's reputation will undoubtedly support a gradual move to a higher price point. However, our experience and understanding of the market make it clear that the dramatic price increase Lion Nathan is demanding will significantly damage the brand. If you are aware of any brands with Argyle's scale that have effected such dramatic price increases in the midst of the economic conditions currently in effect in the United States, we invite you to identify such brands for us. We are not aware of any such instances.

It is also important to consider that Argyle has been unable to provide TWI with ample supply and as such the market was often out of stock and as a result distribution points were lost. When Argyle wines were re-released the distribution was rebuilt by TWI and its distributors and we are very proud of the job that our team has done building and rebuilding Argyle distribution each year. If the pricing strategy was not changing so dramatically, we would agree with you that your increase in availability would create an opportunity for distribution growth. The price increase, however, will undermine this opportunity.

Your Requests for Information

In your recap, you asked us to provide market price survey information, information relating to the pinot noir market, a report on the impact that the slowing economy has on fine wine consumption, and information regarding other producers' Oregon Pinot Noir supply.

As promised, you will receive our competitive set survey on March 15, 2008.

The general demand for pinot noir remains strong, although the increases we had been seeing in demand for the varietal has slowed as the market for the varietal matures.

Under these circumstances and other market conditions, we do believe there is room for a modest price increase relative your pinot noir wines as opposed to the larger increase you are pushing.

On the question of the relationship between the economy and fine wine consumption, we each must recognize that it is difficult to precisely isolate variables and pinpoint the economy's impact on consumption for particular brands and varietals. We are also confused by your request for reports indicating "historically sharp drops in consumption of high quality, Argyle-like wines as a result of economic factors." As noted below, Bill provided a proposed Target Case Sales figure earlier this month using 2007 prices of 41,600 cases, which is a 20% increase over 2007 depletions. We are not, as your request suggests, proposing a decrease in the TCS figure if 2007 pricing remains constant, nor would we be opposed to more modest prices increases provided that such price increases were factored into a revised TCS proposal. Our concerns relate more to the large price increases Argyle desires, which even if the economy were strong would be without precedent.

With respect to the final request, we do not have a data source to access the availability of other producers' Oregon Pinot Noir supply. Given your relationships with your neighbors, I would think that you would be able glean some information regarding their supply and, if so, would ask you to share that with us.

We will provide monthly reporting as provided for in our agreement. Live commentary can be provided live, as well, if you are available for monthly calls.

Other Issues

There are several other points that you raised in your letter, which I would like to address and/or correct:

- Contrary to your statement, distributor inventories on Argyle are currently very healthy and we are not in an over-stock situation.

- Bill has already sent you our proposed Total Case Sales figure for 2008. he sent that information on February 8, 2008. You have not responded, and he sent you a note again yesterday requesting a response. As he indicated in his note, this year's process is a little unusual because pricing is the subject of an arbitration and we remain hopeful that we can agree on how to proceed pending a resolution of that arbitration to protect the brand. We also remain willing to discuss this if it will help achieve a resolution.

- Your increase in available cases combined with an average 43% price increase is absolutely not moderate (as you assert) and, as noted above, we believe it is unprecedented among similar sized US brands.

- Your claim regarding travel is simply inaccurate. As you are well aware, we requested on many occasions via email and phone calls to get available dates from you. In each case, you either failed to reply or stated that you were not available. During the New York Wine Experience Bill Terlato, David Lane and Pete Danko addressed the issue with you in person and you stated that you did not intend to schedule market visits with TWI. Traveling on behalf of the brand, visiting our distributors and seeing key customers with the TWI team and the distributor is important. I do not understand how organizing a Bollinger visit to Argyle is relevant. You are giving us very narrow windows to organize travel for 2008 but we will attempt to set up some market visits.

- We will manage the all future allocations and related decisions. Please do not impede or amend orders that you receive from us. Our orders will serve as your confirmation of which markets received the goods.

On your end, we would ask that you plan to present at our National Sales meeting on April 16th in the morning in Santa Barbara California.

I am also a bit perplexed that you opened your letter with comments on the agendas we exchanged prior to our meeting and accusations that we did not address the topics on your agenda. As you know, you did not even forward your proposed agenda until 7:30 p.m. the night before our meeting. In addition, you did not complain about this topic in our call and, in fact, were provided the opportunity to raise any issues you wanted to raise during our meeting, regardless of whether the issue was on one, both or neither of our agendas. In any event, we are more than happy to schedule another session to cover any topics you wish to discuss. Let us know if there are dates and times when you are available and send us a proposed agenda.

Finally, your recap made a vague reference to cataloguing our supposed "pre-conceptions" regarding the Argyle brand. There is no ambiguity in our mind. Argyle is a fantastic brand and we are very enthusiastic about the brand. We also believe that there is room for price increases. We disagree, however, with your apparent pricing strategy as noted above. As Bill mentioned in his last note, we are happy to discuss these issues with you.

As always, we look forward to continuing our work together..

Thank you,

Tom Steffanci